## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MIMEDX GROUP, INC.
1775 West Oak Commons Ct. NE
Marietta, GA 30062,

        Plaintiff,

   v.

DBW PARTNERS LLC D/B/A THE
CAPITOL FORUM
1233 20th Street NW, Suite 301
Washington, DC 20036,

TREVOR BAINE
1233 20th Street NW, Suite 301
Washington, DC 20036,

TEDDY DOWNEY
1233 20th Street NW, Suite 301
Washington, DC 20036,

JAKE WILLIAMS
1233 20th Street NW, Suite 301
Washington, DC 20036,

MILES PULSFORD
1233 20th Street NW, Suite 301
Washington, DC 20036,

MATT TREACY
1233 20th Street NW, Suite 301
Washington, DC 20036,

and

DOES 1-100, inclusive,

        Defendants.

**Case No.**

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff MiMedx Group, Inc. ("Plaintiff or "MiMedx") hereby complains and alleges

against Defendants DBW Partners LLC d/b/a The Capitol Forum ("The Capitol Forum"); Trevor

Baine; Teddy Downey, Jake Williams, Miles Pulsford, Matt Treacy, and Does 1-100, inclusive (collectively "Defendants") as follows:

## NATURE OF THE CASE

1.      MiMedx is a global processor, marketer, and distributor of medical products. MiMedx began trading publicly in 2008 and was listed on the NASDAQ exchange in 2013.  As its business has flourished over the past several years, its stock price has steadily risen from approximately $3/share to a high of approximately $17.50/share—an increase of over 500%.  In 2017, MiMedx was ranked #5 on Fortune Magazine's 2017 "Fastest Growing Companies" list. MiMedx has also been consistently recognized by Georgia Trend Magazine as one of "Georgia's Top 100 Public Companies" and was honored by the Association for Corporate Growth as one of its "Georgia Fast 40" companies, recognizing the top 40 fastest-growing middle-market companies in the state.  Indeed, MiMedx has experienced a five-year revenue compound annual growth rate ("CAGR") in excess of 90%.

2.      During its rapid growth and success, MiMedx eventually began to notice an extraordinarily large number of "bearish" trades in its stock (*i.e.*, bets that the stock price will decrease; usually in the form of a "short sale" of stock, the purchase of a "put" option, or the sale of a "call" option).  Despite those bearish trades, however, MiMedx's stock price continued to increase through mid-August 2017.

3.      Beginning in mid-August 2017, The Capitol Forum, a supposed subscription-based media outlet, published a series of articles concerning allegations of unfair business practices by MiMedx and purported investigations by the federal Department of Veterans' Affairs Office of the Inspector General ("OIG").  The Capitol Forum and its co-defendants specifically targeted these articles toward MiMedx's shareholders, sending e-mails to those

shareholders bearing excerpts from the articles and asking to set up telephone consultations for further discussion and solicitation.

4.      In those e-mails, Defendants advised MiMedx's shareholders that their article(s), accessible only via subscription, detailed how MiMedx had been accused of illegal conduct by customers and explained the "potential legal risk[s]" and "regulatory risk[s] for MiMedx" stemming therefrom.  This statement was false.  Defendants' e-mails also falsely implied that the OIG was actively investigating allegations of wrongful conduct against MiMedx.

5.      Following these e-mails to MiMedx's shareholders, MiMedx's stock price experienced a significant decline of over 20%.  Upon information and belief, Defendants' statements to MiMedx's shareholders were a cause, if not the primary cause, of this stock price depreciation.  Furthermore, also upon information and belief, the stock price depreciation was a fully intended result of Defendants' conduct, and Defendants' principals and/or affiliated persons stood to benefit from such manipulation of the market for MiMedx's stock because they have made bearish trades in the same.  MiMedx seeks damages for Defendants' wrongful conduct, as well as injunctive relief to prevent Defendants from further disseminating false and misleading statements about the company.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff MiMedx Group, Inc. is a corporation organized under the laws of the State of Florida, having its principal place of business at 1775 West Oak Commons Ct. NE, Marietta, GA 30062.  MiMedx is publicly-traded on the NASDAQ exchange under the ticker symbol MDXG.

7.      Upon information and belief, Defendant DBW Partners LLC d/b/a The Capitol Forum is a limited liability company organized under the laws of the District of Columbia,

having its principal place of business at 1233 20th Street NW, Suite 301, Washington, DC 20036.  The Capitol Forum purports to be a subscription-based media outlet, and engages in direct e-mail and other forms of marketing to sell subscriptions.

8.     Upon information and belief, Defendant Trevor Baine is an individual domiciled within the District of Columbia.  Baine is the Chief Financial Officer and a Senior Editor of The Capitol Forum.  Baine is also a principal at The Capitol Forum.

9.     Upon information and belief, Defendant Teddy Downey is an individual domiciled within the District of Columbia.  Downey is the Chief Executive Officer and Executive Editor of The Capitol Forum.  Downey is also a principal at The Capitol Forum.

10.     Upon information and belief, Defendant Jake Williams is an individual domiciled within the District of Columbia.  Williams is the Chief Operating Officer and a Senior Editor of The Capitol Forum.  Baine is also a principal at The Capitol Forum.

11.     Upon information and belief, Defendant Miles Pulsford is an individual domiciled either within the District of Columbia or the State of New York.  Pulsford is a Correspondent at The Capitol Forum.

12.     Upon information and belief, Defendant Matt Treacy is an individual domiciled within the State of New York.  Treacy is the Managing Director of Sales at The Capitol Forum.

13.     MiMedx is ignorant of the true names and capacities of the defendants named herein as Does 1 through 100, inclusive, and therefore names said defendants by such fictitious names.  MiMedx will seek leave to amend this complaint when the true names and capacities of said defendants have been discovered.  MiMedx is informed and believes, and thereon alleges, that each of said fictitiously named defendants is in some way responsible for the acts which resulted in the harm to MiMedx alleged herein.

14.     Upon information and belief, each of the Defendants herein was the agent of each of the remaining Defendants, and in doing the things alleged herein, was acting within the course and scope of that agency and/or employment.  Also upon information and belief, all activities of the Capitol Forum were undertaken with the full knowledge and endorsement of its principals.

15.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1332 and 1367, as this action includes claims for relief arising under the United States Trademark Act of July 5, 1946, as amended, 15 U.S.C. § 1051 *et seq.* (the "Lanham Act").

16.     This Court also has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332, as the parties are wholly diverse and the amount in controversy exceeds $75,000.00, exclusive of interest, fees and costs.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because The Capitol Forum is organized under the laws of the District of Columbia, has its principal place of business within this district, and does a substantial portion of its business within this district. Upon information and belief, the remaining Defendants are also domiciled within this district.

## GENERAL ALLEGATIONS

18.     In 2016, MiMedx became aware that certain of its former employees had been selling competing products while working for MiMedx, in violation of their non-compete and other restrictive covenants (which continued in effect even after those employees left the company).  MiMedx began filing lawsuits on this and other grounds against those former employees on December 13, 2016, and was immediately successful in obtaining court orders enforcing the non-compete covenants against at least two of the former employees.

19.     In response, these former employees counter-sued MiMedx, claiming among other things that the company terminated their employment in retaliation for their complaints

about the company's purported business practices, including alleged "channel-stuffing" (a practice of inflating sales and revenue figures by distributing to retailers more products than a company is able to sell to the public).

20.     It appeared to MiMedx that the former employees' allegations were designed to intimidate the Company into eliminating their non-compete agreements and paying a large settlement.  Nevertheless, all of their allegations were fully investigated over a three-month period by the Board of Directors, outside counsel, and external auditors—even including an expert on revenue recognition—and no credible evidence of incorrect processes, procedures or wrongdoing by the company or management was found.  Also, there was no credible evidence to indicate that any changes to the company's previously issued financial statements were necessary in light of the former employees' allegations.  In fact, through the discovery process in those lawsuits, MiMedx has obtained admissions from some of the litigants indicating that they did not have evidence to support their claims, and one litigant even withdrew claims.

21.     During approximately the same time frame as the events outlined above, and continuing through the present, MiMedx has been aware of abnormal activity in the market for its publicly-traded stock.  As indicated above, it appeared to MiMedx that an extraordinarily large number of bets were being made that MiMedx stock would plummet in price.  In addition to more complex options, these bets included "short sales," where traders borrowed stock in order to sell it, expecting that the price would fall and they would be able to repurchase the stock for a lower price in the future, pocketing the difference.

22.     Nevertheless, MiMedx's stock price continued to increase through mid-August 2017.  When the price of a stock rises in the face of a trader's short position, a phenomenon called a "margin call" can occur.  A margin call is when the entity who has lent stock to the

trader—typically a broker—requires the trader to put up additional money as collateral to cover his or her potential losses from the rising stock price.  In some cases, rather than doing so, many traders will exit their short position by repurchasing the stock, thereby causing the price to go even higher.  This can trigger a second, related phenomenon called a "short squeeze," which takes place when a large number of short sellers are forced to cover their positions in a small period of time, sending the stock price soaring.  The continually rising price of MiMedx stock therefore posed a significant threat to the trading positions of its short-sellers.

23.     On August 21, 2017, Defendants published an article entitled "MiMedx: Channel Stuffing Accusations Resurface in Recent Counterclaim; Former Employees Corroborate Allegations; A Close Look at Potential Risk."  A copy is attached hereto as Exhibit "A."

24.     In the August 21, 2017 article, Defendants purported to summarize the "channel-stuffing" allegations made against MiMedx by its former employees, including Defendants' own interviews with anonymous former employees in which those anonymous former employees allegedly "corroborated" the allegations.  On the same date, Treacy, The Capitol Forum's Managing Director of Sales, sent an e-mail to several shareholders of MiMedx.  Upon information and belief, Treacy sent the same e-mail to numerous other, if not all, shareholders of MiMedx.  A copy is attached hereto as Exhibit "B."

25.     In his e-mail, Treacy advised MiMedx's shareholders that "[w]e published an update to our coverage of MiMedex [sic] earlier today.  In the article, we detail channel stuffing allegations and recent counterclaims which may pose as a regulatory risk for the company.  The article examines the allegations made by customers & former employees, the company's response to these claims, and the potential legal risks for MiMedx."  He then asked "to schedule a call to discuss [Defendants'] view on MiMedx."

26.     Of course, Treacy's statement concerning allegations made by "customers"—as opposed to "former employees"—was categorically false.

27.     On September 7, 2017, The Capitol Forum published another article regarding MiMedx entitled "VA Office of Inspector General Confirms Investigation Involving MiMedx Documents," and Treacy sent another e-mail to several shareholders of MiMedx containing an excerpt of the article.  Copies of the article and e-mail are attached hereto as Exhibits "C" and "D," respectively.  Upon information and belief, Treacy sent the same e-mail to numerous other, if not all, shareholders of MiMedx.

28.     Treacy's e-mail stated, *inter alia*, that "[t]he VA Office of Inspector General (OIG) is conducting an investigation that involves documents related to MiMedx, according to an OIG response to a Capitol Forum FOIA request.  The OIG disclosed the investigation in a denial of a FOIA request [The Capitol Forum] submitted as part of our ongoing examination of allegations of channel stuffing made by former MiMedx employees."  As before, Treacy then asked "to schedule a call to discuss [The Capitol Forum's] view on MiMedx."

29.     Defendants' September 7, 2017 article and e-mail were misleading for multiple reasons.  First, Defendants blatantly omitted positive information for MiMedx, including statements obtained by Defendants during on-the-record interviews with current MiMedx employees, in which those employees vehemently and truthfully denied the "channel-stuffing" allegations as false.  Defendants also omitted positive information—which they had in fact discovered or, at minimum, would have discovered had they conducted any sort of a reasonable journalistic investigation—that several of the former employees involved in litigation with MiMedx either admitted they have no evidence to support their "channel stuffing" allegations or entirely withdrew their claims.

30.     Second, MiMedx had informed Defendants off-the-record that MiMedx had initiated contact with the OIG, that MiMedx was voluntarily working with the OIG, and that MiMedx was specifically not a target of the investigation.  While Defendants could not have included MiMedx's off-the-record statements in their article or e-mail, Defendants clearly had enough background information that they should have been dissuaded from publishing an article and sending an e-mail blast to shareholders that implied the opposite of what their research had shown to be true.  For example, by stating that the OIG's inquiry involved "documents related to MiMedx," Defendants falsely suggested that the OIG was actively investigating MiMedx even though MiMedx had advised that this was not the case.  Indeed, an investigation of "documents related to MiMedx," as deceptively phrased by Defendants, is far from an investigation into the company itself.  Defendants' suggestions were highly misleading to a reasonable person and placed MiMedx in a false light in the public eye.  Further, upon information and belief, Defendants acted purposely, to manipulate the market for MiMedx's stock.

31.     Also on September 7, 2017, Bloomberg News published an article entitled "MiMedx Down; Capitol Forum Says Virginia OIG Conducting Probe."  The Bloomberg article, as noted in its title, was based solely on The Capitol Forum's article published that same day and serves as an example of the way that Defendants' misleading statements propagated throughout the press, further damaging MiMedx.  A copy of the September 7, 2017, Bloomberg News article is attached hereto as "Exhibit E."

32.     On September 7, 2017, MiMedx's stock price dropped 5.6% on volume of 3,741,800 (almost three times its average daily volume in 2017), and on September 8, 2017, MiMedx's stock price dropped an additional 13.85% on volume of 4,697,000 (almost four times its average daily volume in 2017).  In fact, since Defendants' August 21, 2017 article and e-

mail(s) of the same day, MiMedx's stock price dropped **over 20%** in total, or in terms of total stock market capitalization, over **$300 million**.

33.     Upon information and belief, each of the Defendants conspired to adversely manipulate the stock price of MiMedx via false and/or misleading statements to MiMedx's shareholders, which were intended to cause those shareholders to sell their stock and thereby rescue MiMedx's short sellers from the financial catastrophe that could have resulted if MiMedx's stock price continued to rise.  Publishing an "article" and then having professional sales people reach out directly to shareholders, encouraging them to call them back to "learn more," is not a typical practice of a media outlet.  Rather, Defendants' role was to act as a "shill" for bearish traders in MiMedx stock by publishing false and/or misleading information—while omitting true and positive information—in an attempt to manipulate and drive the stock price down even in the face of positive performance by the company.

34.     Also upon information and belief, Defendants had a nefarious motive to benefit the interests of bearish traders in MiMedx stock at the expense of the company, because those bearish traders included Defendants' friends, family, affiliates, and/or even Defendants themselves.  Indeed, Defendants have strong ties to Wall Street and the financial industry, including but not limited to Baine's former employment at investment firms Strategic Investment Group, Wedge Capital Management, and O'Shaugnessey Asset Management; Downey's former employment at brokerage firms Concept Capital and MF Global; and Williams' former employment at market research firm Insight Research Group.

## APPLICABLE LAW

35.     For claims brought pursuant to federal statute, this Court applies the law as stated by the U.S. Supreme Court and United States Court of Appeals for the D.C. Circuit, as

applicable.   For common-law defamation and other claims, this Court applies the law of the

jurisdiction "where the plaintiff suffered injury by reason of his loss of reputation."   *Weyrich v.*

*New Republic, Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001); *Erie R. Co. v. Tompkins*, 304 U.S. 64,

78 (1938).   Because MiMedx is headquartered in Georgia and stands to suffer injury there, the

Court must apply Georgia law to the common-law claims asserted herein.

## FIRST CLAIM FOR RELIEF

### LIBEL

### (Against All Defendants and Doe Defendants)

36.     MiMedx realleges and incorporates herein, by this reference, all of its foregoing

allegations.

37.     Defendants' conduct herein, and specifically, the false and malicious statement in

the August 21, 2017 e-mail concerning Defendants' article of the same day and allegations of

wrongful conduct against MiMedx by "customers," constituted actionable libel.

38.     Defendants' statement was defamatory of MiMedx, published in writing in an e-

mail sent to MiMedx's shareholders, injured MiMedx's reputation and tended to expose MiMedx

to negative views by those shareholders.

39.     In fact, following Defendants' August 21, 2017 e-mail, and extending through the

date of filing of this Complaint, MiMedx's stock price dropped by over 20%.   The value of the

company has therefore diminished in the eyes of the trading public by over $300 million.

40.     Defendants' wrongful statements are commercial speech that does not enjoy First

Amendment protection from the claims asserted herein.

41.     For this alleged conduct, MiMedx seeks preliminary and permanent injunctive

relief against Defendants and damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### SLANDER

### (Against All Defendants and Doe Defendants)

42.     MiMedx realleges and incorporates herein, by this reference, all of its foregoing allegations.

43.     Defendants' conduct herein also constituted actionable slander.  Specifically, upon information and belief, in addition to publishing the libelous August 21, 2017 e-mail, Defendants repeated the false and malicious statement(s) therein to MiMedx's investors and/or others by telephone or in-person.

44.     Upon information and belief, Defendants' statements were defamatory of MiMedx and constitute actionable slander.

45.     Defendants' wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

46.     For this conduct, MiMedx seeks preliminary and permanent injunctive relief against Defendants and damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### DEFAMATION

### (Against All Defendants and Doe Defendants)

47.     MiMedx realleges and incorporates herein, by this reference, all of its foregoing allegations.

48.     Defendants' conduct herein, and specifically, the false and malicious statement in the August 21, 2017 e-mail concerning Defendants' article of the same day and allegations of wrongful conduct against MiMedx by "customers," constituted actionable defamation.

49.     Upon information and belief, Defendants' statement was unprivileged and defamatory of MiMedx, transmitted to MiMedx's shareholders with fault amounting to at least negligence, and caused harm to MiMedx.

50.     Defendants' wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

51.     For this conduct, MiMedx seeks preliminary and permanent injunctive relief against Defendants and damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF

### FALSE LIGHT

### (Against All Defendants and Doe Defendants)

52.     MiMedx realleges and incorporates herein, by this reference, all of its foregoing allegations.

53.     Defendants' conduct herein wrongfully placed MiMedx in a false light in the public eye.  Defendants made literally false statements as well as misleading statements (*e.g.*, those which purposely omitted facts or context tending to be favorable to MiMedx, or made suggestions concerning MiMedx that ran counter to the actual facts known by Defendants) in their articles, e-mails, and other discussions with shareholders.  Upon information and belief, Defendants did so purposely, in order to further diminish MiMedx's standing with the public and manipulate the market for MiMedx's stock.  The false publicity created by Defendants' wrongful conduct is highly offensive to a reasonable person.

54.     Furthermore, there was absolutely nothing "newsworthy" about the allegations and innuendo contained in Defendants' articles and e-mails.  In fact, upon information and belief, the reason that Defendants made such false and misleading allegations was simply to

adversely manipulate MiMedx's stock price, rather than provide any sort of journalistic service to the public at large. As a result, this case does not implicate "the right of the public to know."

55.     Defendants' wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

56.     For this conduct, MiMedx seeks preliminary and permanent injunctive relief against Defendants and damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

#### (Against All Defendants and Doe Defendants)

57.     MiMedx realleges and incorporates herein, by this reference, all of its foregoing allegations.

58.     Defendants' conduct herein was tortious, malicious, and independently wrongful for the reasons described above.

59.     Upon information and belief, Defendants' publications caused third parties, including customers, investors, and creditors, to fail to enter into anticipated business relationships with MiMedx, which proximately damaged MiMedx.

60.     Defendants' wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

61.     For this conduct, MiMedx seeks preliminary and permanent injunctive relief against Defendants and damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

## VIOLATION OF § 43(a) OF THE LANHAM ACT

### (Against All Defendants and Doe Defendants)

62.     MiMedx realleges and incorporates herein, by this reference, all of its foregoing allegations.

63.     Defendants' conduct herein constituted a violation of the federal Lanham Act by virtue of the false and misleading statements made to MiMedx's shareholders.

64.     Defendants used these false and misleading statements in commercial advertisements or promotions by including them in solicitations to purchase subscriptions. *See, e.g.*, Exhibits B & D.

65.     Defendants' false and misleading statements deceived, or were likely to deceive, a reasonable consumer because there was no way to discern that the statements were false or misleading on their face, and Defendants represented that their statements were the result of independent research and/or investigation that a reasonable consumer would not replicate prior to relying on the statements themselves.

66.     Upon information and belief, Defendants' false and misleading statements traveled in interstate commerce because they originated in the State of New York and/or the District of Columbia and were transmitted to recipients across the country.  As explained above, the statements caused significant competitive or commercial injury to MiMedx because they resulted in a significant diminution in reputation and value for the company.

67.     Defendants' wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

68.    For this conduct, MiMedx seeks preliminary and permanent injunctive relief against Defendants and damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, MiMedx respectfully requests the following relief:

A.    That Defendants, and all of their respective officers, agents, servants, representatives, employees, attorneys, parent and subsidiary corporations, assigns and successors in interest, and all other persons acting in concert with Defendants, be preliminarily and permanently enjoined from publishing any further articles concerning MiMedx, or sending any further communications to MiMedx shareholders or to the public at large, containing false or misleading statements or statements tending to place MiMedx in a false light;

B.    That Defendants, and all of their respective officers, agents, servants, representatives, employees, attorneys, parent and subsidiary corporations, assigns and successors in interest, and all other persons acting in concert with Defendants, be preliminarily and permanently enjoined from any other wrongful or misleading conduct discovered during the course of this action;

C.    That MiMedx be awarded compensatory and punitive damages in an amount according to proof at trial;

D.    That MiMedx be awarded its reasonable attorneys' fees and costs for prosecuting this action; and

E.    That MiMedx be granted such further relief as the Court may deem just and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, MiMedx hereby respectfully demands a trial by jury of all issues triable of right by a jury.


Dated:  <u>September 21, 2017</u>                Respectfully submitted,

Marlon Quintanilla Paz (Bar No. 1001174)
paz@sewkis.com
SEWARD & KISSEL, LLP
901 K Street, NW, Suite 800
Washington, DC 20001
Tel: 202-661-7178

Joseph D. Wargo (GA No. 738764)
*(pending admission Pro Hac Vice)*
jwargo@wargofrench.com
WARGO & FRENCH LLP
999 Peachtree St. NE, Floor 26
Atlanta, GA 30309
Tel: 404-853-1500
Fax: 404-853-1501

Jeffrey N. Williams (CA No. 274008)
*(pending admission Pro Hac Vice)*
jwilliams@wargofrench.com
WARGO & FRENCH LLP
601 S Figueroa Street, Suite 4625
Los Angeles, CA 90017
Tel: 310-853-6300
Fax: 310-853-6333

SK 29482 0001 7659518