# EXHIBIT A

THE CAPITOL FORUM        Vol. 5 No. 283   August 21, 2017

# MiMedx: Channel Stuffing Accusations Resurface in Recent Counterclaim; Former Employees Corroborate Allegations; A Close Look at Potential Risk

## Company Update

Claims that MiMedx engaged in an illegal channel stuffing scheme from 2014 to June 2016 recently resurfaced in a counterclaim filed on July 31, 2017 by defendant and former MiMedx employee Jess Kruchoski. The counterclaim provides additional detail regarding channel stuffing allegations that were first made public in a December 2016 lawsuit against MiMedx filed by Kruchoski and another former MiMedx employee named Luke Tornquist.

Two days before the December 2016 suit was filed in Minnesota District Court, MiMedx filed separate suits against Kruchoski and Tornquist in Florida and Georgia, respectively, alleging that the former employees violated the terms of their noncompete agreements and other restrictive covenants. The Minnesota case was voluntarily dismissed for lack of jurisdiction; Kruchoski and Tornquist now separately maintain the channel stuffing allegations in the noncompete lawsuits.

For this article, we reviewed the pleadings filed by and against MiMedx, and interviewed three former MiMedx employees who corroborated the channel stuffing allegations. We also spoke with MiMedx CEO Parker "Pete" Petit. Finally, we talked to Michael Keats at Stroock about potential penalties a company could face if the SEC were to investigate and determine that the company engaged in channel stuffing to inflate revenue figures.

## A Closer Look at Channel Stuffing Allegations

According to Kruchoski's counterclaim, MiMedx used a distribution agreement with a supply contractor called AvKARE to facilitate and conceal the channel stuffing scheme. MiMedx partnered with AvKARE in 2012, signing a distribution agreement that allowed MiMedx to sell products to government accounts, including VA hospitals, through AvKARE using the distributor's Federal Supply Schedule (FSS) contract. According to MiMedx CEO Pete Petit, MiMedx eventually obtained its own FSS contract and began selling to federal facilities directly in 2015, but continued to partner with AvKARE until June 30, 2017.

When asked why MiMedx continued to partner with AvKARE after receiving its own FSS contract, Petit stated "When we received our own FSS contract in 2015, we began to transition all of our activities towards our own contract, but such a transition for 160 plus hospitals took time. Also, there are certain VA purchasing agents who are prone to purchase through a SDVOSB [Service Disabled Veteran Owned Small Business] so we left AvKare's contract in place with certain modifications."

According to the terms of the distribution agreement, AvKARE was authorized to sell MiMedx's EpiFix product on the FSS to the U.S. government "and all agencies and subdivisions thereof." MiMedx sold its products to AvKARE, and AvKARE in turn sold the products to VA hospitals and other government facilities. To buy products from MiMedx, AvKARE submitted purchase orders noting the product, quantities, and other relevant order details. Upon invoicing or receiving the product (whichever was later), AvKARE had 45 days to make payment to MiMedx.

SEC correspondence also references "consignment agreements" in which products were shipped out but title to the inventory remained with MiMedx until the products were withdrawn and purchased by the consignee. Under consignment arrangements, MiMedx has stated that "the Company recognizes revenue when we are notified that product has been used or implanted."

1

© 2017 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.

But according to the counterclaim, the relationship between AvKARE and MiMedx allowed MiMedx to book revenue for the consignment inventory when it was shipped. The counterclaim alleges that "MiMedx sales representatives would [submit] bogus orders to MiMedx for 'consignment' product to be delivered to VA facilities." MiMedx would then ship the product directly to the VA, where it would be left unnoticed on hospital shelves. Finally, "MiMedx would then report these shipments as sales to AvKARE even [though] AvKARE had not requested . . . or initiated the order, and had not paid for the product."

**AvKARE's role.** To enable and cover up the channel stuffing, Kruchoski alleges in the counterclaim that MiMedx and AvKARE had an arrangement in which AvKARE produced sales documentation for the "consignment" order. "MiMedx would send an invoice to AvKARE, and AvKARE would in turn cut a dummy purchase order to MiMedx for the bogus sale to the VA."

According to the counterclaim, "Notwithstanding the fact that MiMedx did not meet the requirements for revenue recognition in connection with the product placed at VA hospitals . . . MiMedx publicly recognizes the shipment of this inventory as revenue in its filings with the Securities and Exchange Commission and to investors in MiMedx stock." When asked whether MiMedx plans to make any changes to its revenue recognition policies, CEO Pete Petit responded simply: "No."

Kruchoski's counterclaim also states that despite "the alleged sale of the product to AvKARE, the MiMedx sales representatives were responsible for later procuring actual sales of the product to the VA." When the VA ultimately used and implanted the product, the MiMedx representatives allegedly submitted the purchase order directly to MiMedx, entirely bypassing AvKARE despite the contractual arrangement that AvKARE was supposed to function as the distributor for VA sales, and the fact that—because of the dummy purchase order—AvKARE ostensibly already owned the product in question. At some later date, according to the allegations in the counterclaim, MiMedx and AvKARE would reconcile their accounts.

**Concealing inventory from the VA.** According to the counterclaim, the VA facilities were generally unaware of the fraudulent orders, and oblivious to the quantity of MiMedx products stored on their shelves. Kruchoski states in the counterclaim that in order to conceal "consignment" inventory, "the sales representatives were also tasked with managing the MiMedx 'consignment' product on the VA shelves, on some occasions having to conceal or obscure the fact that the product was being stored at the VA facility at all, and [on] other occasions having to store the product in their home or car to avoid detection of the excess product."

**The counterclaim also details the systematic and top-down nature of the alleged scheme.** In the filing, Kruchoski recounts conversations with MiMedx's Government Market Development Manager Matt Bloemer; Senior Director of Operations Lou Roselli, Area Vice President Steve Blocker, President and COO William Taylor, and others in which the channel stuffing plan was directly acknowledged. In the case of Lou Roselli, Kruchoski provides a detailed transcript of a phone call in which Roselli admitted pushing sales reps to carry out the scheme. A representative paragraph is included below:

© 2017 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.

> Mr. Roselli: No, I—look, I get it. I—I've sat on the other side of the table and I've been asked to do it, you know. And now I'm on the other side asking everybody to do it too, you know. What I'll tell you is that—I mean, if you can do it you know, and just don't want to do it, and orders come through—this is—this is right out of Pete's mouth. So this is the— Pete says—I [unintelligible]—I fully understand the risk that we're taking. We share the same risk with him. And he said: But this is a company directive. So if they can help, they need to help. And if they don't and orders come through between now and [team meeting]—this is the only time I've ever heard him cuss. He said: Their ass is grass. So, I'm just—I'm just putting it out there. I don't want to see anybody in trouble became an order came in in January that he didn't want to come in, you know.

When asked about the excerpts from this conversation, CEO Pete Petit said that "There is more to that conversation than was recorded, and that will come out in the litigation."

### Former MiMedx Employees Substantiate Allegations

*The Capitol Forum* spoke to three former MiMedx employees who seemingly corroborated the channel stuffing allegations. On condition of anonymity, and expressing a fear of retribution from MiMedx if their identities were revealed, the former employees described a culture of dishonesty and no-holds-barred rulebreaking among the company's senior officers. "Let's just say compliance isn't their focus—it's the bottom dollar" stated one former account executive.

The same individual recounted being asked to engage in channel stuffing by their direct manager: "Just send the products and find the sales later." They also stated their belief that the directive came from a "trickle-down effect" from upper management, and that the practice went "all the way to the top." Another former employee described hearing MiMedx employees discuss a scheme in which MiMedx products would be loaded onto a truck and "driven around the corner like it was going to a wholesaler," but never actually delivered.

The former employees reported that workers who raised concerns with unethical or illegal practices faced retribution. One former stated that "Trying to protect the company and do the right thing is not prized—I've seen people punished for doing that. When they noticed that something was inappropriate, if they said something like 'I'm not sure this is legal,' then they were seen as obstructionist. People would be critical of them and their work, and it wouldn't take long for them to get fired." Another former agreed: "If you spoke out against [channel stuffing], you were basically pushed out."

**Some senior sales staff came from a company with a history of fraud accusations.** On January 11, 2017, the Department of Justice announced that Shire, along with a company Shire acquired in 2011 called Advanced

3

© 2017 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.

BioHealing (ABH), would pay $350 million to settle federal and state False Claims Act allegations that the companies gave kickbacks and other illegal rewards to clinics and physicians for using their Dermagraft product. The Dermagraft product is similar to the EpiFix product alleged to be at the heart of MiMedx's channel stuffing scheme, and in the years leading up to the DOJ settlement MiMedx hired numerous sales reps and other staff from Shire and ABH.

A LinkedIn search suggests that at least 57 current MiMedx employees used to work for Shire or ABH, including the company's current Vice President of Sales and a number of senior sales staff. One former MiMedx employee described the former ABH sales reps as "kind of a rowdier crowd" and expressed concern about their sales methods. "I was kind of scared to do anything inappropriate because of that crowd and the stories of what they had done at ABH."

When asked how many current MiMedx employees used to work at Shire or ABH, CEO Pete Petit stated "We have approximately 350 sales employees at this point. A very small percentage of those are former Shire/Advanced Bio Healing sales persons."

**Message boards.** The online forum cafepharma contains several threads in which anonymous posters accuse MiMedx of illegal behavior and express their frustration with the company. The *Capitol Forum* posted a reply in one of the cafepharma threads, expressing interest in any information regarding the channel stuffing accusations or other MiMedx sales practices. Within a few days, the post was deleted without notification.

### MiMedx's Response

On December 27, 2016, twelve days after Kruchoski and Tornquist filed their first lawsuit against MiMedx, the company released a public statement saying that a preliminary investigation by the Audit Committee of the Board of Directors showed "no credible evidence to indicate that any changes to previously issued financial statements are necessary" in light of the channel stuffing allegations.

When asked who worked on this investigation, CEO Pete Petit listed "[t]he Audit Committee members themselves, an outside law firm, our Auditors and a nationally recognized expert on revenue recognition." On March 1, 2017, MiMedx published a press release stating that the Audit Committee had completed its investigation and found "no credible evidence of any wrongdoing on behalf of members of MiMedx management."

MiMedx reaffirmed this finding in a press release on August 17, 2017: "As previously disclosed, all of these allegations were fully investigated over a three-month period by the Board of Directors and its Audit Committee and an external team, which included outside legal counsel, the Company's independent auditors, and a nationally-recognized expert on revenue recognition. No credible evidence of incorrect processes, procedures or wrongdoing by the Company or MiMedx management was found. Also, there was no credible evidence to indicate that any changes to the Company's previously issued financial statements were necessary in light of the former employees' allegations." The press release also addresses specifics of the lawsuits, as well as other allegations of impropriety.

**CEO's response.** We reached out to MiMedx for comment, and spoke with CEO Pete Petit, who defended the company's practices. "We just had a former SEC commissioner from Obama and Bush join the board—do you think an individual like that is going to join this board if he didn't do a very thorough due diligence on what's going on here?"

© 2017 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.

Petit described the sources of the allegations as "glib salespeople" who have "absolutely no clue about accounting rules, revenue recognition, contracts we had with AvKARE, or anything else." He also stated that those former employees are "trying to intimidate the company with—frankly—lies" and argued that "it doesn't take a lot of common sense to say 'wait a minute, what's going on here?'"

### A Close Look at Legal Risk

We spoke with Michael Keats, a partner at Stroock and co-head of the firm's Financial Services Litigation and Enforcement practice, about potential penalties for channel stuffing. According to Keats, the SEC would generally view channel stuffing—which may violate revenue recognition accounting rules—as potential securities fraud, for which tough penalties are available.

To assess illegal profits, the agency would have to assess how the channel stuffing affected the company's share price, and how much investors were harmed. According to Keats, punitive fines could be in the millions, and would ultimately be up to the SEC. Finally, Keats stated that "the SEC might seek charges against individual executives, depending on individual culpability."

Penalties could vary widely depending on the nature of the improper revenue recognition allegations charged by the SEC and whether the party that allegedly engaged in the improper revenue recognition scheme agreed to settle. In a case against Bristol-Myers Squibb, the SEC settled for $150 million in addition to requiring remedial undertakings. Smaller companies have settled for less; in May 2017 the agency brokered a $3 million settlement with MagnaChip.

**SEC correspondence.** Since November 30, 2016, the SEC's Division of Corporate Finance has corresponded with MiMedx about the company's financial filings on five separate occasions. Many of the agency's questions have centered on MiMedx's relationship with AvKARE, sales of MiMedx products to the federal government, and the company's revenue recognition policies.

Although the letters are not from the SEC's Division of Enforcement, Michael Keats indicated that the Division of Corporate Finance might refer correspondence of this type to the enforcement division if they found anything of enforcement interest. To date, the *Capitol Forum* has not uncovered evidence of an active SEC investigation.

© 2017 The Capitol Forum. Direct or indirect reproduction or distribution of this article without prior written permission from The Capitol Forum is a violation of Federal Copyright Law.