# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MIMEDX GROUP, INC., | |
|     Plaintiff, | |
|     v. | |
| DBW PARTNERS LLC,<br>      D/B/A THE CAPITOL FORUM,<br>TREVOR BAINE,<br>TEDDY DOWNEY,<br>JAKE WILLIAMS,<br>MILES PULSFORD,<br>MATT TREACY, and<br>DOES 1-100, inclusive, | Case No. 1:17-cv-01925-JDB |
|     Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Kevin T. Baine
Stephen J. Fuzesi
Connor S. Sullivan *(application for
   admission pending)*

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
kbaine@wc.com

Dated:  November 13, 2017

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

BACKGROUND .......................................................................................................2

ARGUMENT .............................................................................................................5

I.   THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION .....................6

    A.   The Reference to "Customers" in the August 21 Email Did Not Render the Email Substantially False or Defamatory .................................................8

        1.   Including the Word "Customers" Did Not Make the Email Substantially False ......................................................................8

        2.   The Word "Customers" Did Not Cause any Incremental Harm ...............12

    B.   The Complaint Fails To Allege Actual Malice .................................................13

        1.   The Actual Malice Standard Governs MiMedx's Claims.........................14

        2.   MiMedx Has Not Alleged Actual Malice .................................................26

    C.   The Complaint Fails to Allege Compensable Damage ..........................................27

II.  THE COMPLAINT FAILS TO STATE A CLAIM FOR FALSE LIGHT INVASION OF PRIVACY...............................................................................28

    A.   A Claim for False Light Invasion of Privacy Can Only Be Asserted by a Natural Person.......................................................................................29

    B.   Georgia Law Does Not Recognize a Claim for False Light Invasion of Privacy Arising from Statements About Business Affairs .....................................31

    C.   MiMedx Has Not Alleged Falsity or Actual Malice.............................................32

III. THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS .........................................................34

    A.   MiMedx Has Not Alleged Any Improper Act .......................................................34

    B.   The Relationship Between MiMedx and its Shareholders Is Not A "Business Relationship" for Purposes of a Tortious Interference Claim..............35

    C.   MiMedx Has Not Identified Any Specific Business Relationships......................36

IV.  THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF THE LANHAM ACT .........................................................................................37

CONCLUSION........................................................................................................40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649 (D.C. Cir. 1966) .................................................12

*Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852 (2014) .........................................................8

*ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958 (D.C. Cir. 1990) ..................23, 24

*Am. Petrol. Inst. v. Technomedia Int'l Inc.*, 699 F. Supp. 2d 258 (D.D.C. 2010) ..............................................................................................................................28

*Art-Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151 (D.C. Cir. 1985) .............................28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................40

*Atiyeh Publ'g, LLC v. Times Mirror Mags., Inc.*, No. CIV. A. 00-CV-1962, 2000 WL 1886574 (E.D. Pa. Dec. 7, 2000) .................................................................34, 35

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ........................................................................40

*Biro v. Condé Nast*, 883 F. Supp. 2d 441 (S.D.N.Y. 2012) ..................................................6, 12

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ......................................................24

*Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262 (7th Cir. 1983) ..............................................................................................................................15

*Bustos v. A & E T.V. Networks*, 646 F.3d 762 (10th Cir. 2011) .............................................10

*Canuto v. Mattis*, No. CV 16-2282 (EGS), 2017 WL 3437662 (D.D.C. Aug. 10, 2017) ...........................................................................................................................17

*Carpenter v. King*, 792 F. Supp. 2d 29 (D.D.C. 2011), *aff'd*, 473 F. App'x 4 (D.C. Cir. 2012) ....................................................................................................................11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) ..............................................................................................................................23

*Charles v. City of Los Angeles*, 697 F.3d 1146 (9th Cir. 2012) .............................................24

*Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001) ................................12, 13

*CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068 (W.D. Ky. 1995) ....................................28

*Coates v. Law Sch. Admission Council*, No. CIV.A. 105CV0641JDB, 2005 WL 3213960 (D.D.C. Oct. 25, 2005) ..................................................................................8

*Croixland Properties L.P. v. Corcoran*, 174 F.3d 213 (D.C. Cir. 1999) ................................8

*Deripaska v. Associated Press*, No. CV 17-00913 (ESH), 2017 WL 4685297
(D.D.C. Oct. 17, 2017) ................................................................................27

*Econ. Res. Servs., Inc. v. Res. Econ., LLC*, 208 F. Supp. 3d 219 (D.D.C. 2016) ...................36

*Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113 (2d Cir. 1977) ........................................34

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ................................................. passim

*Farah v. Esquire Mag., Inc.*, 863 F. Supp. 2d 29 (D.D.C. 2012) ............................................39

*FCC v. AT & T Inc.*, 562 U.S. 397 (2011) ..............................................................................30

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ...............................................28

*Gertz v. Robert Welch Inc.*, 418 U.S. 323 (1974) .......................................................14, 18, 19

*Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45 (D.D.C. 2002),
*aff'd in part, remanded in part sub nom. Gov't of Rwanda v. Johnson*, 409
F.3d 368 (D.C. Cir. 2005) ..............................................................................17

*Groden v. Random House, Inc.*, No. 94 CIV. 1074 (JSM), 1994 WL 455555
(S.D.N.Y. Aug. 23, 1994), *aff'd*, 61 F.3d 1045 (2d Cir. 1995)....................................24, 25

*Guccione v. Hustler Mag., Inc.*, 800 F.2d 298 (2d Cir. 1986)...........................................12, 13

*H.B. Halicki Productions v. United Artists Commc'ns, Inc.*, 812 F.2d 1213
(9th Cir. 1987)...............................................................................................38

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) ........................24, 33, 34

*In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616 (N.D. Ala. 2009)...................................15

*Hearts With Haiti, Inc. v. Kendrick*, No. 2:13-CV-00039-JAW, 2015 WL
3649592 (D. Me. June 9, 2015).....................................................................29, 30

*Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128 (D.D.C. 2016), *aff'd*,
690 F. App'x 1 (D.C. Cir. 2017) ...................................................................27

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) ................................................................23

*Jamison v. Texas*, 318 U.S. 413 (1943) ..................................................................................24

*Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir. 1986) ....................................................33

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016), *cert. denied*, 137
S. Ct. 1434 (2017) ..............................................................................20, 21, 26

iii

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348 (S.D.N.Y. 1998) ...............................11, 12

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017), *cert. denied*, No. 17-5916, 2017 WL 3980837 (U.S. Oct. 16, 2017) ......................................5, 26

*L. Cohen & Co. v. Dun & Bradstreet, Inc.*, 629 F. Supp. 1425 (D. Conn. 1986)...................30

*\*Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995)............................................24

*Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955 (2d Cir. 1988) ............................................................................................................................7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) ........... passim

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) ...........................................................18

*Lowe v. SEC*, 472 U.S. 181 (1985) .........................................................................................25

*Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103 (D.D.C. 2011) ....................................7, 9

*\*Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947 (D.D.C. 1976)........................................................................................................... passim

*\*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) ............................................. passim

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209 (2012) ...............................................................................................................37

*In re Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.,*, 931 F. Supp. 1487 (D. Ariz. 1996) ............................................................................................................30

*\*Metastorm, Inc. v. Gartner Grp., Inc.*, 28 F. Supp. 2d 665 (D.D.C. 1998) ..............14, 15, 16

*Moldea v. N.Y. Times Co.*, 15 F.3d 1137 (D.C. Cir.), *modified*, 22 F.3d 310 (D.C. Cir. 1994) ......................................................................................................12, 34

*Montgomery v. Risen*, 197 F. Supp. 3d 219 (D.D.C. 2016)....................................................35

*Murdock v. Pennsylvania*, 319 U.S. 105 (1943) ....................................................................24

*\*National Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627 (D. Md. 1992) ...........................................................................................................................25, 26

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964).........................................................14, 23, 24

*Ning Ye v. Holder*, 644 F. Supp. 2d 112 (D.D.C. 2009) ....................................................10, 11

*\*OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005) (Bates, J.).......................................................................................................... passim

iv

*Oasis Nite Club, Inc. v. Diebold, Inc.*, 261 F. Supp. 173 (D. Md. 1966)................................30

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) ....................................................9

*Palin v. N.Y. Times Co.*, No. 17-CV-4853 (JSR), 2017 WL 3712177
 (S.D.N.Y. Aug. 29, 2017) (Rakoff, J.) ...............................................27

*Parsi v. Daioleslam*, 890 F. Supp. 2d 77 (D.D.C. 2012) ....................................8, 27

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S.
 376 (1973) ...........................................................................23

*Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir. 2001) ................................26

*Robertson v. Cartinhour*, 867 F. Supp. 2d 37 (D.D.C. 2012), *aff'd*, 553 F.
 App'x 1 (D.C. Cir. 2014) ...............................................................10

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ........................................................28

*S. Air Transp., Inc. v. Am. Broad. Companies, Inc.*, 670 F. Supp. 38 (D.D.C.
 1987) .................................................................................29

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ...................................................26

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) (en banc) ......................................7, 9, 19

*Teri Woods Publ'g, L.L.C. v. Williams*, No. CIV.A. 12-04854, 2013 WL
 1500880 (E.D. Pa. Apr. 12, 2013)....................................................29, 30

*Time, Inc. v. Hill*, 385 U.S. 374 (1967)........................................................32

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914 (3d Cir.
 1990) .................................................................................26

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950).............................................30

\**Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) ....................... passim

*Washington v. Smith*, 80 F.3d 555 (D.C. Cir. 1996)...............................................15

*Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966)......................................6

*Wiggins v. Dist. Cablevision, Inc.*, 853 F. Supp. 484 (D.D.C.1994) .................................8

## STATE CASES

*Andrews v. Stallings*, 892 P.2d 611 (N.M. Ct. App. 1995)..........................................30

*Bd. of Regents of Univ. Sys. of Georgia v. Atlanta J.*, 378 S.E.2d 305 (Ga. 1989) ................................................................................................31

*\*Brewer v. Rogers*, 439 S.E.2d 77 (Ga. Ct. App. 1993) ...........................7, 9, 10

*Bryant v. Cox Enterprises, Inc.*, 715 S.E.2d 458 (Ga. Ct. App. 2011) ...................12

*Carter v. Hahn*, 821 A.2d 890 (D.C. 2003) .......................................................6

*Disaster Servs., Inc. v. ERC P'ship*, 492 S.E.2d 526 (Ga. Ct. App. 1997)..............34

*Evans v. Sandersville Georgian, Inc.*, 675 S.E.2d 574 (Ga. Ct. App. 2009) ...........7

*Exec. Excellence, LLC v. Martin Bros. Invs.*, LLC, 710 S.E.2d 169 (Ga. Ct. App. 2011) ...............................................................................................11

*Felsher v. Univ. of Evansville*, 755 N.E.2d 589 (Ind. 2001)....................................30

*Ferreri v. Plain Dealer Publ'g Co.*, 756 N.E.2d 712 (Ohio Ct. App. 2001) ...........13

*Health Cent. v. Comm'r of Ins.*, 393 N.W.2d 625 (Mich. Ct. App. 1986).........30, 31

*Ion Equip. Corp. v. Nelson*, 168 Cal. Rptr. 361 (Ct. App. 1980)............................31

*\*Jaillett v. Georgia T.V. Co.*, 520 S.E.2d 721 (Ga. Ct. App. 1999) ............... passim

*Jenkins v. Gen. Hosps. of Humana, Inc.*, 395 S.E.2d 396 (Ga. Ct. App. 1990) .....36

*Kitfield v. Henderson, Black & Greene*, 498 S.E.2d 537 (Ga. Ct. App. 1998).........12

*Looney v. M-Squared, Inc.*, 586 S.E.2d 44 (Ga. 2003) ..........................................34

*Macon Tel. Publ'g Co. v. Elliott*, 302 S.E.2d 692 (Ga. Ct. App. 1983) ...................7

*Mathews v. Atlanta Newspapers, Inc.*, 157 S.E.2d 300 (Ga. Ct. App. 1967) ...........9

*Mathis v. Cannon*, 573 S.E.2d 376 (Ga. 2002) ......................................................6

*Mead v. True Citizen, Inc.*, 417 S.E.2d 16 (Ga. Ct. App. 1992) ...............................7

*Patton v. Royal Indus., Inc.*, 70 Cal. Rptr. 44 (Ct. App. 1968)................................32

*Pavesich v. New Eng. Life Ins. Co.*, 50 S.E. 68 (Ga. 1905) ..............................31, 32

*Renden, Inc. v. Liberty Real Estate L.P. III*, 444 S.E.2d 814 (Ga. Ct. App. 1994) ...............................................................................................35, 36

*Savannah Coll. of Art & Design v. Sch. of Visual Arts, Inc.*, 515 S.E.2d 370 (Ga. 1999) ..............................................................................................31

*Savannah News-Press, Inc. v. Hartridge*, 120 S.E.2d 918 (Ga. Ct. App. 1961) ...................8

*Sewell v. Trib Publ'ns, Inc.*, 622 S.E.2d 919 (Ga. Ct. App. 2005) ...........................32

*Smith v. Stewart*, 660 S.E.2d 822 (Ga. 2008) ........................................31

*Speedway Grading Corp. v. Gardner*, 425 S.E.2d 676 (Ga. Ct. App. 1992)...........................6

*Stange v. Cox Enterprises, Inc.*, 440 S.E.2d 503 (Ga. Ct. App. 1994) .............................8, 10

*Swindall v. Cox Enterprises, Inc.*, 558 S.E.2d 788 (Ga. Ct. App. 2002) ................................10

*Thomason v. Times-Journal, Inc.*, 379 S.E.2d 551 (Ga. Ct. App. 1989) .............................7, 9

*Tonnessen v. Denver Publ'g. Co.*, 5 P.3d 959 (Colo. App. 2000) ...........................................13

*Torrance v. Morris Publ'g Grp. LLC*, 636 S.E.2d 740 (Ga. Ct. App. 2006)..........................29

*Vito v. Inman*, 649 S.E.2d 753 (Ga. Ct. App. 2007) ................................................11

*Warner-Lambert Co. v. Execuquest Corp.*, 691 N.E.2d 545 (Mass. 1998) ...........................30

*Webster v. Wilkins*, 456 S.E.2d 699 (Ga. Ct. App. 1995)...........................................7

*West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640 (Tenn. 2001) ...................................30

*Yandle v. Mitchell Motors, Inc.*, 404 S.E.2d 313 (Ga. Ct. App. 1991) ...................................33

## CONSTITUTION AND STATUTES

U.S. Const. amend. I ........................................................................ passim

15 U.S.C. § 1125(a)(1)(B) ................................................................5, 37, 39

15 U.S.C. § 1127.................................................................................37, 38

Fed. R. Civ. P. 11...................................................................................5

Ga. Code Ann. § 51-5-1.......................................................................6, 12

Ga. Code Ann. § 51-5-4.........................................................................6

## OTHER AUTHORITIES

134 Cong. Rec. H10,419-21 (daily ed. Oct. 19, 1988) (statement of Rep.
   Kastenmeier) ........................................................................38

Restatement (Second) of Torts § 558 (1977)...........................................6

Restatement (Second) of Torts § 652E (1977).................................29, 32

Restatement (Second) of Torts § 652I (1977)....................................................................29, 30

Restatement (Third) of Unfair Competition § 47 (1995)........................................................25

## INTRODUCTION

MiMedx Group, Inc. has brought a defamation action based on a single word in an email describing an accurate news report published by the Capitol Forum, a subscription-based newsletter.  On August 21, 2017, the Capitol Forum accurately reported allegations made in court pleadings by former employees of MiMedx that the company had engaged in "channel stuffing"— a practice of inflating sales and revenue figures by distributing to retailers more product than they are able to sell.  In an email sent to potential subscribers, which contained an excerpt of the report, the Capitol Forum's sales director stated that the allegations of channel stuffing had been made "by customers & former employees."  The reference to "customers" was a mistake.  MiMedx did not call the mistake to the Capitol Forum's attention until it filed its Complaint in this case, claiming that the reference to "customers" was false and defamatory.  The Forum corrected the mistake the next day.

This lawsuit is frivolous.   As the Complaint at least implicitly acknowledges, the underlying report describing the channel stuffing allegations was itself accurate and privileged against a defamation claim.  And the reference to "customers" was neither materially false nor defamatory.  In addition, the Complaint fails to allege that the mistaken reference to "customers" was the product of actual malice.

MiMedx attempts to save its case by adding claims of false light invasion of privacy, tortious interference with business relations, and violation of the Lanham Act.  But the law is clear that a corporation cannot state a claim for false light invasion of privacy, and a plaintiff cannot circumvent the limitations on a defamation claim by dressing that claim in different garb.  For these and other reasons, the Complaint fails to state any claim upon which relief can be granted.

1

# BACKGROUND

## A. The Capitol Forum's Publications

As alleged in the Complaint, the Capitol Forum is a subscription-based media outlet. Compl. ¶ 7. On August 21, 2017, it published a report in its newsletter entitled "MiMedx: Channel Stuffing Accusations Resurface in Recent Counterclaim; Former Employees Corroborate Allegations; A Close Look at Potential Risk." Compl. Ex. A. The report explained that two former employees, Jess Kruchoski and Luke Tornquist, had filed a lawsuit against MiMedx in December 2016 containing allegations of channel stuffing, and that they had subsequently included those allegations in a counterclaim in separate lawsuits in which MiMedx accused them of breaching their noncompete agreements. After quoting Kruchoski's counterclaim and statements by three former employees, the report quoted extensively from two MiMedx press releases addressing the allegations—including one press release explaining that an investigation by the company's Audit Committee and an external team including outside legal counsel had found "no credible evidence of incorrect processes, procedures or wrongdoing." Compl. Ex. A at 4. In short, the report provided a fair and accurate account of newsworthy allegations and MiMedx's response.

On the same day that the report was published, defendant Matt Treacy, the Director of Sales at the Capitol Forum, sent an email to potential subscribers that included an excerpt of the report. Compl. Ex. B. The full body of the email was as follows:

> We published an update to our coverage of MiMedex earlier today. In the article, we detail channel stuffing allegations and recent counterclaims which may pose a regulatory risk for the company. The article examines the allegations made by customers & former employees, the company's response to these claims, and the potential legal risks for MiMedx. I've included a brief excerpt from our article below.
>
> **". . . Claims that MiMedx engaged in an illegal channel stuffing scheme from 2014 to June 2016 recently resurfaced in a <u>counterclaim</u> filed on July 31, 2017 by defendant and former MiMedx employee Jess Kruchoski. The**

> **counterclaim provides additional detail regarding channel stuffing allegations that were first made public in a December 2016 lawsuit against MiMedx filed by Kruchoski and another former MiMedx employee named Luke Tornquist.**
>
> **Two days before the December 2016 suit was filed in Minnesota District Court, MiMedx filed separate suits against Kruchoski and Tornquist in Florida and Georgia, respectively, alleging that the former employees violated the terms of their noncompete agreements and other restrictive covenants.  The Minnesota case was voluntarily dismissed for lack of jurisdiction; Kruchoski and Tornquist now separately maintain the channel stuffing allegations in the noncompete lawsuits . . ."**

> If you have some time today or later this week, I'd like to schedule a call to discuss our view on MiMedx or any other situations we are covering (see our coverage list below).  Please advise what time works best with your schedule for a call.

Compl. Ex. B (bold in original).  The email then set forth a list of some 85 additional "Antitrust/M&A Issues" and "Consumer Protection Issues" that the Capitol Forum was covering or had covered.

The reference to "customers" in the August 21 email was a mistake: as the underlying report (and the quoted excerpt) indicated, the allegations of channel stuffing were contained in claims and counterclaims filed by former MiMedx employees Jess Kruchoski and Luke Tornquist.

On September 7, the Capitol Forum published a second report titled "MiMedx: VA Office of Inspector General Confirms Investigation Involving MiMedx Documents," which was again referred to in an email Treacy sent the same day to potential subscribers.  Compl. Exs. C, D. MiMedx does not allege that anything published in this report and email was false.  It alleges that its CEO told Capitol Forum *off the record* that to his knowledge the company was not a target of the investigation, but it acknowledges that "Defendants could not have included MiMedx's off-the-record statements in their article."  Compl. ¶ 30.  The report did not state that MiMedx was a

target, but only that the Department of Veterans Affairs Office of the Inspector General "is conducting an investigation that involves documents related to MiMedx," which is concededly true.  Ex. C.

## B.  The Complaint

The Complaint contains four categories of claims.  First, it purports to state three repetitive claims for libel, slander and defamation, all based on the same allegation—that "the false and malicious statement in the August 21, 2017 e-mail concerning Defendants' article of the same day and allegations of wrongful conduct against MiMedx by 'customers,' constituted actionable libel" and defamation.  Compl. ¶¶ 37, 48.  (The slander claim alleges, "upon information and belief," that the same statement was made "by telephone or in-person."  *Id.* ¶ 43.)  These three claims are not based on the August 21 and September 7 articles or on the September 7 email.  They are based "specifically" on the reference to "customers" in the August 21 email—and "upon information and belief," repetition of that false reference "by telephone or in-person."  *Id.* ¶¶ 37, 43, 48.

Second, the Complaint purports to state a claim for false light invasion of privacy.  That claim alleges that the "Defendants made literally false statements as well as misleading statements (*e.g.*, those which purposely omitted facts or context tending to be favorable to MiMedx, or made suggestions concerning MiMedx that ran counter to the actual facts known by Defendants) in their articles, e-mails, and other discussions with shareholders."  Compl. ¶ 53.  No specific false statement is alleged other than the reference to "customers."

Third, MiMedx attempts to state a claim for tortious interference with business relations, alleging in vague terms that "Defendants' conduct herein was tortious, malicious, and independently wrongful" and, "upon information and belief," that it "caused third parties, including customers, investors, and creditors, to fail to enter into anticipated business relationships

with MiMedx."  *Id.* ¶¶ 58-59.  No such third parties are identified, and no such "independently wrongful" conduct is alleged.

Fourth, the Complaint attempts to state a claim for unfair competition under section 43(a) of the Lanham Act, alleging that "Defendants' false and misleading statements deceived, or were likely to deceive, a reasonable consumer."  *Id.* ¶ 65.  The Complaint, however, does not identify or describe what "consumers" of MiMedx's products even received the challenged publications. Nor does it allege that anything misleading was stated about "the nature, characteristics, qualities, or geographic origin" of its products.  15 U.S.C. § 1125(a)(1)(B).

Finally, the Complaint alleges that the Capitol Forum's emails to MiMedx shareholders "were a cause, if not the primary cause," of a decline in the price of MiMedx stock.  *Id.* ¶ 5.  No other damage is alleged.  MiMedx has sued other publications for the same alleged decline.  *See MiMedx Grp., Inc. v. Sparrow Fund Mgmt. L.P., et al.*, No. 17-cv-7568 (S.D.N.Y. Oct. 4, 2017).[1]

## ARGUMENT

"To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits."  *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017), *cert. denied*, No. 17-5916, 2017 WL 3980837 (U.S. Oct. 16, 2017).  Even an otherwise meritless suit "'entails long and expensive litigation,'" and allowing such a suit to proceed past a motion to dismiss means that "the protective purpose of

---

[1] Without any good faith basis, the Complaint alleges, "upon information and belief," that "Defendants' principals and/or affiliated persons stood to benefit" from the alleged stock price drop "because they have made bearish trades in the same."  Compl. ¶ 5.  On August 24, undersigned counsel responded to an inquiry by plaintiff's counsel on this subject by assuring him that the Capitol Forum and its employees do not trade in the stock of companies they cover. Notwithstanding that assurance, and without any evidence to contradict it, plaintiff's counsel nevertheless included this baseless allegation in the Complaint.  *See* Fed. R. Civ. P. 11(b).

the First Amendment is thwarted even if the defendant ultimately prevails." *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (granting motion to dismiss defamation claim) (quoting *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)).  This is such a suit, and dismissal is not only warranted, but necessary to remove the threat that it poses to the defendants as they continue to cover the underlying controversy.  Otherwise, "[t]he prospect of legal bills, court appearance, and settlement conferences means that all but the most fearless will pull their punches." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 n.5 (S.D.N.Y. 2012) (internal quotation marks and citations omitted).

## I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION

MiMedx alleges that the Capitol Forum libeled, slandered and defamed it by including the word "customers" in its August 21 email concerning the article it published the same day.  Compl. ¶¶ 25-26, 37-38, 43, 48.  Because the inclusion of that single word did not render the email false or defamatory, MiMedx's defamation claims must fail.

Defamation under Georgia law consists of "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Mathis v. Cannon*, 573 S.E.2d 376, 380 (Ga. 2002) (internal quotation marks omitted) (citing Restatement (Second) of Torts § 558 (1977)).[2]  District of Columbia law is identical.  *See Carter v. Hahn*, 821 A.2d 890, 893 (D.C. 2003).[3]

---

[2] Georgia has codified the definitions of libel and slander.  Ga. Code Ann. § 51-5-1 (libel); Ga. Code Ann. § 51-5-4 (slander).  However, "[t]o be actionable, [any] communication must be both false and malicious," *Speedway Grading Corp. v. Gardner*, 425 S.E.2d 676, 678 (Ga. Ct. App. 1992), whether written and therefore libel or spoken and therefore slander.

[3] MiMedx has alleged that this case is governed by the law of Georgia, where it resides, as opposed to the law of the District of Columbia, where the Capitol Forum is incorporated and domiciled, where it publishes its newsletter, where most of the individual defendants live and work, and where

Under Georgia law, courts must determine at the outset either that a publication "'is not defamatory, that it is defamatory, or that it is ambiguous and the question is one for a jury.'" *Mead v. True Citizen, Inc.*, 417 S.E.2d 16, 17 (Ga. Ct. App. 1992) (quoting *Thomason v. Times-Journal, Inc.*, 379 S.E.2d 551, 552 (Ga. Ct. App. 1989)).   "On this point, as others," Georgia's law "is similar" to the law in D.C., which requires "'the court [in a libel case] to determine whether the challenged statement is capable of bearing a particular meaning and whether that meaning is defamatory.'" *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 114 n.6 (D.D.C. 2011) (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C. Cir. 1987) (en banc)).   In doing so, courts "'will not hunt for a strained construction in order to hold the words used as being defamatory,'" *Evans v. Sandersville Georgian, Inc.*, 675 S.E.2d 574, 578 (Ga. Ct. App. 2009) (quoting *Webster v. Wilkins*, 456 S.E.2d 699, 701 (Ga. Ct. App. 1995)), but will "'look . . . at what construction would be placed upon it by the average reader,'" *Mead*, 417 S.E.2d at 17 (ellipsis in original) (quoting *Macon Tel. Publ'g Co. v. Elliott*, 302 S.E.2d 692, 694 (Ga. Ct. App. 1983)).

Further, the plaintiff in a defamation action bears the burden of proving that the allegedly defamatory utterance was false.  The statement does not have to be true in a "literal" or technical sense. *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 959 (2d Cir. 1988).   "'Defamation law 'overlooks minor inaccuracies and concentrates upon *substantial* truth. . . .  [A] statement is not considered false unless it would have a different effect on the mind of the [reader] from that which the pleaded truth would have produced.'" *Brewer v. Rogers*, 439 S.E.2d 77, 81 (Ga. Ct. App. 1993) (emphasis added) (quoting *Masson v. New Yorker Mag., Inc.*,

---

the bulk of the reporting concerning MiMedx was performed.  Because Georgia law does not differ from D.C. law on the issues raised on this motion, there is no need to resolve any choice of law issue.  Defendants will assume, for the purposes of this memorandum only, that Georgia law applies, reserving the right to revisit the issue should a conflict of laws arise.

501 U.S. 496, 516-17 (1991)). "[I]t is irrelevant whether trained lawyers or judges might with the luxury of time have chosen more precise words." *Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 866 (2014). "'[M]inor factual errors which do not go to the substance, the gist, the sting of [a] story' do not render a communication false for defamation purposes." *Jaillett v. Ga. T.V. Co.*, 520 S.E.2d 721, 724 (Ga. Ct. App. 1999) (quoting *Stange v. Cox Enters., Inc.*, 440 S.E.2d 503, 507 (Ga. Ct. App. 1994)).

### A. The Reference to "Customers" in the August 21 Email Did Not Render the Email Substantially False or Defamatory

#### 1. Including the Word "Customers" Did Not Make the Email Substantially False

"Defamation claims must be pleaded with particularity and specify the 'time, place, content, speaker and listener of the alleged defamatory material.'" *Coates v. Law Sch. Admission Council*, No. Civ.A. 105CV0641JDB, 2005 WL 3213960, at *2 (D.D.C. Oct. 25, 2005) (quoting *Wiggins v. Dist. Cablevision, Inc.*, 853 F. Supp. 484, 494 (D.D.C. 1994)). As the Court of Appeals of Georgia has put it, a defamation complaint must be dismissed unless it contains "an affirmative statement that . . . *particular portions* of the article are false." *Savannah News-Press v. Hartridge*, 120 S.E.2d 918, 922 (Ga. Ct. App. 1961) (emphasis added).[4]

In this case, MiMedx has alleged only that a single word in a single email—the word "customers" in the August 21 email—was false. It is on this allegation alone that MiMedx's defamation claims must stand or fall; every other statement must be "taken as true, since none is alleged to be false." *Savannah News-Press*, 120 S.E.2d at 922. At the motion to dismiss stage,

---

[4] *See also Croixland Props. L.P. v. Corcoran*, 174 F.3d 213, 215 n.2 (D.C. Cir. 1999); *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. 2012) (Bates, J.) (faulting plaintiffs for failing "to define the universe of allegedly defamatory statements" and "for the most part [failing] to identify which statements they perceive as defamatory" out of "several articles" attached "to [the] complaint and . . . other pleadings").

absent "affirmative allegation[s] that [some] facts in the article are untrue," the court must assume "that [those] statements are true." *Mathews v. Atlanta Newspapers, Inc.*, 157 S.E.2d 300, 303 (Ga. Ct. App. 1967); *see also Ollman v. Evans*, 750 F.2d 970, 1003 (D.C. Cir. 1984) (treating as true the facts reported in the article at issue whose "literal accuracy" the plaintiff had "not challenged").

The dispositive question, then, is whether the reference to "customers," taken in the context of the publication as a whole, produced "'a different effect on the mind'" of the reader from that which the remainder of the publication would have produced in any event. *Brewer*, 439 S.E.2d at 81 (quoting *Masson*, 501 U.S. at 517); *see also Mar-Jac*, 773 F. Supp. 2d at 114-15 ("An allegedly defamatory statement[] must be construed in the context of the entire publication, as a whole, to determine whether it was potentially defamatory" (citing *Thomason*, 379 S.E.2d at 552, and *Tavoulareas*, 817 F.2d at 779)).

The August 21 email, like the article that it excerpted and summarized, reported accurately on "channel stuffing allegations" that had been made against MiMedx. The specific information pertaining to those allegations was quoted directly from the August article:

> "Claims that MiMedx engaged in an illegal channel stuffing scheme from 2014 to June 2016 recently resurfaced in a counterclaim filed on July 31, 2017 by defendant and former MiMedx employee Jess Kruchoski. The counterclaim provides additional detail regarding channel stuffing allegations that were first made public in a December 2016 lawsuit against MiMedx filed by Kruchoski and another former MiMedx employee named Luke Tornquist."

Compl. Ex. B at 1. The "substance, the gist, the sting" of the August 21 email and article was that MiMedx had been accused of channel stuffing, which was accurate. *Jaillett*, 520 S.E.2d at 724. The email's indication that these allegations had been made by "customers," as well as former employees, did not alter the substance or sting of the report; it would not have produced a materially different "effect on the mind" of the reader. *Brewer*, 439 S.E.2d at 81 (internal quotation marks omitted). The reader would understand, correctly, that MiMedx had been accused of

channel stuffing.  And the reader would have understood that the allegations were the subject of ongoing, unresolved litigation.

The email was, therefore, *substantially* accurate, even if it contained a "[m]inor inaccurac[y]," *Masson*, 501 U.S. at 517; *Brewer*, 439 S.E.2d at 81; or a "[m]inor factual error[]," *Jaillett*, 520 S.E.2d at 724; *see also Stange*, 440 S.E.2d at 507 (same); *Swindall v. Cox Enters., Inc.*, 558 S.E.2d 788, 790 (Ga. Ct. App. 2002) (same).  As then-Judge Gorsuch put it in a similar context, the difference between the publication with and without the single word "customers" is not one "that matters for purposes of the plaintiff's public reputation." *Bustos v. A & E T.V. Networks*, 646 F.3d 762, 767 (10th Cir. 2011) (not substantially false to refer to a prisoner as a member of the Aryan Brotherhood when he was merely "*affiliate*[*d*] with" the Brotherhood).

Courts have not hesitated to dismiss libel cases based on minor errors of this sort. *See Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 59 (D.D.C. 2012) (dismissing defamation complaints because statements were substantially true), *aff'd per curiam*, 553 F. App'x 1 (D.C. Cir. 2014); *Ning Ye v. Holder*, 644 F. Supp. 2d 112, 118 (D.D.C. 2009) (dismissing libel complaint because statement was substantially true).  For example, in *Stange v. Cox Enterprises*, the defendant published several articles about litigation over the plaintiff's involvement in real estate transactions.  440 S.E.2d at 504.  The court held that incorrectly stating the plaintiff was a defendant in lawsuits when he had not been sued, and overstating the number of owners who alleged that they were deceived by the plaintiff, were minor factual errors that did "not go to 'the substance, the gist, the sting' of the story.'" *Id.* (quoting *Masson*, 501 U.S. at 517).  The same is true here.  The Capitol Forum's email incorrectly described some of the individuals who had accused MiMedx of misconduct, just as the defendant in *Stange* had incorrectly stated the number of homeowners who had complained.  If anything, the error in *Strange* was more material: the

10

plaintiff there was not even the person named in the suit, whereas here there is no question that MiMedx was the subject of the allegations.  If the reports in *Stange* did not rise to the level of "substantial" falsehood, then the Capitol Forum's email does not even approach the line.  *See also, e.g.*, *Exec. Excellence, LLC v. Martin Bros. Invs.,* LLC, 710 S.E.2d 169, 175 (Ga. App. 2011) (substantially true to say that there was active litigation between parties even though no litigation had been filed, where the parties were "embroiled in a contract dispute . . . when the statement was made"); *Vito v. Inman*, 649 S.E.2d 753, 756 (Ga. App. 2007) (substantially true for an attorney to claim that he represented "several" patients suing a physician when he had settled one claim in the past and was preparing to file another claim).

Similarly, in *Jaillett v. Georgia Television Co.*, a news broadcast reported that an air conditioning repair business had deceptively told a homeowner that she had to replace her air conditioning unit, when in fact a less expensive solution was available.  520 S.E.2d at 725.  The business sued, alleging among other things that the report was false because it failed to report that it had also provided a quote for a less expensive alternative repair.  *Id.*  The court concluded that the report was not *substantially* false because the omission did not "alter the truth of the gist of the story—i.e., that [the business] incorrectly told [the customer] the entire unit needed to be replaced." *Id.*  "[T]he failure to mention the quote for [the less expensive alternative] did not render the broadcast substantially false." *Id.*  Just so here.  The inclusion of the word "customers" did not alter the main thrust of the August 21 email—that MiMedx was the subject of unresolved allegations of channel stuffing.   And a defamation complaint that does not identify any substantially false statement must be dismissed.  *See also, e.g.*, *Carpenter v. King*, 792 F. Supp. 2d 29, 37-38 (D.D.C. 2011) (dismissing defamation claim because the statement was substantially true in light of admissions in plaintiff's complaint), *aff'd*, 473 F. App'x 4 (D.C. Cir. 2012); *Jewell*

*v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 367 (S.D.N.Y. 1998) (dismissing defamation claim where plaintiff did not challenge statement that he was a "suspect," rendering the statement that he was a "prime" or "main" suspect substantially true).

### 2. The Word "Customers" Did Not Cause any Incremental Harm

Words challenged as defamatory must not only be false; they must also be defamatory. They must themselves expose the plaintiff to "public hatred, contempt, or ridicule," *Kitfield v. Henderson, Black & Greene*, 498 S.E.2d 537, 540 (Ga. Ct. App. 1998) (citing Ga. Code Ann. § 51-5-1), or "'injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.'" *Moldea v. New York Times Co.*, 15 F.3d 1137, 1142 (D.C. Cir.) (quoting *Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649, 654 (D.C. Cir. 1966), *modified*, 22 F.3d 310 (D.C. Cir. 1994)).  MiMedx's defamation counts also fail to satisfy this element, because the single word MiMedx challenges is not defamatory in the context of the overall email.

The word "customers" is not actionable because it cannot be said to have caused any incremental harm above and beyond the harm that would have been caused by the remainder of the publication, which is not challenged.  The incremental harm doctrine "reasons that when unchallenged or non-actionable parts of a [particular] publication are damaging, [another] statement, even if maliciously false, might be non-actionable because it causes no appreciable additional harm."  *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 176 (2d Cir. 2001). "[W]here the true defamatory sting is caused by statements that are not challenged in the lawsuit," the plaintiff cannot recover because he cannot trace any injury to an actionable wrong.  *Biro*, 883 F. Supp. 2d 468 n.10; *see also Bryant v. Cox Enters., Inc.*, 715 S.E.2d 458, 463 (Ga. Ct. App. 2011) (affirming on other grounds the trial court's conclusion that one of the plaintiff's claims was "barred by the incremental-harm doctrine").  "[I]n those instances where an allegedly libelous statement cannot realistically cause impairment of reputation . . . because the true portions of a

statement have such damaging effects, even nominal damages are not to be awarded.  Instead, the claim should be dismissed so that the costs of defending against the claim of libel, which can themselves impair vigorous freedom of expression, will be avoided."  *Guccione v. Hustler Mag., Inc.*, 800 F.2d 298, 303 (2d Cir. 1986).

MiMedx cannot argue here that the single word "customers" caused any damage to its reputation beyond the damage inflicted by the statements it does not challenge as actionable.  The word itself did not add to the substance of the channel-stuffing allegations as summarized in the August 21 email.  It "cannot realistically" be said to have caused "appreciable additional harm."  *Guccione*, 800 F.2d at 303; *Church of Scientology Int'l*, 238 F.3d at 176.  Indeed, it is implausible that a recipient of the August 21 email would have reached any conclusion about the validity of the channel-stuffing allegation without reading the underlying report indicating that the allegations originated only with former employees.  That implausibility aside, any harm caused by the single reference to "customers" is precisely the kind of harm that the law regards as insufficient to support a claim of defamation as a matter of law.[5]

### B.    The Complaint Fails To Allege Actual Malice

MiMedx's defamation claims also fail because it has not alleged, as it must, that the alleged mistake in the August 21 email was made with actual malice.

---

[5]  *See also Ferreri v. Plain Dealer Publ'g Co.*, 756 N.E.2d 712, 723 (Ohio Ct. App. 2001) (if the "incremental reputational harm inflicted by the challenged statements[,] beyond the harm imposed by the nonactionable remainder of the publication[,] . . . is determined to be nominal or nonexistent, the statements are dismissed as [non]actionable" (internal quotation marks omitted)); *Tonnessen v. Denver Publ'g. Co.*, 5 P.3d 959, 965 (Colo. App. 2000) (affirming dismissal of defamation complaint where challenged statement did only "nominal" damage in light of other nonactionable statement).

### 1.        The Actual Malice Standard Governs MiMedx's Claims

The Supreme Court has recognized the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  As a result, the First Amendment requires a "public figure" defamation plaintiff to allege and prove by "clear and convincing evidence that the defendant published the defamatory statement with actual malice, *i.e.*, with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Masson*, 501 U.S. at 510 (quoting *Sullivan*, 376 U.S. at 279-80).

"Whether the plaintiff is a public figure is a question of law for the court to resolve." *Waldbaum v. Fairchild Publ'ns., Inc.*, 627 F.2d 1287, 1293 n.12 (D.C. Cir. 1980).  Under the decisions of this Court, MiMedx is a public figure by virtue of the fact that it is a publicly held corporation.  And even if that were not the case, it would be a public figure for purposes of this case by virtue of its involvement in the public controversy over channel stuffing.

### a.        As a Public Corporation, MiMedx Is a Public Figure

As this Court has previously held, "[c]orporate plaintiffs are treated as public figures as a matter of law in defamation actions brought against mass media defendants involving matters of public interest." *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 47 (D.D.C. 2005) (Bates, J.).  The reason for that rule was first stated in this Court some 40 years ago by Judge Flannery:  "corporations, while legal persons for some purposes, possess none of the attributes the [Supreme] Court sought to protect" in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974), and "a libel action brought on behalf of a corporation does not involve 'the essential dignity and worth of every human being.'" *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947, 955 (D.D.C. 1976); *see also Metastorm, Inc. v. Gartner Grp., Inc.*, 28 F. Supp. 2d 665, 669 (D.D.C. 1998) (quoting *Martin Marietta*).  "'[I]f the purpose of the public figure-private person dichotomy

14

is to protect the privacy of individuals who do not seek publicity or engage in activities that place them in the public eye, there seems no reason to classify a large corporation as a private person.'" *OAO Alfa Bank*, 387 F. Supp. 2d at 48 (alteration in original) (quoting *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 273 (7th Cir. 1983)).

Courts in this District have applied this rule to a variety of corporations, including a publicly held corporation, *Martin Marietta*, 417 F. Supp. at 956; "a privately owned corporation" that resold an electronic forms product to governmental agencies and private corporations and associations, *Metastorm*, 28 F. Supp. 2d at 666; and a Russian bank, *OAO Alfa Bank*, 387 F. Supp. 2d at 48 n.51.  The rule is fully applicable here.  MiMedx is a publicly owned biopharmaceutical company with a market capitalization at the time of the August 21 email of over $1.5 billion. Compl. ¶ 32.[6]  Its shares trade on the NASDAQ exchange with an average daily volume of over a million shares per day.  *Id.* ¶¶ 6, 32.  This year it placed fifth on Fortune Magazine's list of "Fastest Growing Companies."  *Id.* ¶ 1.  As a public company, MiMedx has subjected its business to extensive federal regulation and public disclosure requirements.  There is "no reason to classify" such a large public corporation "as a private person."  *OAO Alfa Bank*, 387 F. Supp. 2d at 48 (internal quotation marks omitted).

There is no question that these reports "involve[d] matters of . . . public interest."  *OAO Alfa Bank*, 387 F. Supp. 2d at 47.  "This Circuit has defined legitimate public interest broadly." *Metastorm*, 28 F. Supp. 2d at 670 (citing *Washington v. Smith*, 80 F.3d 555, 556 (D.C. Cir. 1996)). For example, in *Martin Marietta*, the challenged report qualified as a matter of public interest

---

[6] MiMedx alleges that a decline of over 20% in its stock price led to a decrease in its market capitalization of over $300 million.  Compl. ¶ 32.  "Market capitalization equals the stock price multiplied by the number of outstanding shares."  *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 636 (N.D. Ala. 2009).  Assuming MiMedx's allegations are true, it follows that MiMedx's market capitalization was at one time over $1.5 billion.

because it involved a defense contractor's use of so-called "stag parties" thrown for government officials "to influence the award of defense contracts."  417 F. Supp. at 953, 956 (internal quotation marks omitted).  In *Metastorm*, the publication discussed the implications of an agreement between two companies about the future development of a software product.  28 F. Supp. 2d at 666–68. The court there found that the report constituted a "matter of legitimate public interest," because "[t]he public is increasingly dependent upon information technology and the large corporations that dominate the IT world" and "thousands of corporations and government agencies rely on [the software product in question] in the daily operation of their businesses."  *Id.* at 670.

The Capitol Forum articles touched on matters at least as important to the public.  They reported on allegations that MiMedx, a publicly traded company, improperly manipulated its sales to Department of Veterans Affairs hospitals and facilities to create "bogus sale[s]" and "inflate revenue figures."  Compl. Ex. A at 1-2.  Those allegations were at the time the subject of investigations by the SEC and the Department of Veterans Affairs.[7]  If scandalous methods used to win defense contracts qualify as matters of legitimate public interest, *Martin Marietta*, 417 F. Supp. at 956, so too does alleged accounting fraud involving sales to government-run facilities intended to care for the nation's veterans.  Likewise, if the public's interest in the use of information technology is a matter of legitimate public interest, *Metastorm*, 28 F. Supp. 2d at 670,

---

[7]  News Release, *MiMedx Reports Further Developments in its Civil Litigation Against Former Employees*, (Sep. 7, 2017) http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2299232 ("Additionally, MiMedx has been aware for some time of an ongoing investigation by the Department of Veterans Affairs ('VA') Office of Inspector General, but the Company is not a target of that investigation."); News Release, *MiMedx provides Information on Its Interaction With The SEC*, (Sept. 21, 2017) http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2302107 ("The Company reported that it is working with the SEC in its investigation of these accusations and supplying all of the documents requested, including those obtained through the civil lawsuit discovery process to help the Commission understand what has transpired.").

so too is the alleged use of deceptive accounting methods by a publicly traded company and government contractor like MiMedx—as MiMedx has implicitly acknowledged by issuing multiple press releases defending itself against those allegations.[8]  *See infra* nn. 13, 15-16.

Finally, there is no question that although the Capitol Forum has a more limited circulation than major media companies, it qualifies as a "member of the mass media" for purposes of the *Martin Marietta* analysis.  *OAO Alfa Bank*, 387 F. Supp. 2d at 48; *Metastorm*, 28 F. Supp. 2d at 670.  The Complaint itself alleges that the Capitol Forum is a "subscription-based media outlet" that reached "numerous[,] . . . if not all, shareholders of MiMedx."  Compl. ¶¶ 7, 24, 27.  Its reach is alleged to be broad enough to have caused a 20% decline in the price of MiMedx stock.  *Id.* ¶ 32.  In *Metastorm*, the court found that a "provider of information technology reports and consulting services," which charged an annual subscription fee of $19,000 and largely distributed its publications only to its subscriber base, qualified as a "member of the mass media" for the purposes of the *Martin Marietta* test, even where "only a limited number of . . . clients . . . received [the report in question]," in part because the plaintiff argued that "many entities, both public and private, base their buying decisions on reports [the defendant] issued."  28 F. Supp. 2d at 670 (internal quotation marks omitted).  In light of MiMedx's own allegations, the Capitol Forum qualifies in the same way and for the same reasons: it reaches a meaningful number of subscribers and its reports allegedly influence buying decisions.

In the *OAO Alfa Bank* case, the defendant was a "nonpartisan and nonprofit watchdog group" that published "investigative and analytical reports on topics relating to government ethics

---

[8] The court can take judicial notice of MiMedx's website and other matters of a "general public nature."  *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 60 n.6 (D.D.C. 2002), *aff'd in part, remanded in part sub nom. Gov't of Rwanda v. Johnson*, 409 F.3d 368 (D.C. Cir. 2005).  *See also Canuto v. Mattis*, No. CV 16-2282 (EGS), 2017 WL 3437662, at *3 n.6 (D.D.C. Aug. 10, 2017) (taking judicial notice of information on websites the court had consulted).

and the accountability of public officials." 387 F. Supp. 2d at 29. Similarly, the Capitol Forum publishes investigative and analytical reports on topics related to government regulation. It has described itself as "an in-depth news and analysis service dedicated to informing policymakers, investors, and industry stakeholders on how policy affects market competition."[9]

For these reasons, MiMedx is required to prove actual malice under this Court's decisions in *Martin Marietta*, *OAO Bank* and *Metastorm*.

### b.    MiMedx Is a Limited-Purpose Public Figure with Respect to Its Alleged Sales Misconduct

Even if MiMedx were not a public figure by virtue of its corporate status alone, it would nonetheless qualify as a limited-purpose public figure with respect to the controversy over its sales and accounting practices under the more general standards of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). In *Gertz*, the Supreme Court articulated two factors that "set the dividing line between public and private figures." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003). First, as a general matter public figures "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz*, 418 U.S. at 344. And second, public figures "run[] the risk of closer public scrutiny" by "invit[ing] attention and comment"—or at least "the communications media are entitled to act on [that] assumption." *Id.* at 344-45.

Each of these "guideposts" in the "public figure inquiry . . . is present in this case." *OAO Alfa Bank*, 387 F. Supp. 2d at 44. First, MiMedx enjoys full access to the channels of effective communication and has, in fact, made use of those channels to respond to the very allegations that are the subject of this suit. MiMedx regularly issues statements to the press; it currently lists 70

---

[9]  *See*  https://web.archive.org/web/20170126224259/https://thecapitolforum.com/staff/ (Jan. 26, 2017 Internet Archive capture, Capitol Forum, About Us, thecapitolforum.com/staff).

such releases for 2017 so far and 52 in the previous year.[10]   When MiMedx was recognized by

Fortune Magazine as one of the fastest growing companies of 2017, it touted that positive coverage

to the press to magnify its impact.  Compl. ¶ 1.[11]  And when the Capitol Forum and others reported

on channel stuffing allegations, MiMedx issued press releases and other commentary to rebut the

allegations.  *See infra* nn.13, 15-17.

Second, as a public corporation and government contractor, MiMedx "run[s] the risk of

closer public scrutiny"—or at least "the communications media are entitled to act on [that]

assumption."  *Gertz*, 418 U.S. at 344-45.  MiMedx makes no attempt to avoid that scrutiny, nor

could it if it tried.  The company files regular reports with the SEC (60 so far in 2017 alone), issues

earnings announcements, delivers investor presentations and earnings calls, and is followed by

multiple market analysts.[12]  In short, MiMedx has "chosen [a] path[] of endeavor that 'invite[s]

attention and comment.'"  *Id.* (quoting *Tavoulareas v. Piro*, 817 F.2d at 773).

MiMedx also satisfies the three-factor public-figure test set out in *Waldbaum*, 627 F.2d at

1296.  "First, the court must isolate an existing 'public controversy' at issue, because the scope of

the controversy in which the plaintiff involves himself defines the bounds of the public presence."

*OAO Alfa Bank*, 387 F. Supp. 2d at 42–43 (quoting *Waldbaum*, 627 F.2d at 1297).  "Second, the

court should assess whether the plaintiffs have achieved more than a trivial or tangential

---

[10] MiMedx, 2017 News Releases, http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-news&nyo=0; MiMedx, 2016 News Releases, http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-news&nyo=1.

[11] MiMedx, *News Release: MiMedx Recognized as Number 5 on Fortune Magazine's List of the 100 Fastest Growing Public Companies* (Sept. 12, 2017), http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2300026

[12] *See* Mimedx, Investors Overview, http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-irhome (including pages for SEC Filings, News Releases, Webcasts & Presentations, Analyst Coverage).

prominence in the debate." *Id.* at 43. "Finally, the 'alleged defamation must have been germane to the plaintiff's participation in the controversy.'" *Id.* (quoting *Waldbaum*, 627 F.2d at 1298).

First, there can be little question that at the time of these reports a public controversy existed over MiMedx's sales and accounting practices. Under *Waldbaum*, a "public controversy" exists if "persons actually were discussing some specific question" and "persons beyond the immediate participants in the dispute" would likely "feel the impact of its resolution." *OAO Alfa Bank*, 387 F. Supp. 2d at 43 (citing *Waldbaum*, 627 F.2d at 1297). "[C]ourts often define the public controversy in expansive terms." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 586 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 1434 (2017). In this case, as the Capitol Forum reported, the controversy over channel stuffing by MiMedx had been the subject of litigation in 2016, was the subject of renewed litigation in July 2017, and was the subject of an investigation by the Department of Veterans Affairs; it was also the subject of an SEC investigation. Compl. Exs. A-D.[13] And this was clearly a controversy that would affect persons beyond the immediate participants. It would have significant effects on the countless shareholders who owned shares in MiMedx—precisely the audience to which the August 21 email was directed. Moreover, these investigations involve alleged misconduct by MiMedx in its capacity as a government contractor, providing products to federal health care facilities that provide care for military veterans. This is plainly significant to politicians, regulators and citizens alike.[14]

---

[13] MiMedx, *News Release: MiMedx Reports Further Developments in its Civil Litigation Against Former Employees* (Sept. 7, 2017), http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2299232 ("Additionally, MiMedx has been aware for some time of an ongoing investigation by the Department of Veterans Affairs ('VA') Office of Inspector General, but the Company is not a target of that investigation" (emphasis in original)); MiMedx, *News Release: MiMedx Provides Information On Its Interaction With the SEC* (Sept. 21, 2017), http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2302107.

[14] At the very least, MiMedx is a public figure in the eyes of the audience to which the allegedly defamatory publication in this case was directed: MiMedx shareholders. As the Court of Appeals

Second, MiMedx had "more than a trivial or tangential prominence" in the controversy over its own sales practices. *OAO Alfa Bank*, 387 F. Supp. 2d at 43. MiMedx "drew attention to [itself]" and used its "position in the controversy as a fulcrum to create public discussion" by attempting to shape the narrative of the controversy and portray its accusers in negative terms. *Jankovic*, 822 F.3d at 588 (internal quotation marks omitted). MiMedx issued multiple press releases regarding the allegations of its misconduct before the Capitol Forum ever reported on those allegations.[15] It continued to issue similar press releases after the Capitol Forum's coverage began.[16] It maintains a separate section of its website devoted to telling a counter-narrative of

---

observed in *Waldbaum*, when "an individual [is] well known in a small community," he can qualify as "a public figure for the segment of the audience to which he is well known," even if not a public figure with respect to other communities. 627 F.2d at 1296 n.22. Whatever MiMedx's status with the public generally, there can be no serious argument that MiMedx is anything other than "well known" in the "community" of its own shareholders.

[15] *See* MiMedx, *News Release: MiMedx Comments on Meritless Lawsuit* (Dec. 15, 2016), http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2230176; MiMedx, *News Release: MiMedx Announces Preliminary Investigative Findings* (Dec. 27, 2016), http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2232886; MiMedx, *News Release: MiMedx Files Lawsuits Against Two Additional Former Sales Employees For Breach Of Contractual Obligations* (Dec. 30, 2016), http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2233159; MiMedx, *News Release: MiMedx Provides Update on Litigation with Terminated Employees* (Aug. 17, 2017), http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2294496.

[16] *See* MiMedx, *News Release: MiMedx Reports Further Developments in its Civil Litigation Against Former Employees* (Sept. 7, 2017), http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2299232; MiMedx, *News Release: MiMedx Files Lawsuit Related to Short Seller Attacks* (Oct. 4, 2017), http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2304631; MiMedx, *News Release: MiMedx Provides Information on Its Interaction With The SEC* (Sept. 21, 2017), http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2302107.

these allegations.[17]   And it disclosed the allegations against it in its quarterly SEC filings.[18] Together, all this makes clear that MiMedx had "more than a trivial or tangential prominence" in the controversy.  *OAO Alfa Bank*, 387 F. Supp. 2d at 43.

And, finally, the Capitol Forum's publications were certainly "germane" to the controversy over MiMedx's conduct, *Waldbaum*, 627 F.2d at 1297-98—or, "[a]t the very least, . . . not wholly unrelated" to it, *OAO Alfa Bank*, 387 F. Supp. 2d at 44 (internal quotation marks omitted).

For all of these reasons as well, MiMedx is a public figure for purposes of this case.

### c.   MiMedx Cannot Avoid the Actual Malice Standard by Alleging that Capitol Forum's Publications Are "Commercial Speech"

In an apparent attempt to avoid the actual malice standard, MiMedx alleges that "Defendants' wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein."  Compl. ¶¶ 40, 45, 50, 55, 60, 67.  Neither the Capitol Forum's articles nor the emails that summarized and excerpted those articles, however, constitute "commercial speech," as that term has been defined.  And no matter how they are categorized, they enjoy the full protection of the First Amendment.

To begin with, it is contrary to decades of the Supreme Court's First Amendment jurisprudence to suggest that whether the Constitution protects certain speech from defamation claims depends on where the challenged statement is published.  The Supreme Court has held that the commercial context of certain speech may determine how far the *government* may go in

---

[17]    MiMedx, Short Selling Commentary,  https://www.mimedx.com/content/short-selling-commentary (last visited Nov. 6, 2017).

[18]    *See* MiMedx Group, Inc., Quarterly Report (Form 10-Q), at 21 (July 31, 2017), https://www.sec.gov/Archives/edgar/data/1376339/000137633917000116/mdxg-2017630x10xq.htm; MiMedx Group, Inc., Quarterly Report (Form 10-Q), at 19 (Oct. 31, 2017), https://www.sec.gov/Archives/edgar/data/1376339/000137633917000138/mdxg-2017930x10xq.htm.

*regulating* it.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).  But in the context of private defamation suits, the applicable question for determining the level of constitutional protection is whether the plaintiff is a public figure.  In *New York Times* itself, the allegedly defamatory material was part of a paid advertisement that "sought financial support."  376 U.S. at 266.  The Supreme Court held that "if the allegedly libelous statements would otherwise be constitutionally protected . . .  they do not forfeit that protection because they were published in the form of a paid advertisement."  *Id.*  Indeed, the Supreme Court has observed—in the context of applying the actual malice standard—that economic motivation cannot lessen the applicable First Amendment protection, as the vast majority of protected expression is created and distributed for profit:  "If a profit motive could somehow strip communications of the otherwise available constitutional protection, [the Supreme Court's] cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).[19]

In any case, even if the commercial/noncommercial distinction were relevant here, the Capitol Forum's publications do not qualify as "commercial speech" as the Supreme Court has defined it.  "Commercial speech" means speech that "[does] *no more* than propose a commercial transaction," *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973) (emphasis added), or "expression related *solely* to the economic interests of the speaker and its audience," *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 561 (emphasis added).  Again, however, an economic motive, standing alone, does not automatically strip speech of full constitutional protection: "not all advertising material . . . that refers to specific products, or

---

[19] *See also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52-53 (1988) (holding that the First Amendment fully protected a "parody" advertisement satirizing a public figure).

material distributed with an economic motive is commercial speech." *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 973 n.16 (D.C. Cir. 1990) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983)); *see also Harte-Hanks*, 491 U.S. at 667.

And whatever may be true of advertising materials in general, the Supreme Court has recognized that advertisements promoting protected speech are entitled to the same protection as the underlying speech they promote.  In *Bolger*, the Court explained that while the contraceptive advertisements at issue constituted commercial speech, the same would not be true "*in a case where the pamphlet advertises an activity itself protected by the First Amendment*."  463 U.S. at 67 n.14 (emphasis added) (citing *Murdock v. Pennsylvania*, 319 U.S. 105 (1943); *Jamison v. Texas*, 318 U.S. 413 (1943)).[20]

Following *Bolger*, courts have looked to whether the challenged promotional material "relates to a speech product that is itself protected."  *Lane v. Random House, Inc.*, 985 F. Supp. 141, 152 (D.D.C. 1995).  In *Lane*, a conspiracy theorist alleged that a publisher defamed him by promoting a book that called the plaintiff's theories misleading.  The court held that the publisher's economic motivation for promoting the book did not convert the advertisement into "commercial speech."  *Id.*  Observing that "it is essential to identify and protect 'advertising which summarizes an argument or opinion contained in the book,'" the court held that the advertisement remained protected because it was "not about laundry detergent; it cannot be divorced from the book . . . and the book is protected speech."  *Id.* (quoting *Groden v. Random House, Inc.*, No. 94 Civ. 1074 (JSM), 1994 WL 455555, at *6 (S.D.N.Y. Aug. 23, 1994), *aff'd*, 61 F.3d 1045 (2d Cir. 1995)).

---

[20] Notably, *Bolger*—like almost all cases about the "commercial speech" distinction—considered the permissible scope of government regulation of commercial activity, not the proper standard for private defamation suits.  *See Charles v. City of Los Angeles*, 697 F.3d 1146, 1155 (9th Cir. 2012) (commercial motive may be relevant for permitting increased government regulation but not for imposing increased tort liability).

Similarly, in *National Life Insurance Co. v. Phillips Publishing, Inc.*, 793 F. Supp. 627 (D. Md. 1992), a company sued an investment newsletter based on statements in promotional packages that included excerpts of articles, subscription information, and applications.  The court rejected the plaintiff's argument that these promotional packages should be treated as commercial speech and held that the inclusion of the challenged statements in an advertisement was irrelevant: "[MiMedx]'s complaint is over the fact that the statements were made," not that "they happen[ed] to appear" in promotional materials.  *Id.* at 644.  If the mere fact that a statement that otherwise would be protected was made in an advertisement could deprive it of First Amendment protection, "a factually inaccurate statement about the President, or any government official, contained in a news story on '60 Minutes' could be transformed into [less protected] commercial speech if that statement became part of an advertisement to promote the show."  *Id.* at 648.[21]

There can be no question that the Capitol Forum's reports on allegations of misconduct by a publicly traded corporation and government contractor are fully protected by the *New York Times* standard.  *See, e.g., Lowe v. SEC*, 472 U.S. 181, 210 (1985) (holding that a publication containing factual information and commentary on general market conditions and trends was entitled to First Amendment protection); *Nat'l Life Ins.*, 793 F. Supp. at 644-49 (holding that a defamation suit against a financial newsletter brought by a company the newsletter covered was subject to the "actual malice" standard).

---

[21] Similarly, courts have held that liability for commercial appropriation of a name or likeness does not attach when the name or likeness appears in a *publication* on a matter of public interest *or* when the name or likeness appears in a *sample* of the publication used to advertise or promote it. *See, e.g., Groden v. Random House, Inc.*, 61 F.3d 1045, 1049 (2d Cir. 1995) (listing cases); *see also* Restatement Third, Unfair Competition § 47 cmt. a (1995) ("A magazine soliciting subscriptions, for example, may refer to a past article about a particular celebrity as an illustration of the magazine's customary content" without facing tort liability for appropriating the celebrity's likeness).

Likewise, the August 21 email is entitled to the same First Amendment protection as the underlying report that it promoted, summarized and quoted. If the Capitol Forum had used the single word "customers" in the underlying article—and that word were somehow considered a substantial defamatory falsehood—MiMedx could not press a claim for defamation arising from that single word without pleading and proving actual malice. The result is no different simply because the word in question was instead inserted in an email promoting and summarizing that article. *See Nat'l Life Ins.*, 793 F. Supp. at 645-48 ("The statements in the promotional materials are not commercial, or even if so classified, the different treatment of them cannot be justified").[22]

### 2.    MiMedx Has Not Alleged Actual Malice

As a public figure, MiMedx must allege and prove actual malice—that is, knowledge of falsity or reckless disregard for the truth. *Kahl*, 856 F.3d at 113. "A defendant has acted recklessly if 'the defendant in fact entertained *serious doubts* as to the truth of his publication' or acted 'with a high degree of awareness of . . . probable falsity.'" *Jankovic*, 822 F.3d at 589 (ellipsis in original) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). The Complaint in this case does not even allege actual malice in general, conclusory terms, much less with "sufficient particularized

---

[22]  The Third Circuit has held, in a markedly different context, that Lanham Act and defamation claims arising from "a comparative advertising war" in which two competitors allegedly misrepresented each other's products were not subject to the actual malice standard "[b]ecause [such] speech is chill-resistant." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 939 (3d Cir. 1990). The Fifth Circuit has held that actual malice does not apply to a Lanham Act claim arising from commercial speech. *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 542 (5th Cir. 2001), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). Whatever the merits of those decisions, this case is different: it does not involve competing advertising campaigns, but rather a report on a matter of public concern by a media outlet about a company in an entirely different business, with which it did not compete. *Cf. U.S. Healthcare*, 898 F.2d at 935 (noting that the result would be different even if "a corporation addresse[d] an issue of public concern involving a *competitor*" (emphasis added)).

facts to support a claim of actual malice by clear and convincing evidence." *Palin v. N.Y. Times Co.*, No. 17-CV-4853 (JSR), 2017 WL 3712177, at *7 (S.D.N.Y. Aug. 29, 2017) (Rakoff, J.).

"[C]ourts" in this district routinely "grant motions to dismiss based in part on the failure of a public figure to plausibly allege facts that support an inference of actual malice in a defamation case." *Deripaska v. Associated Press*, No. 17-00913 (ESH), 2017 WL 4685297at *5 (D.D.C. Oct. 17, 2017) (collecting cases); *see also Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 144 (D.D.C. 2016) (granting motion to dismiss where "[t]he bald allegations of the Complaint [were] insufficient to allege malice"), *aff'd per curiam*, 690 F. App'x 1 (D.C. Cir. 2017). Thus, in *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. 2012) (Bates, J.), this Court dismissed the complaint where plaintiffs had failed "to identify which statements they perceive as defamatory *and to put forth specific evidence of actual malice* relating to those statements." (emphasis added).

The Complaint here alleges only that the word "customers" was "transmitted . . . with fault amounting to at least negligence." Compl. ¶ 49. That is insufficient as a matter of law. And the problem is not simply one of failing to invoke the magic words "actual malice." For the Complaint fails altogether to allege any facts—and there are no facts—that would support a plausible inference of actual malice. To the contrary, when MiMedx first called the Capitol Forum's attention to the mistake—by serving them with its Complaint—the Capitol Forum immediately emailed everyone who had received the original email to correct and withdraw the error. "Such behavior is much more plausibly consistent with making an unintended mistake and then correcting it than with acting with actual malice." *Palin*, 2017 WL 3712177, at *8 (dismissing a defamation complaint for failure plausibly to allege actual malice).

### C.     The Complaint Fails to Allege Compensable Damage

Finally, "[t]he law of libel has long reflected the distinction between corporate and human plaintiffs by *limiting corporate recovery to actual damages in the form of lost profits*." *Martin*

*Marietta*, 417 F. Supp. at 955 (emphasis added).  Individuals can claim general injury to their "essential dignity and worth" when they are defamed.  *Id.* (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring)).  But corporations have no general sense of dignity and worth, so they can only recover "actual damages in the form of lost profits."  *Art-Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1156 (D.C. Cir. 1985); *see also Am. Petrol. Inst. v. Technomedia Int'l Inc.*, 699 F. Supp. 2d 258, 267 n.7 (D.D.C. 2010) (same); *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995) ("[H]istorically, damages to corporate reputation may be proven only by loss of profits caused by the defamation.").

MiMedx does not claim any lost profits.  Its only alleged injury is a decrease in the price of its stock "[f]ollowing these e-mails to MiMedx's shareholders."[23]  Compl. ¶ 5.  If that is an injury to anyone, it is an injury to the corporation's shareholders, not to the corporation itself.  For this reason as well—the failure to allege any recoverable damages—the Complaint should be dismissed.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM FOR FALSE LIGHT INVASION OF PRIVACY

MiMedx attempts to state a claim for false light invasion of privacy based on "omitted facts" and "suggestions" in "Defendants' articles and e-mails."  Compl. ¶ 53.  Again, however, the only specific falsehood alleged is the reference to "customers."  This count fails to state a claim

---

[23] That allegation is worded carefully and vaguely.  Public records show that MiMedx's stock closed *higher* on August 21, the day the allegedly defamatory email was sent, than on August 18, the previous trading day, and higher still on August 22 than on August 21.  *See* MiMedx Group, Inc. (MDXG), Historical Data for August 18–23, 2017, Yahoo Finance, https://finance.yahoo.com/quote/MDXG/history?period1=1503028800&period2=1503460800&interval=1d&filter=history&frequency=1d.  *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (holding that a "district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment," especially where "the movement of [a certain] stock price is integral to the plaintiff['s]" claims).

for a variety of reasons:  (1) a claim for false light invasion of privacy can only be stated by a natural person; (2) such a claim cannot be based on a statement about one's business; and (3) the Complaint fails to allege either substantial falsity or actual malice.

### A.     A Claim for False Light Invasion of Privacy Can Only Be Asserted by a Natural Person

To establish a claim for false light under Georgia law, "a plaintiff must show the existence of false publicity that depicts [her] as something or someone which she is not [and] must demonstrate that the false light in which she was placed would be highly offensive to a reasonable person." *Torrance v. Morris Publ'g Grp. LLC*, 636 S.E.2d 740, 747 (Ga. Ct. App. 2006) (alterations in original) (internal quotation marks omitted).  False light is a branch of privacy law, and it focuses on a publication's "*offensive*[*ness*]" to "a reasonable *person.*"  *Id.* (emphasis added).  As the Restatement explains, however, "[*a*] *corporation*, partnership or unincorporated association has no personal right of privacy.  It *has* therefore *no cause of action for* any of the four forms of invasion," including for "*publicity placing* [*a person*] *in a false light*."  Restatement (Second) of Torts § 652I, cmt. c (1977) (emphases added),  § 652E (emphasis added).

Consistent with the Restatement, this Court and others have consistently held that a corporation cannot assert a false light claim.  *See S. Air Transp., Inc. v. Am. Broad. Cos., Inc.*, 670 F. Supp. 38, 42 (D.D.C. 1987) (corporation "cannot bring suit for being placed in a false light because a corporation has no right of privacy"), *on reconsideration*, 678 F. Supp. 8 (D.D.C. 1988), *aff'd*, 877 F.2d 1010 (D.C. Cir. 1989); *see also, e.g.*, *Hearts With Haiti, Inc. v. Kendrick*, No. 2:13-00039-JAW, 2015 WL 3649592, at *8 (D. Me. June 9, 2015) ("In short, just because a corporation has the right to bring a defamation action, it does not follow that it also has the right to bring a false light action."); *Teri Woods Publ'g, L.L.C. v. Williams*, No. CIV.A. 12-04854, 2013 WL 1500880, at *7 (E.D. Pa. Apr. 12, 2013) (under Pennsylvania law, "'a corporation, partnership or

unincorporated association has no right to privacy,' and therefore, causes of action for false light invasion of privacy are precluded" (quoting Restatement (Second) of Torts § 652I cmt. c); *In re Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 931 F. Supp. 1487, 1493 (D. Ariz. 1996) (dismissing false light claim and other invasion of privacy claims because "a corporation has no privacy rights; such rights are personal and can only be held by human beings"); *L. Cohen & Co. v. Dun & Bradstreet, Inc.*, 629 F. Supp. 1425, 1429 (D. Conn. 1986) (dismissing false light claim based on "the considerable uncontroverted authority that corporations do not enjoy a right to privacy" (internal quotation marks omitted)); *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 648 (Tenn. 2001) ("[T]he right to privacy is a personal right.  As such, the right cannot attach to corporations or other business entities," which therefore cannot recover under false light); *Andrews v. Stallings*, 892 P.2d 611, 626 (N.M. Ct. App. 1995) (dismissing false light claim because "only individuals, not corporations, have a right to seek recovery for invasion of privacy").[24]

Georgia courts have not addressed the precise issue whether a corporation can ever assert a claim for false light invasion of privacy.  But the Georgia courts have often relied on the

---

[24]  These decisions are consistent with other decisions holding more broadly that corporations do not have privacy rights.  *See, e.g.*, *FCC v. AT & T Inc.*, 562 U.S. 397, 406 (2011) ("'Personal' in the phrase 'personal privacy' conveys more than just 'of a person.'  It suggests a type of privacy evocative of human concerns—not the sort usually associated with an entity like" a corporation); *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) ("[C]orporations can claim no equality with individuals in the enjoyment of a right to privacy"); *Oasis Nite Club, Inc. v. Diebold, Inc.*, 261 F. Supp. 173, 175 (D. Md. 1966) ("Plaintiff is a corporation.  As such, it cannot be said to possess a right of privacy"); *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 594 (Ind. 2001) ("a corporation has "'no cause of action for any of the four forms of invasion'" of privacy (quoting Restatement (Second) of Torts § 652I cmt. c)); *Warner-Lambert Co. v. Execuquest Corp.*, 691 N.E.2d 545, 548 (Mass. 1998) ("Cases from other jurisdictions unanimously deny a right of privacy to corporations"); *Health Cent. v. Comm'r of Ins.*, 393 N.W.2d 625, 630 (Mich. Ct. App. 1986) (per curiam) ("[T]he right of privacy is primarily designed to protect the feelings and sensibilities of human beings and does not protect artificial entities"); *Ion Equip. Corp. v. Nelson*, 168 Cal. Rptr. 361, 366 (Ct. App. 1980) ("It is generally agreed that the right to privacy is one pertaining only to individuals, and that a corporation cannot claim it as such").

Restatement provisions regarding the invasion of privacy torts, *see, e.g.*, *Smith v. Stewart*, 660 S.E.2d 822, 833 (Ga. 2008), and the Supreme Court of Georgia has held in a different context that although a corporation may have had "a corporate *preference* for privacy," it had no "personal right to privacy" and could not make a "claim on behalf of [an] individual for an invasion of personal privacy." *Bd. of Regents of Univ. Sys. of Ga. v. Atlanta J.*, 378 S.E.2d 305, 308 (Ga. 1989).[25]

 In short, as a corporation MiMedx cannot maintain a false light claim as a matter of law.

**B. Georgia Law Does Not Recognize a Claim for False Light Invasion of Privacy Arising from Statements About Business Affairs**

 Even apart from the fact that MiMedx is a corporation, the law is clear in Georgia and elsewhere that the false light tort does not protect a plaintiff from "publicity . . . related solely to the operation of [its] business." *Jaillett v. Ga. T.V. Co.*, 520 S.E.2d 721, 727 (Ga. Ct. App. 1999). Indeed, it has been the law in Georgia for more than a century that "'the right of privacy . . . can be waived" by "'engag[ing] in any pursuit or occupation or calling which calls for the approval or patronage of the public.'" *Id.* at 726-27 (brackets omitted) (quoting *Pavesich v. New Eng. Life Ins.*, 50 S.E. 68, 72 (Ga. 1905)).  Therefore, when "publicity . . . relate[s] solely to the operation of [the plaintiff's] business," it does not "violate [the plaintiff's] right to be let alone," *id.*, and false light liability cannot arise.  *See also, e.g.*, *Patton v. Royal Indus., Inc.*, 70 Cal. Rptr. 44, 48 (Ct. App. 1968) ("[W]hat is public is not private and what is private is not public. . . .  [The statements]

---

[25] *Savannah Coll. of Art & Design v. Sch. of Visual Arts, Inc.*, 515 S.E.2d 370, 374 n.19 (Ga. 1999) is not to the contrary.  There, the Supreme Court of Georgia found that the "privacy interest" of the Savannah College of Art & Design in its confidential settlement agreements justified sealing those agreements when filed as part of an action to enforce them.  *Id.* at 372.  That ruling was consistent with the Court's earlier observation in *Board of Regents* that a corporation may have a "corporate *preference* for privacy."  378 S.E.2d at 308 (emphasis added).  Whether a corporation has a legitimate interest in the confidentiality of a settlement agreement is an entirely different question from whether it has a privacy right sufficient to support a tort claim.

reflected exclusively upon the professional standing of the plaintiffs in the public view.  There was no invasion of the rights of privacy.").  As the allegations in this case relate exclusively to the operation of a business, they cannot form the basis for a false light claim.

### C.      MiMedx Has Not Alleged Falsity or Actual Malice

"The First Amendment considerations that apply to defamation . . . apply also to [MiMedx's] count[] for false light."  *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013).  In particular, a false light claim requires proof that a false statement was published with actual malice.  *Sewell v. Trib Publ'ns, Inc.*, 622 S.E.2d 919, 924 & n.25 (Ga. Ct. App. 2005) (citing *Time, Inc. v. Hill*, 385 U.S. 374 (1967)).  And, like a defamation claim, a plaintiff can only recover for false light invasion of privacy for "*major* misrepresentation[s] of his character, history, activities[,] or beliefs."  Restatement (Second) of Torts § 652E cmt. c. (emphasis added).  Also, "a plaintiff's privacy is not invaded when . . . unimportant false statements are made, even when they are made deliberately."  *Id.*  Because MiMedx has not alleged either substantial falsity or actual malice in support of its false light claim, the count must be dismissed on those bases as well.

1.      The only allegedly false statement identified anywhere in the Complaint is the reference to "customers."  But that reference is neither substantially false nor incrementally harmful, for all the reasons stated above.  Beyond that allegation, the false light claim alleges that the defendants "omitted facts or context tending to be favorable to MiMedx" and improperly suggested in its September 7 report that MiMedx was the target of an investigation.  Neither of these allegations is a sufficient allegation of falsity.

First, the omission of favorable facts does not render a publication false.  *See, e.g.*, *Jaillett*, 520 S.E.2d at 725 ("Although the broadcast may not have told the whole truth, the failure to mention the quote for replacing the fan motor alone did not render the broadcast substantially false." (internal quotation marks omitted)); *Yandle v. Mitchell Motors, Inc.*, 404 S.E.2d 313, 314

(Ga. Ct. App. 1991) ("appellee may have had a moral duty also to report any underlying extenuating circumstances, but its failure to have done so was not a breach of a legal duty which exposed it to liability").   Indeed, the law recognizes that "[c]ourts must be slow to intrude into the area of editorial judgment, not only with respect to choices of words, but also with respect to inclusions in or omissions from news stories. . . .  [U]nder the First Amendment the decision of what to select must almost always be left to writers and editors.   It is not the business of government."  *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1306 (8th Cir. 1986).

Second*,* there can be no claim that the Capitol Forum suggested falsely on September 7 that MiMedx was the target of an investigation.  The report was precise, stating only that the VA Office of the Inspector General's investigation "involves documents related to MiMedx."  Compl. ¶ 28; Compl. Ex. C.  There is no contention that this was false.

2.      Nor does MiMedx attempt to allege actual malice.  As part of its false light claim, the Complaint alleges that MiMedx's CEO told Capitol Forum *off the record* that it was not the target of the VA investigation.  Compl. ¶ 30.  But the Complaint acknowledges that Capitol Forum "could not have included MiMedx's off-the-record statements in their article or email."  *Id.*  And the law is clear, in any event, that the existence of such a denial cannot establish actual malice.  As the Supreme Court has explained, "the press need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'"  *Harte-Hanks*, 491 U.S. at 691 n.37 (quoting *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 (2d Cir. 1977)).  That is even more clearly the case when a party is unwilling to put its denial on the record.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

MiMedx also attempts to claim tortious interference with business relations, but that claim is based on nothing other than the dissemination of an allegedly defamatory publication.   As explained below, a plaintiff cannot circumvent the requirements of falsity and actual malice by recasting a defamation claim as a tortious interference claim.   Nor can MiMedx satisfy the other requirements of a tortious interference claim.

To establish liability for tortious interference, MiMedx must show that the Capitol Forum: "(1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury." *Looney v. M-Squared, Inc.*, 586 S.E.2d 44, 49 (Ga. 2003).   MiMedx has not alleged these elements.

### A.   MiMedx Has Not Alleged Any Improper Act

A tortious interference plaintiff must first show that the defendant performed an "[i]mproper action[]," meaning "conduct wrongful in itself." *Disaster Servs., Inc. v. ERC P'ship*, 492 S.E.2d 526, 529 (Ga. Ct. App. 1997).   There is nothing "wrongful in itself" about publishing or promoting a newsletter, and for the reasons stated above the content of Capitol Forum's publications is not actionable.   "[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994).   "In a situation such as this . . . where the underlying wrong alleged in the complaint is essentially commercial disparagement by publication of defamatory statements, and the alleged injury springs solely from the act of publication, the plaintiff should not be able to circumvent the rules for pleading defamation simply by characterizing the claim as one for intentional interference with [business] relations." *Atiyeh Publ'g., LLC v. Times Mirror Mags.*,

34

*Inc.*, No. CIV. A. 00-CV-1962, 2000 WL 1886574, at *4 (E.D. Pa. Dec. 7, 2000); *see also, e.g.*, *Farah*, 736 F.3d at 540 ("Because [the plaintiffs'] defamation claim fails, so do their other tort claims based upon the same allegedly defamatory speech."); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 267 (D.D.C. 2016) (collecting cases).

### B.    The Relationship Between MiMedx and its Shareholders Is Not A "Business Relationship" for Purposes of a Tortious Interference Claim

MiMedx's tortious interference claim also fails because it has not alleged interference with an existing or prospective business relationship.  Under Georgia law, tortious interference plaintiffs must allege that the defendant "induced *a third party or parties* not to enter into or continue *a business relationship* with the plaintiff."  *Renden, Inc. v. Liberty Real Estate L.P. III*, 444 S.E.2d 814, 817 (Ga. Ct. App. 1994) (emphasis added).  MiMedx does not allege interference with a business relationship with a third party; it alleges interference with its own shareholders. And there is no case of which we are aware that suggests that a communication with a corporation's shareholders can constitute tortious interference.  Shareholders do not do *business* with the corporation whose shares they hold; they *own* the corporation.  And a corporation does not do *business* with its shareholders; it does business with others *for the benefit* of the shareholders who own it.  Likewise, when MiMedx presses its claims here, it does for the benefit of its shareholders. In short, its shareholders are not "third parties," and communications with shareholders cannot constitute tortious interference with the corporation's business relationships.

Moreover, MiMedx cannot complain that it lost shareholders in the way that a tortious interference plaintiff claims to have lost customers.  The total number of outstanding MiMedx shares remains constant.  And because shares don't simply vanish, one investor's decision to sell some or all of its shares is matched by another investor's corresponding decision to buy the same quantity of shares.  In other words, even if investors are third parties doing business with the

35

corporation whose shares they buy, MiMedx cannot claim to have lost any business.  It had precisely the same number of shares in circulation—the same amount of so-called "business"—after Capitol Forum's publications as it did before.

Additionally, MiMedx must show "financial loss" arising from the disrupted business relationships it identifies.  *Jenkins v. Gen. Hosps. of Humana, Inc.*, 395 S.E.2d 396, 398 (Ga. Ct. App. 1990).  But the loss alleged here—from the alleged decline in stock price—is to shareholders, not to MiMedx itself.

### C.    MiMedx Has Not Identified Any Specific Business Relationships

Finally, the tortious interference claim also fails because the Complaint does not identify any *specific* relationship with which the Capitol Forum allegedly interfered, either existing or prospective.  Georgia, like many other jurisdictions, requires plaintiffs to point to specific, identifiable business relationships they allege were disrupted by the defendant's wrongful act, and bars plaintiffs from recovering if they fail to satisfy this requirement.  *See Jenkins*, 395 S.E.2d at 398 ("[P]laintiff is unable to name a single patient he has lost or failed to acquire due to the actions of defendants"); *Econ. Res. Servs., Inc. v. Res. Econ., LLC*, 208 F. Supp. 3d 219, 229 (D.D.C. 2016).

Moreover, "[in order] to establish a cause of action for interference with prospective business relations, [the] plaintiff must demonstrate that absent the interference, those relations were reasonably likely to develop in fact."  *Renden*, 444 S.E.2d at 817.   A plaintiff obviously cannot satisfy this requirement without identifying the individuals or entities with whom it would have entered into a business relationship.

For all of these reasons, the Complaint fails to state a claim for intentional interference with business relations.

## IV.   THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF THE LANHAM ACT

In another attempt to circumvent the limitations imposed by the law of libel, MiMedx attempts to state a claim for under Section 43(a) of the Lanham Act.  But the Lanham Act does not create some federal cause of action for defamation with standards different from those imposed by the First Amendment and the common law.  It creates a cause of action for a specific form of unfair competition that has no applicability in this case.  Specifically, Section 43(a) provides for liability for a "false or misleading description of fact, or false or misleading representation of fact, which —[1] in commercial advertising or promotion, [2] misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).  The explicit purpose of the Act is "to protect persons engaged in . . . commerce [from] *unfair competition*."  15 U.S.C. § 1127 (emphasis added).

The Supreme Court has made clear that the only plaintiffs eligible to bring a Lanham Act claim are those whose interests fall within the statute's "zone of interests," meaning that the "legislatively conferred cause of action encompasses [that] particular plaintiff's claim."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014).  This test requires courts to determine "whether [the plaintiff] falls within the class of plaintiffs whom Congress has authorized to sue" under the statute.  *Id.*  And it "forecloses suit . . . when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue."  *Id.* at 1389 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 225 (2012)).

"Identifying the interests protected by the Lanham Act . . . requires no guesswork, since the Act includes an 'unusual, and extraordinarily helpful,' detailed statement of the statute's

purposes." *Id.* (quoting *Halicki v. United Artists Commc'ns, Inc.*, 812 F.2d 1213, 1214 (9th Cir.

1987)).  The statute provides that its intent is

> to regulate commerce within the control of Congress by making
> actionable the deceptive and misleading use of marks in such
> commerce; to protect registered marks used in such commerce from
> interference by State, or territorial legislation; *to protect persons
> engaged in such commerce against unfair competition*; to prevent
> fraud and deception in such commerce by the use of reproductions,
> copies, counterfeits, or colorable imitations of registered marks; and
> to provide rights and remedies stipulated by treaties and conventions
> respecting trademarks, trade names, and unfair competition entered
> into between the United States and foreign nations.

15 U.S.C. § 1127 (emphasis added).

MiMedx here is not asserting an interest in fair competition.  Indeed, nothing that Capitol

Forum said is alleged to have affected MiMedx's competitive position at all.  MiMedx does not

even allege that the August 21 email was sent to any of its customers.  Instead, MiMedx is asserting

a general reputational interest that is "so marginally related to . . . the purposes implicit in the

statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue."

*Lexmark*, 134 S. Ct. at 1389.  The legislative history makes clear that "section 43(a) will not

provide a kind of commercial defamation action."  134 Cong. Rec. H10,419-21 (daily ed. Oct. 19,

1988) (statement of Rep. Kastenmeier).  When that section was amended in 1988, Representative

Kastenmeier, the sponsor of the legislation, acknowledged explicitly that allowing section 43(a)

to be invoked outside the context of competition would raise "a host of constitutional problems,"

*id.,* because on its face the Lanham Act does not contain any requirement of fault, as the

Constitution requires in defamation cases.

The Lanham Act certainly does not create a cause of action for the subject of a publication

by a non-competitor on a matter of public interest that is not even circulated to the subject's

customers.  Every circuit court of appeals to have considered the issue, including the D.C. Circuit,

has held that the Lanham Act can only be applied to false and misleading speech encompassed within the Supreme Court's "commercial speech" doctrine.  *See Farah*, 736 F.3d at 541 (the First Amendment limits the Lanham Act to regulating only "commercial speech . . . entitled to reduced protection"); *Farah v. Esquire Mag., Inc.*, 863 F. Supp. 2d 29, 39-40 (D.D.C. 2012) (collecting circuit cases), *aff'd*, 736 F.3d 528.  As explained above, the publications here do not fall within the Supreme Court's "commercial speech" doctrine and are entitled to full constitutional protection.  *See* pp. 22-26, *supra*.

In addition, Section 43(a) applies only to a person's false statements about "the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).  MiMedx has not alleged, and cannot allege, that the Capitol Forum made any representations about those subjects.  The Capitol Forum did not report, for example, that MiMedx's products did not work, or that other products were superior.  It said nothing about the "nature, characteristics, qualities, or geographic origin" of MiMedx's products.

Finally, a Lanham Act plaintiff must show that "deception of consumers causes them to withhold trade from the plaintiff." *Lexmark*, 134 S. Ct. at 1391.  MiMedx has not plausibly alleged that the Capitol Forum's publications caused anyone to "withhold trade" from it.  *Id.*  There is no allegation that the challenged publications were even distributed to any MiMedx customer, much less that they caused any particular customer not to buy MiMedx's products—or even that MiMedx's sales in general declined.  MiMedx has alleged only that that the Capitol Forum's publications were distributed to MiMedx *shareholders*, Compl. ¶¶ 24, 33, 43, 49, and the only specific allegation of injury is a decline in its share price.  But MiMedx does not "trade" with the investors who own the company, and a decline in share price is not the kind of injury against which

39

the Lanham Act was intended to protect (even assuming that such a decline could be considered an injury to the corporation).  The only references to MiMedx customers or consumers in the Complaint are a general allegation in the tortious interference count that "[u]pon information and belief, Defendants' publications caused third parties, including customers, investors, and creditors, to fail to enter into anticipated business relationships with MiMedx," and an equally vague allegation in the Lanham Act count that "Defendants' false and misleading statements deceived, or were likely to deceive, a reasonable consumer."  *See id.* ¶¶ 59, 65.  But these are precisely the kind of "conclusions," "naked assertion[s]" and "formulaic recitation[s] of the elements of a cause of action that will not do."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 557 (2007)).  In the absence of any "further factual enhancement," *id.* at 678 (quoting *Twombly*, 550 U.S. at 557), there is simply no plausible allegation that MiMedx's "position in the marketplace has been damaged" by Capitol Forum's publications. *Lexmark,* 134 S. Ct. at 1393.

For all of these reasons—plus the fact that MiMedx has not alleged any substantial falsity—the Complaint fails to state a claim under the Lanham Act.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: /s/ Kevin T. Baine
Kevin T. Baine
Stephen J. Fuzesi
Connor S. Sullivan *(application for admission pending)*

40

725 Twelfth Street NW
Washington, DC 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
kbaine@wc.com

November 13, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, I caused Defendants' Motion to Dismiss and supporting Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss to be filed and served electronically via the Court's ECF System upon counsel of record.  I further certify that all parties required to be served have been served.


Dated:  November 13, 2017                                        By:  /s/ Kevin T. Baine
                                                                             Kevin T. Baine