**A IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MIMEDX GROUP, INC., | **Case No. 1:17-cv-01925-JDB** |
| Plaintiff, | |
| v. | |
| DBW PARTNERS LLC D/B/A THE CAPITOL FORUM; TREVOR BAINE; TEDDY DOWNEY; JAKE WILLIAMS; MILES PULSFORD; MATT TREACY; and DOES 1-100, inclusive, | |
| Defendants. | |

**<u>PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page No.**

I.     INTRODUCTION ........................................................................................................ 1

II.    STATEMENT OF FACTS ....................................................................................... 3

III.   LEGAL STANDARD ............................................................................................... 8

IV.   ARGUMENT ............................................................................................................ 8

     A.     MiMedx Has Sufficiently Pleaded its Defamation Claims ........................... 11

         1.     Defendants' August 21, 2017 and September 7, 2017 publications contained "false and defamatory statements concerning" MiMedx. ................ 12

         2.     Defendants' publications were unprivileged communications to third parties, as the allegations of the Complaint demonstrate "actual malice." ........ 20

         3.     Defendants acted with the requisite scienter. ................................................... 25

         4.     MiMedx has alleged both defamation per se and special damages. .................. 25

     B.     MiMedx Has Sufficiently Pleaded its False Light Claim ............................ 28

     C.     MiMedx Has Sufficiently Pleaded its Tortious Interference Claim ............. 30

     D.     MiMedx Has Sufficiently Pleaded its Claim for Violation of the Lanham Act ......... 33

V.     CONCLUSION ........................................................................................................ 38

# TABLE OF AUTHORITIES

**Page No.**

**Cases**

Advanced Marine Techs., Inc. v. Burnham Sec., Inc.,
  16 F. Supp. 2d 375 (S.D.N.Y. 1998).................................................................33

Air Wisconsin Airlines Corp. v. Hoeper,
  134 S. Ct. 852 (2014)...........................................................................................13

* Airlie Found., Inc. v. Evening Star Newspaper Co.,
  337 F. Supp. 421 (D.D.C. 1972)................................................................21, 22

Ampex Corp. v. Bettini,
  No. A097630, 2003 WL 1558183 (Cal. App. Mar. 26, 2003)..............................27

Appalachian Voices v. Chu,
  262 F.R.D. 24 (D.D.C. 2009)............................................................................27

Ashcroft v. Iqbal,
  556 U.S. 662 (2009).........................................................................................8, 9

Balance Point Divorce Funding, LLC v. Scrantom,
  978 F. Supp. 2d 341 (S.D.N.Y. 2013).................................................................33

Bank of Am. Corp. v. City of Miami, Fla.,
  137 S. Ct. 1296 (2017).......................................................................................37

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007).............................................................................................8

* Bolger v. Youngs Drug Prod. Corp.,
  463 U.S. 60 (1983)........................................................................................36, 37

Bustos v. A & E T.V. Networks,
  646 F.3d 762 (10th Cir. 2011) ..........................................................................13

Carter v. Hahn,
  821 A.2d 890 (D.C. 2003) .................................................................................11

Charles Atlas, Ltd. v. Time-Life Books, Inc.,
  570 F. Supp. 150 (S.D.N.Y. 1983) .....................................................................33

Cmty. Nutrition Inst. v. Block,
  698 F.2d 1239 (D.C. Cir. 1983),
  rev'd on other grounds, 467 U.S. 340 (1984)........................................................28

Competitive Enter. Inst. v. Mann,
  150 A.3d 1213 (D.C. 2016) ...........................................................................12, 19

Dean v. Am. Fed'n of Gov't Employees, Local 476,
  509 F. Supp. 2d 39 (D.D.C. 2007).....................................................................25

2

*Dubinsky v. United Airlines Master Exec. Council*,
   303 Ill. App. 3d 317 (1999) ............................................................................................ 29

*Fanelle v. LoJack Corp.*,
   79 F. Supp. 2d 558 (E.D. Pa. 2000) ................................................................................ 29

*Farah v. Esquire Magazine*,
   736 F.3d 528 (D.C. Cir. 2013) ........................................................................................ 31

\* *First Mariner Bank v. Resolution Law Grp., P.C.*,
   No. CIV. MJG-12-1133, 2014 WL 1652550 (D. Md. Apr. 22, 2014) ............................... 35

*Franklin v. Pepco Holdings, Inc. (PHI)*,
   875 F. Supp. 2d 66 (D.D.C. 2012) .................................................................................. 25

\* *Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989) .................................................................................................. 21, 22

*Hayes Microcomputer Prod., Inc. v. Franza*,
   601 S.E.2d 824 (Ga. App. 2004) ..................................................................................... 12

*Herbert v. Lando*,
   441 U.S. 153 (1979) .................................................................................................. 19, 21

*Int'l Union v. Garner*,
   601 F. Supp. 187 (M.D. Tenn. 1985) ............................................................................... 28

*Jaillett v. Georgia Television Co.*,
   520 S.E.2d 721 (Ga. App. 1999) ......................................................................... 15, 16, 30

*Jankovic v. Int'l Crisis Grp.*,
   822 F.3d 576 (D.C. Cir. 2016) ........................................................................................ 21

*Koly v. Enney*,
   269 F. App'x 861 (11th Cir. 2008) ................................................................................... 12

*Lasker v. UBS Sec. LLC*,
   614 F. Supp. 2d 345 (E.D.N.Y. 2008) ............................................................................. 32

\* *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ....................................................................................... 34, 35, 37

*Liberty Lobby, Inc. v. Anderson*,
   746 F.2d 1563 (D.C. Cir. 1984),
   *vacated on other grounds*, 477 U.S. 242 (1986) ........................................................... 18

*Lindsey v. D.C.*,
   879 F. Supp. 2d 87 (D.D.C. 2012) .............................................................................. 18, 26

*Mar-Jac Poultry, Inc. v. Katz*,
   773 F. Supp. 2d 103 (D.D.C. 2011) ................................................................................. 25

*Martin Marietta Corp. v. Evening Star Newspaper Co.*,
   417 F. Supp. 947 (D.D.C. 1976) ..................................................................................... 27

\* *Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991) ........................................................................................................ 14

*Mathis v. Cannon*,
 573 S.E.2d 376 (Ga. 2002).................................................................... 11

*Moldea v. New York Times Co.*,
 15 F.3d 1137 (D.C. Cir.),
 *as modified*, 22 F.3d 310 (D.C. Cir. 1994) ......................................... 18

*Montgomery v. Risen*,
 197 F. Supp. 3d 219 (D.D.C. 2016).................................................... 19

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*,
 957 A.2d 890 (D.C. 2008) .................................................................. 31

*Organovo Holdings, Inc. v. Dimitrov*,
 162 A.3d 102 (Del. Ch. 2017).............................................................. 27

*Parsi v. Daioleslam*,
 595 F. Supp. 2d 99, 103, (D.D.C. Feb. 4, 2009) ................................... 24

*Parsi v. Daioleslam*,
 890 F. Supp. 2d 77 (D.D.C. Sept. 13, 2012).......................................... 24

*Pavesich v. New England Life Ins. Co.*,
 50 S.E. 68 (Ga. 1905)........................................................................ 30

\* *Prins v. Int'l Tel. & Tel. Corp.*,
 757 F. Supp. 87 (D.D.C. 1991) ............................................... 16, 17, 18

*Rebecca Broadway Ltd. P'ship v. Hotton*,
 143 A.D.3d 71 (1st Dep't 2016) .......................................................... 32

*Robins Fed. Credit Union v. Brand*,
 507 S.E.2d 185 (Ga. App. 1998).......................................................... 32

*Rowell v. Phoebe Putney Mem'l Hosp., Inc.*,
 791 S.E.2d 183 (Ga. App. 2016).......................................................... 31

*S & W Seafoods Co. v. Jacor Broad. of Atlanta*,
 390 S.E.2d 228 (Ga. App. 1989).......................................................... 30

*Singletary v. D.C.*,
 351 F.3d 519 (D.C. Cir. 2003) ............................................................ 28

*SIRQ, Inc. v. The Layton Companies, Inc.*,
 379 P.3d 1237 (Utah 2016) ................................................................. 28

*Stange v. Cox Enterprises, Inc.*,
 440 S.E.2d 503 (Ga. App. 1994).................................................... 15, 16

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
 330 F.3d 1110 (9th Cir. 2003) ....................................................... 21, 23

*Swierkiewicz v. Sorema N.A.*,
 534 U.S. 506 (2002)............................................................................. 8

*Time, Inc. v. Firestone*,
 424 U.S. 448 (1976)............................................................................. 8

4

*Torrance v. Morris Publ'g Grp. LLC*,
   636 S.E.2d 740 (Ga. App. 2006)................................................................. 28

*Valdez v. Maya Pub. Grp. LLC*,
   No. 10CV733-L BGS, 2011 WL 2413510 (S.D. Cal. June 15, 2011)...................................... 21

*Washington v. Smith*,
   893 F. Supp. 60 (D.D.C. 1995),
   *aff'd*, 80 F.3d 555 (D.C. Cir. 1996) ................................................................. 12, 19

*Weil v. Express Container Corp.*,
   824 A.2d 174 (N.J. App. 2003)................................................................. 32

*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) ................................................................. 12, 13

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990) ................................................................. 20

*White v. Manchester Enter., Inc.*,
   871 F. Supp. 934 (E.D. Ky. 1994) ................................................................. 29

\* *Zimmerman v. Al Jazeera Am., LLC*,
   246 F. Supp. 3d 257 (D.D.C. 2017) ................................................................. 20, 21, 26


**Statutes**

15 U.S.C. § 1125(a)(1)(B) ................................................................. 33

15 U.S.C. § 1127................................................................. 35


**Other Authorities**

50 Am. Jur. 2d Libel and Slander § 212 ................................................................. 25

Leonard M. Niehoff, *Opinions, Implications, and Confusions*, Comm. Law., November
   2011................................................................. 20

Meiring De Villiers, *Quantitative Proof of Reputational Harm*, 15 Fordham J. Corp. &
   Fin. L. 567 (2010) ................................................................. 27

## I.     <u>INTRODUCTION</u>

Plaintiff MiMedx Group, Inc. ("MiMedx") brought this action against Defendants DBW Partners LLC d/b/a The Capitol Forum; Trevor Baine; Teddy Downey; Jake Williams; Miles Pulsford; Matt Treacy; and Does 1-100 inclusive (collectively "Defendants") after suffering a calculated and knowing short-and-distort attack that caused the company to lose hundreds of millions of dollars in value over the span of a few short weeks. As alleged in the Complaint, while Defendants purport to be journalists, they actually served as a compensated "shill" with no regard for the truth, on behalf and in concert with persons looking to manipulate MiMedx's stock price. Indeed, not only did Defendants publish several false or misleading articles about MiMedx in short succession, but they took their disparaging tactics even further when they sent "summaries" of the articles containing blatant falsehoods directly to MiMedx's shareholders—a tactic decidedly unlike those pursued by traditional media outlets. At the outset, then, Defendants' characterization of the Complaint in the instant Motion to Dismiss ("Motion") is disingenuous. MiMedx has not "brought a defamation action based on a single word in an email describing an accurate news report." Mtn. at 1. MiMedx has alleged an overall scheme by Defendants to manipulate the value of MiMedx's publicly-traded stock by distorting the truth in an effort to profit at the expense of unsuspecting investors. That scheme has been made obvious by at least two known instances of blatantly defamatory conduct, with other instances of wrongful conduct likely to be uncovered in discovery.

The first instance—and the one that Defendants focus on as if it was the only allegation in the Complaint—occurred when Defendants wrote a negative article about MiMedx and then immediately e-mailed a "summary" of that article to MiMedx's shareholders. The summary falsely alleged that the full article contained details about accusations of fraud by MiMedx

customers. But the article did not actually contain any such details, which fact was obscured from recipients because the article was not attached to the e-mail and was only accessible via subscription to Defendants' website. Defendants now admit that their statement was false, and their claim in the Motion that it was not "materially" false is absurd. There is an enormous difference between allegations of fraud by **customers** and allegations of fraud by **disgruntled former employees** terminated for selling competitors' products on the side. Defendants understood that the so-called "news" was the kind of information an investor would want to know when making a determination to buy, sell, or hold MiMedx stock.

The second instance, which is almost entirely ignored in Defendants' Motion, occurred when Defendants sought to publish another negative article about MiMedx, but prior to publishing obtained facts that refuted the allegations of fraud against the company. In a manner entirely inconsistent with Defendants' supposed devotion to objective journalism, Defendants ignored those facts and went ahead and published their "hit piece" about the company anyway, omitting any mention of this positive evidence. Defendants also went to great lengths to craft a cleverly-worded, misleading allegation in this article that there was an ongoing government investigation "involving documents related to" MiMedx, which falsely suggested that MiMedx itself was the target of investigation. Thus, MiMedx has described at least two knowingly false and misleading publications by Defendants in its Complaint.

For these reasons, as further detailed below, MiMedx's defamation claim is not subject to dismissal. One simply does not have the right—under the First Amendment or otherwise—to maliciously defame a company for the sole purpose of devaluing its stock price (at great harm to investors and the capital markets) and then retreat behind the cloak of supposed "journalism." While Defendants will have every right to defend themselves against MiMedx's allegations, the

allegations are certainly sufficient to overcome the low hurdle of stating a plausible claim for relief. Additionally, MiMedx has properly stated claims for false light, tortious interference with business relations, and violation of the Lanham Act based on the same wrongful conduct. The Court should reject Defendants' efforts to unilaterally recharacterize MiMedx's allegations to their own benefit, and deny their Motion.

## II.  STATEMENT OF FACTS

MiMedx is a global processor, marketer, and distributor of medical products. Compl., ¶ 1. MiMedx began trading publicly in 2008 and was listed on the NASDAQ exchange in 2013. *Id.* As its business flourished, its stock price steadily rose from approximately $3/share to a high of approximately $17.50/share. *Id.* Over this timeframe, MiMedx began to notice an increasing number of bearish trades in its stock (*i.e.*, bets that the stock price will decrease; usually in the form of a "short sale" of stock, or more complex option trading). *Id.*, ¶ 2. Despite those bearish trades, however, MiMedx's stock price continued to increase through mid-August 2017. *Id.* When the stock price of a company rises against a short-seller's position, the short-seller not only takes a loss on paper, but may be subjected to a "margin call" and/or "short squeeze" that would cause an actual monetary loss. *Id.*, ¶ 22. The rising price of MiMedx stock therefore posed a significant threat to its short-sellers' trading positions. *Id.*

Not coincidentally, beginning in mid-August 2017, Defendants—holding themselves out as a supposed subscription-based media outlet—published a series of articles concerning allegations of fraudulent business practices by MiMedx and purported investigations by the federal Department of Veterans' Affairs Office of the Inspector General ("OIG"). *Id.*, ¶ 3. Defendants specifically targeted these articles toward MiMedx's shareholders, sending e-mails to

those shareholders bearing summaries and excerpts from the articles and asking to set up telephone consultations for further discussion. *Id.*

Specifically, on August 21, 2017, Defendants published an article entitled "MiMedx: Channel Stuffing Accusations Resurface in Recent Counterclaim; Former Employees Corroborate Allegations; A Close Look at Potential Risk." *Id.*, ¶ 23, Ex. A. Therein, Defendants purported to summarize allegations of "channel stuffing" made against MiMedx by former employees. *Id.* The former employees in question, however, had been fired because they had abused their positions as salespeople by selling competing products while working for MiMedx. *Id.*, ¶ 18. After MiMedx sued those former employees for breaching their non-compete agreements with the company, the employees counter-sued MiMedx, alleging that the company terminated their employment in retaliation for their complaints about purported channel stuffing practices. *Id.*, ¶ 19. Channel stuffing is a term sometimes used to describe a form of revenue fraud in which a company inflates sales and revenue figures by distributing to retailers more products than the company is able to sell to the public. *Id.*

It appeared that the former employees' allegations were designed merely to intimidate MiMedx into eliminating their non-compete agreements and paying a large "hush money" settlement. *Id.*, ¶ 20. Nevertheless, all of the allegations were fully investigated over a three-month period by the Board of Directors, outside counsel, and external auditors—even including an expert on revenue recognition—and no credible evidence of incorrect processes, procedures or wrongdoing by the company or management was found. *Id.* Also, there was no credible evidence to indicate that any changes to the company's previously issued financial statements were necessary in light of the former employees' allegations. *Id.* In fact, MiMedx obtained

admissions from some of the former employees in litigation indicating that they did not have any evidence to support their claims, and one even withdrew claims. *Id.*

Nevertheless, on the same date that Defendants' article concerning these allegations was published, Defendant Treacy—The Capitol Forum's Managing Director of Sales—sent an e-mail to MiMedx's shareholders. *Id.*, ¶ 24, Ex. B. In his e-mail, Treacy advised that "[w]e published an update to our coverage of MiMedex [sic] earlier today. In the article, we detail channel stuffing allegations and recent counterclaims which may pose as a regulatory risk for the company. The article examines the allegations made by **customers** & former employees, the company's response to these claims, and the potential legal risks for MiMedx." *Id.* (emphasis added). He then asked "to schedule a call to discuss [Defendants'] view on MiMedx." *Id.* The actual article was not attached to the e-mail, and in fact could not be viewed at all unless the recipient purchased a subscription to Defendants' website. *Id.*, ¶¶ 64-65, Ex. B.

Defendants' August 21, 2017 article, however, says nothing about any channel stuffing allegations made by MiMedx customers. *Id.* Treacy's e-mail to shareholders was therefore categorically false, intended merely to convince the shareholders to sell their MiMedx stock. *Id.*, ¶ 26, 33. (Defendants now claim in their Motion that Treacy's false reference to customers was a "mistake," but admit that the allegations of channel stuffing in the article were limited to those presented by MiMedx's former employees. Mtn. at 3.)[1]

To further their goal of devaluing MiMedx's stock price, Defendants then prepared to publish a second negative article about MiMedx concerning channel stuffing, as well as a purported investigation by the OIG. Compl., ¶¶ 29-30, 33. Defendants conducted on-the-record

---

[1] Defendants additionally claim that the "mistake" was somehow corrected after MiMedx filed its Complaint, although they cannot support this claim with any reference to materials properly before the Court, and it is not particularly relevant in any event. Mtn. at 1; *see infra* n.6.

5

interviews that elicited numerous positive statements regarding MiMedx, including statements that the channel stuffing allegations were false. *Id.* Defendants also conducted at least one off-the-record interview in which Defendants learned that the OIG's investigation was **not** targeted at MiMedx. *Id.* In fact, MiMedx was working **with** the OIG to provide documents that might assist its efforts against others. *Id.* Finally, Defendants learned—or should have learned if they had taken their journalistic investigation to a reasonable conclusion—that several of the former employees who had made channel stuffing allegations against MiMedx either admitted they have no evidence to support them, or entirely withdrew their claims. *Id.*

Notwithstanding the foregoing, Defendants published their second article on September 7, 2017, entitled "VA Office of Inspector General Confirms Investigation Involving MiMedx Documents." *Id.*, ¶ 27, Ex. C. As before, Defendant Treacy sent another e-mail to MiMedx shareholders purporting to summarize the article. *Id.*, ¶ 28, Ex. D. Treacy's e-mail stated that "[t]he VA Office of Inspector General (OIG) is conducting an investigation that **involves documents related to MiMedx**, according to an OIG response to a Capitol Forum FOIA request. The OIG disclosed the investigation in a denial of a FOIA request [Defendants] submitted as part of our ongoing examination of allegations of channel stuffing made by former MiMedx employees." *Id.* (emphasis added). As before, Treacy then asked "to schedule a call to discuss [Defendants'] view on MiMedx." *Id.*

The September 7, 2017 article and associated e-mail were therefore false and misleading for multiple reasons. First, by omitting a host of known information about MiMedx—information that was not only positive for the company, but that actually controverted the fraud allegations that Defendants were purporting to cover—Defendants intentionally and maliciously conveyed a misleading overall impression of MiMedx. *Id.*, ¶ 29. Second, Defendants' statement

that the OIG investigation "involve[d] documents related to MiMedx" was intentionally and maliciously crafted to imply that MiMedx was the target of the OIG investigation—a fact made particularly obvious given that this misleading allegation became the sole focus of the article's headline—when Defendants knew that was not the case. *Id.,* ¶ 30. Rather, MiMedx had merely provided documents to the OIG to assist in its investigation. *Id.* The fact that Defendants learned this information in an off-the-record interview only meant that they could not include that specific information (from that specific source) in their article. *Id.* It does not compel the conclusion that Defendants did not know they were suggesting a falsehood. *Id.*

On the same day that Defendants' September 7, 2017 article was published, it was picked up by Bloomberg News, which published an article of its own entitled "MiMedx Down; Capitol Forum Says Virginia OIG Conducting Probe."[2] *Id.*, ¶ 31, Ex. E. The Bloomberg article, as noted in its title, was based solely on Defendants' article published that same day and serves as an example of the way that Defendants' misleading statements propagated throughout the press, further damaging MiMedx. *Id.*

On September 7, 2017, MiMedx's stock price dropped 5.6% on volume of 3,741,800 (almost three times its average daily volume in 2017), and on September 8, 2017, MiMedx's stock price dropped an additional 13.85% on volume of 4,697,000 (almost four times its average daily volume in 2017). *Id.*, ¶ 32. In fact, following Defendants' August 21, 2017 article and e-mail(s) of the same day, MiMedx's stock price dropped ***over 20%*** in total, or in terms of total stock market capitalization, by over ***$300 million***. *Id.*

---

[2]     The fact that Bloomberg erroneously interpreted the abbreviation "VA" in Defendants' article to refer to the State of Virginia and not the federal Department of Veterans' Affairs is clear evidence that Bloomberg did not actually read the article or do any independent investigation, but merely republished the article's allegations to a larger audience.

As alleged in the Complaint, this was the intended effect of Defendants' false and misleading statements about MiMedx. *Id.*, ¶¶ 33-34. Indeed, publishing an "article" and then having professional sales people reach out directly to shareholders, encouraging them to call them back to "learn more," is not a typical practice of a media outlet. *Id.* Rather, Defendants' role was to act as a "shill" for bearish traders in MiMedx stock by publishing false and/or misleading information—while omitting true and positive information—in an attempt to manipulate and drive the stock price down even in the face of positive performance by the company. *Id.* Defendants all have strong, specific ties to Wall Street and the financial industry that are decidedly atypical for the average journalist. *Id.*, ¶ 34.

## III. **LEGAL STANDARD**

In considering a Rule 12(b)(6) motion, the Court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). The plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## IV. **ARGUMENT**

Defendants aim to portray themselves as journalists, and attempt to make this case about the First Amendment. Mtn. at 5-6. But Defendants have not acted as journalists, and this case has nothing to do with the First Amendment. Indeed, the First Amendment does not protect defamatory statements. *See Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976) ("[I]naccurate and

defamatory reports . . . deserv[e] no First Amendment protection."). Thus, the only questions to be determined on the instant Motion are whether MiMedx has alleged facts that "plausibly give rise to an entitlement to relief" under its claims for defamation (including libel and slander), false light, tortious interference with business relations, and violation of the Lanham Act. *Iqbal*, 556 U.S. at 679. For the reasons that follow, the Complaint more than meets this standard.[3]

First, as to its defamation claims, MiMedx has alleged at least two specific publications by Defendants that were false and misleading as to MiMedx, and explained exactly why they were false and misleading. Defendants' protestations that the admittedly false portion of these publications was not "material" are misplaced because accusations of fraud by customers—as Treacy falsely purported were contained in the August 21, 2017 article—are far more damaging than accusations by disgruntled former employees. Defendants also incorrectly argue that MiMedx has failed to plead "actual malice," given that the Complaint alleges numerous facts from which to conclude that Defendants acted against MiMedx with intentional or reckless disregard for the truth. Finally, to the extent that Defendants attempt to argue that MiMedx has not shown actionable damages, MiMedx is not required to do so because Defendants' conduct disparaged MiMedx in its trade or business and therefore constituted defamation *per se*. In any event, the significant and unusual drop in MiMedx's stock price is also evidence of damage to the company, and MiMedx need not resolve complicated questions of causation at this early stage of the litigation without the benefit of discovery.

Second, as to MiMedx's claim for false light, Defendants argue that MiMedx cannot assert such a claim because it is a corporation, because Defendants' false and misleading

---

[3]     MiMedx explained in its Complaint that to the extent there is any conflict between District of Columbia and Georgia law concerning the tort claims presented therein, the D.C. Circuit's conflict-of-laws analysis will apply Georgia law, and Defendants do not contend otherwise. Compl., ¶ 35. Federal law applies to the Lanham Act claim. *Id.*

statements were directed toward its business, and because MiMedx has not alleged "actual malice." The latter argument, of course, fails for the same reasons it fails with respect to the defamation claims. The Complaint more than adequately alleges that Defendants acted with intentional or reckless disregard for the truth. Otherwise, Defendants paint with too broad a brush in contending that no corporation or person operating a business could ever state a false light claim. There is no Georgia case standing for such a proposition. Instead, the Court must examine the facts alleged to determine whether Defendants' actions have intruded upon MiMedx's right to conduct business free of false and misleading statements by those who endeavor to harm the company for their own personal gain.

Third, as to the tortious interference claim, there can be little question that MiMedx has alleged the sort of "independently wrongful" conduct that forms the gravamen of such a claim. Defendants' arguments concerning "wrongfulness" are the same as presented in support of their motion to dismiss the defamation claims, and fail for the same reasons. Furthermore, Defendants' contention that the relationship between a company and its shareholders cannot be the subject of tortious interference is incorrect as a matter of law.

Fourth and finally, as to MiMedx's claim for violation of the Lanham Act, Defendants purport that such a claim is in all cases limited to one brought between direct competitors, and does not apply where the defendant is a journalist speaking about a public entity. But as Defendants admit in their Motion, the Lanham Act applies to regulate "commercial speech," which undoubtedly encompasses Defendants' publications here. Indeed, the most egregious of Defendants' misstatements were contained in e-mails that were sent for the purpose of selling subscriptions to Defendants' website (although MiMedx has alleged that the true purpose was far more nefarious—to manipulate the market for MiMedx's stock). Under these circumstances, the

Lanham Act serves to protect MiMedx from the sort of false and misleading contentions disseminated by Defendants, and the claim therefore is not subject to dismissal.

Given the foregoing, as set out in more detail below, the Court should deny Defendants' motion to dismiss and order them to file an answer to the Complaint.

### A.     MiMedx Has Sufficiently Pleaded its Defamation Claims

As previously observed, Defendants' Motion blatantly mischaracterizes the Complaint by asserting that "MiMedx alleges that the Capitol Forum libeled, slandered and defamed it by including the word 'customers' in its August 21 email," and arguing that MiMedx's defamation claims cannot be predicated on "the inclusion of that single word" because it was not material to the overall meaning of the publication.  Mtn. at 6.  To the contrary, any shareholder reading Treacy's August 21, 2017 e-mail would have necessarily concluded that the article of the same day included accusations of fraud by MiMedx's customers—a severely damaging allegation toward any company—and thus the use of the word "customers" was plainly material.  In any event, this case is about far more than one word in an e-mail.  It is about Defendants' clearly-demonstrated, malicious campaign to malign MiMedx for the benefit of either themselves or their cohorts.  Viewed through this lens, the defamation claims are more than viable.

The law of defamation generally requires the plaintiff to demonstrate four elements to establish a claim for relief: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm [usually referred to as defamation *per se*]."  *Mathis v. Cannon*, 573 S.E.2d 376, 380 (Ga. 2002); *see also Carter v. Hahn*, 821 A.2d 890, 893 (D.C. 2003) (same).  In cases where the plaintiff is considered a "public figure," statements are generally considered privileged unless the defendant uttered them with "actual malice."  *Id.* at 380-81.

*Defendants' August 21, 2017 and September 7, 2017 publications contained "false and defamatory statements concerning" MiMedx.*

Publications that are actionable under the law of defamation typically include those which contain "express or implied verifiably false statements of fact."  *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001).  However, publications "can [also] be actionable if they imply a provably false fact, or rely upon stated facts that are provably false."  *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1241 (D.C. 2016); *see also Hayes Microcomputer Prod., Inc. v. Franza*, 601 S.E.2d 824, 828 (Ga. App. 2004) (same).  Additionally, a statement cast as the speaker's opinion which suggests to the listener that it is "based on undisclosed facts" can also form the basis of a defamation claim.  *Washington v. Smith*, 893 F. Supp. 60, 63 (D.D.C. 1995), *aff'd*, 80 F.3d 555 (D.C. Cir. 1996); *see also Koly v. Enney*, 269 F. App'x 861, 865 (11th Cir. 2008) (same) (applying Georgia law).  The determination of whether a statement is fact or opinion is made within "the context of the statement in question."  *Mann*, 150 A.3d at 1241.

As summarized above, Defendants published false statements concerning MiMedx on at least two instances: August 21, 2017 and September 7, 2017.

i.        The August 21, 2017 publication

Defendants' August 21, 2017 statement was reflected in Treacy's e-mail to promote The Capitol Forum's purported "coverage" of MiMedx, and stated that Defendants "published an update to our coverage of MiMedex [sic] earlier today.  In the article, we detail channel stuffing allegations and recent counterclaims which may pose as a regulatory risk for the company.  The article examines the allegations made by customers & former employees, the company's response to these claims, and the potential legal risks for MiMedx."  Compl., ¶ 24, Ex. B.

Defendants admit that the article in question did not, in fact, "examin[e] the allegations made by customers . . ." concerning channel stuffing.  Mtn. at 3.  Therefore, Treacy's e-mail

undisputedly contained an "express . . . verifiably false statement of fact." *Weyrich*, 235 F.3d at 623. However, Defendants now claim that it was somehow immaterial that they wrongly made representations to MiMedx's shareholders about allegations of fraud by the company's own customers. One argument they make in this respect is that "it is implausible that a recipient of the August 21 email would have reached any conclusion about the validity of the channel-stuffing allegation without reading the underlying report indicating that the allegations originated only with former employees." Mtn. at 13. But the recipients of Treacy's August 21, 2017 e-mail **could not** read the underlying article to deduce that it contained no allegations by actual customers. The e-mail did not attach the article, which was available only to subscribers (one assumes that the recipients of the e-mail were not subscribers, otherwise there would be no point in soliciting them). Compl., ¶ 24, Ex. B. Thus, this argument is entirely unfounded.

Defendants' other argument regarding the materiality of the statement about "customers" is that because the channel stuffing allegations had been made by former employees in any event, the statement concerning customers made no difference to the overall impression of the publication. Mtn. at 9. At the outset, this argument is inappropriate for purposes of a motion to dismiss. *See Air Wisconsin Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 868 (2014) ("[M]ateriality is the sort of 'mixed question of law and fact' that 'has typically been resolved by juries.'"). In any case, the argument simply does not hold water. The difference between allegations of fraud by a customer—as opposed to a disgruntled former employee with an axe to grind against the company—is enormous, and for several reasons is assuredly one "that matters for purposes of the plaintiff's public reputation." Mtn. at 10 (citing *Bustos v. A & E T.V. Networks*, 646 F.3d 762, 767 (10th Cir. 2011)).

First, a customer has an immediate and substantial ability to affect a company's revenues by ceasing to do business with the company, whereas an employee does not. Second, if a company is alleged to deal unfairly with one customer, such allegations could easily spread to the company's other customers and cause them to also withdraw their business, potentially even absent any actual corroboration of the allegations. Third, a company's relationship with its customers is often its most important business relationship. For better or for worse, a company that is seen to deal unfairly with its employees may not suffer the wrath of its investors, but a company that is seen to deal unfairly with its customers will inevitably see its reputation shattered within its industry. Fourth—and particularly with respect to MiMedx in this case—the channel stuffing allegations by former employees had long since been public knowledge, and it had been made clear (in public documents) that these former employees harbored a specific bias against MiMedx after being fired from the company and sued for breach of contract.[4] Conversely, there was absolutely no reason for a recipient of Treacy's e-mail to think that any customers who may have leveled a new set of allegations at MiMedx would have any ulterior motive to do so. To be deemed "materially" false, a statement need only "have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). The inclusion of the word "customers" in Treacy's e-mail clearly had such a "different effect."

As Defendants concede in their Motion, the multitude of cases that they cite on this issue concern "minor errors" or "minor inaccuracies" in a public statement, and are inapposite for that

---

[4] Certainly, MiMedx's shareholders were already fully aware of these former employee allegations as they had previously been discussed in the company's July 31, 2017 quarterly report to the SEC, as well as the company's press release of August 17, 2017. Moreover, via their counsel, the former employees themselves had begun publishing press releases detailing the allegations as early as December 2016.

reason.  Mtn. at 10.  For example, in *Stange v. Cox Enterprises, Inc.*, 440 S.E.2d 503 (Ga. App. 1994), the plaintiff had purchased homes from owners in his own name, or as an agent for his sister and brother-in-law, and then rented the houses back to the former owners.  *Id.* at 505.  The defendant then published an editorial concerning the plaintiff containing two allegedly false statements.  *Id.* at 507.  The first was that "three former homeowners" had said the plaintiff had "posed as a lender," which he argued was untrue because only two homeowners had done so, and one of them had merely stated that he "felt deceived."  *Id.*  The second was that "at least one former homeowner is suing," which the plaintiff argued was untrue because it did not clarify that his sister and brother-in-law were the actual defendants in that suit (likely because the plaintiff had simply purchased the property in their name, rather than his own).  *Id.*  In his deposition, however, the plaintiff conceded that these statements "were in large part accurate;" a concession the court agreed with when affirming the judgment on the defamation claim.  *Id.*

Similarly, in *Jaillett v. Georgia Television Co.*, 520 S.E.2d 721 (Ga. App. 1999), the defendant news broadcaster stated that the plaintiff air conditioning repair business had falsely told a homeowner that she had to replace her entire air conditioning unit.  *Id.* at 725.  The plaintiff argued that this was not substantially true because, it claimed, it had also given her a quote to replace the fan motor (although it did not dispute that a second company later repaired the unit for substantially less, without having to replace the unit or the fan motor).  *Id.*  The court concluded that the broadcast did not "alter the truth of the gist of the story—that [plaintiff] incorrectly told Mrs. Dillard the entire unit needed to be replaced" and affirmed the trial court's grant of summary judgment on the defamation claim.  *Id.*

These cases are decidedly unlike the fact pattern presented in the instant Complaint. Defendants argue that "the error in *Strange* [sic] was more material" than the error in Treacy's e-

mail here because the plaintiff was not actually named in the homeowner's lawsuit, but the defendant did not claim as much, and the lawsuit did clearly center on allegations of deception by the plaintiff himself. Mtn. at 10-11. Moreover, Defendants disingenuously attempt to equate the *Stange* defendant's "minor error" in specifying the wrong **number** of persons airing grievances against the plaintiff with Defendants' claim that their article contained allegations of fraud by entirely different **types** of persons. Mtn. at 10. While there is no appreciable difference between allegations by two and three former homeowners, there is a significant difference between allegations by a company's customers and its disgruntled former employees.

Defendants also argue that, like the failure to mention the quote for the fan motor repair in *Jaillett*, the inclusion of the word "customers" in Treacy's e-mail did not alter the main thrust of the August 21 e-mail, which they characterize as the contention "that MiMedx was the subject of unresolved allegations of channel stuffing." Mtn at 11. But while true that it was immaterial in *Jaillett* whether the defendant had mentioned the quote for the lesser work—given that the "main thrust" of the broadcast was that the plaintiff had misrepresented that the entire air conditioning unit needed to be repaired—the same is not true here. As described above, the inclusion of the word "customers" materially altered the "main thrust" of the e-mail, making it far more concerning to a shareholder than if it had been correctly limited to those allegations brought by former employees.

This case is far more like *Prins v. Int'l Tel. & Tel. Corp.*, 757 F. Supp. 87 (D.D.C. 1991) than either *Stange* or *Jaillett*. In *Prins*, the plaintiff was a supervisor at a company that was the subject of a federal indictment for conspiracy to defraud the U.S. government. *Id.* at 88-89. One of his employees was personally indicted, and the government made the plaintiff out to be an unindicted co-conspirator for his conduct in overseeing that employee. *Id.* The defendant news

organization then published a story about the indictment. *Id.* Therein, the defendant stated that the company had attempted to distance itself from wrongdoing by blaming its former employees, and that since the investigation began, the plaintiff had been "fired." *Id.* The plaintiff sued the news organization for defamation based solely on the use of the word "fired," contending that he was actually let go as a result of a completely separate corporate restructuring. *Id.*

Like Defendants here, the defendant in *Prins* argued that the use of the singular word "fired" did not change the "gist or sting" of the publication because whether or not he was technically fired, the plaintiff lost his employment under circumstances suggesting he engaged in wrongdoing. *Id.* at 92. The court firmly rejected that argument, finding that "the published statement about the plaintiff having been fired was not merely an 'inoffensive detail of secondary importance,'" but significantly added to the seriousness of the charge against the plaintiff:

> As the plaintiff correctly points out, [if the story had been strictly accurate], he would have been "stung" somewhat by the government's allegations, but they would have been nothing more than allegations not substantiated in a court of law and not implicitly supported by his employer's decision to fire him. By comparison, [the defendant's] statements about the plaintiff carried a much more powerful sting. They could reasonably be construed as implying a link between the government's charges against the plaintiff and [the employer's] adverse personnel action, thus placing this powerful corporation's imprimatur upon the government's unsubstantiated allegations. [¶] **This is not merely a semantic difference and is not comparable to a minor inaccuracy that is immaterial to the truth of the defamatory statement.**

*Id.* (emphasis added).

In this case, the use of the word "customers" in Treacy's e-mail substantively changed the meaning of the entire communication far beyond what was actually true (that Defendants' article contained allegations of fraud by MiMedx's disgruntled former employees). While the former employees' allegations carried some sting, they were "nothing more than allegations not substantiated in a court of law." *Id.* The added detail that "customers and former employees" had made the same allegations, however, made it appear that the article contained new or

additional allegations that might corroborate the former employees' allegations (it did not). Therefore, Defendants' contention that the use of the word customers "did not alter the substance or sting" of the report (Mtn. at 9) fails for the same reason it failed in *Prins*.

Finally, to the extent that Defendants include an argument concerning the "incremental harm" doctrine in their Motion (Mtn. at 12-13), that doctrine adds nothing to Defendants' analysis because, for the same reasons described above, there was clearly an "incremental harm" achieved when Treacy falsely added the word "customers" to his e-mail. In any event, the D.C. Circuit has "squarely rejected" the application of the incremental harm doctrine as a defense to a claim of defamation, and Defendants are unable to cite to any cases where the Georgia appellate courts or the Eleventh Circuit have applied the doctrine. *Moldea v. New York Times Co.*, 15 F.3d 1137, 1149 (D.C. Cir.), *as modified*, 22 F.3d 310 (D.C. Cir. 1994); *see also Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568 (D.C. Cir. 1984) (then-Judge Scalia reasoning that even if true statements in a publication "are in fact much more derogatory than the statements under challenge, the latter cannot be said to be harmless. Even the public outcast's remaining good reputation . . . is not inconsequential."), *vacated on other grounds*, 477 U.S. 242 (1986).

Accordingly, the August 21, 2017 publication was a "false statement" upon which MiMedx's defamation claim is properly predicated.

ii.       The September 7, 2017 publication

Defendants do not make any attempt to argue that their September 7, 2017 publication did not constitute a "false statement" for purposes of MiMedx's defamation claim, and therefore impliedly concede the point. *See Lindsey v. D.C.*, 879 F. Supp. 2d 87, 95 (D.D.C. 2012) (arguments not made in party's opening memorandum are waived; party cannot raise arguments for the first time on reply). But even if they did, such an argument would be unconvincing.

Indeed, as alleged in the Complaint, the September 7, 2017 article and e-mail omitted any mention of information that was known by Defendants to controvert the channel stuffing allegations against the company, including on-the-record interviews where those allegations were refuted. Compl., ¶ 29. Furthermore, despite conducting an off-the-record interview with MiMedx in which MiMedx advised Defendants that it was assisting the OIG with a pending investigation—one that did not target MiMedx—by supplying documents for its review, Defendants stated in both the article and e-mail that the OIG was conducting an investigation "involving documents related to MiMedx." *Id.*, ¶ 30. This statement was obviously crafted to intentionally and falsely imply that MiMedx was the target of the OIG investigation when Defendants knew that was not the case. *Id.*

Given the foregoing, the September 7, 2017 article and e-mail were also "false statements" for purposes of the defamation claim, in that they "impl[ied] a provably false fact" (that the OIG was directly investigating MiMedx) and/or were "based on undisclosed facts" (the known and omitted evidence that the channel stuffing allegations were false). *Mann*, 150 A.3d at 1241; *Washington*, 893 F. Supp. at 63. To be clear, of course, MiMedx makes no argument that Defendants were obligated in all circumstances to publish positive information about the company. Defendants were, of course, entitled to exercise their own discretion regarding the issues they chose to publish on. *Herbert v. Lando*, 441 U.S. 153, 169 (1979). But that privilege was not absolute, and it did not permit Defendants to publish defamatory allegations while purposely omitting evidence that specifically controverted those allegations. *Id.; see also Montgomery v. Risen*, 197 F. Supp. 3d 219, 241 (D.D.C. 2016) (confirming that "defamation by implication . . . has a longstanding history in defamation law," and courts must strictly scrutinize "false impression[s] given by the juxtaposition or omission of facts."); Leonard M. Niehoff,

*Opinions, Implications, and Confusions*, Comm. Law., November 2011, at 19, 20–21 ("For example, if I tell you that I saw Jones running away from a bank mere seconds after it was robbed, but fail to add that Jones was chasing the culprit, it seems unfair to allow me to take refuge in the literal truth of my statement.").[5]

Accordingly, the September 7, 2017 publication was also a "false statement" upon which MiMedx's defamation claim is properly predicated.

       2.     *Defendants' publications were unprivileged communications to third parties, as the allegations of the Complaint demonstrate "actual malice."*

The second element of the defamation claim is the non-existence of privilege (there is no dispute in this case that Defendants' communications were published to third parties). It is in this respect that Defendants complain arduously that they are a "media outlet" and that they have a First Amendment privilege to speak freely about issues of public concern. Mtn. at 13-28. But again, this is not a case where the allegations describe a journalist acting in good conscience to keep the public informed. This is a case where the allegations describe a company out to secure profits for itself and/or its cohorts by guaranteeing that the short-sellers betting against MiMedx's stock price profit from those bets, at the expense of MiMedx and its investors.

Courts apply an "actual malice" standard to ensure that a defendant cannot invoke the First Amendment to shield his or her defamatory statements if those statements were made with "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 274 (D.D.C. 2017). Of course, it is the rare case that a plaintiff is able to prove "awareness of falsehood from the mouth of the

---

[5]     In some circumstances, courts have required an additional showing in cases of defamation by implication or omission, usually more or less akin to the "actual malice" standard applied in cases where the defamed party is a public figure. *E.g., White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990). For the reasons described below, MiMedx has easily made such a showing in this case. *See infra* Part IV.A.2.

defendant himself," so the determination of actual malice almost invariably refers to circumstantial evidence. *Herbert*, 441 U.S. at 170; *see also Zimmerman*, 246 F. Supp. 3d at 281 ("The plaintiff can prove the defendant's subjective state of mind [regarding malice] through the cumulation of circumstantial evidence, as well as through direct evidence.").

Courts have observed several types of circumstantial evidence that may be sufficient to prove that a defendant acted with actual malice when publishing a defamatory statement. A non-exhaustive list of these types of evidence includes: (1) evidence that indicates that "there are obvious reasons to doubt the veracity" of the original source of the information, and a corresponding failure to investigate further; (2) the initiation of an investigation but a failure to carry that investigation to a reasonable conclusion, or a disregard of the evidence elicited in that investigation; (3) a financial motive to ascribe a falsity to the plaintiff; and/or (4) "anger and hostility" toward the plaintiff. *Zimmerman*, 246 F. Supp. 3d at 281; *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016); *Airlie Found., Inc. v. Evening Star Newspaper Co.*, 337 F. Supp. 421, 428 (D.D.C. 1972); *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1135–36 (9th Cir. 2003); *see also Valdez v. Maya Pub. Grp. LLC*, No. 10CV733-L BGS, 2011 WL 2413510, at *6 (S.D. Cal. June 15, 2011) (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) ("Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category.")).

The Complaint alleges the existence of several types of circumstantial evidence sufficient to demonstrate actual malice, using the guideposts offered by these types of cases. First, MiMedx has alleged that the sources of the channel stuffing allegations against MiMedx were former employees who asserted those claims in a counter-suit, after the company sued them for breach of their non-compete agreements. Compl., ¶¶ 18-20. These former employees clearly

had a reason to fabricate their claims against MiMedx (in fact, the evidence obtained by MiMedx suggests that this is exactly what they did). *Id.* Consequently, it was incumbent on Defendants to investigate those claims. A reasonable investigation into the former employees' claims would have shown that some of those former employees had admitted that they did not have evidence to support their claims, and one even withdrew his claims. *Id.*

Second, MiMedx has alleged that prior to publishing their September 7, 2017 article, Defendants conducted on- and off-the-record interviews yielding evidence that the channel stuffing allegations lacked merit, and that the OIG investigation did not count MiMedx as a target. *Id., ¶¶* 29-30. Nevertheless, not only did Defendants ignore this evidence and publish the article anyway—crafting a clever statement that the OIG was conducting an investigation "involving documents related to MiMedx"—they purposefully omitted from the article any mention of the evidence controverting their channel stuffing allegations. *See Airlie*, 337 F. Supp. at 428 ("[O]nce one has undertaken to conduct an investigation he should not be permitted to ignore with impunity the fruits of that investigation.").

To counter this point, Defendants posit that "the press need not accept denials" as they are "so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." Mtn. at 33 (citing *Harte-Hanks*, 491 U.S. at 691 n.37). But Defendants were not "conscientious reporters," and this was not a situation where Defendants were placed on notice of an allegation against a third party and received a denial from the target of the allegation. Rather, Defendants submitted a request for documents to the OIG pursuant to the Freedom of Information Act ("FOIA"), and the OIG responded that it could not release those documents as doing so "could reasonably be expected to interfere with enforcement proceedings." Compl., Ex. C. Defendants then asked MiMedx to

comment, and MiMedx advised Defendants (off-the-record) that MiMedx had provided said documents to **assist** with the OIG's investigation, which was not directed at MiMedx. *Id.*, ¶ 30. Therefore, far from a "polemical charge and countercharge situation," Defendants published a statement misleadingly suggesting that the OIG was directly investigating MiMedx despite having **no evidence or allegation whatsoever** to support such a statement.

Third, MiMedx has alleged on numerous occasions that Defendants had an overriding financial motivation to publish negative information about MiMedx and therefore to devalue the company's stock price, all so that they and their cohorts could profit. Compl., ¶¶ 32-34. This matter is therefore analogous to cases like *Suzuki*, where the defendant was alleged to have maliciously published a misleadingly negative review of the plaintiff's automobile because the defendant was in financial straits and needed a "blockbuster story to raise [its] profile and increase fundraising revenues." 330 F.3d at 1135-36.

When considered together, the aforementioned allegations are more than sufficient to carry any burden that MiMedx may have in this case to allege that Defendants published their defamatory statements with "actual malice." In their Motion, Defendants make no actual argument otherwise, other than to speciously point to MiMedx's recitation of the elements of a defamation claim in their third claim for relief and contend that MiMedx alleges no more than negligence on Defendants' behalf in this case. Mtn. at 27; *see also* Compl., ¶ 49 ("Defendants' statement was unprivileged and defamatory of MiMedx, transmitted to MiMedx's shareholders with fault amounting to at least negligence, and caused harm to MiMedx."). A mere recitation of the elements of a claim, of course, is no concession by MiMedx that Defendants could not have published their statements with knowing or reckless disregard for their truth. In any event, even

this recitation stated that the publications were made with fault amounting to "at least" negligence, which does not exclude higher levels of fault.

In fact, Defendants' position on the "actual malice" issue is entirely disingenuous. In addition to their intentionally faulty reading of the Complaint just discussed, Defendants attempt to mislead the Court by citing to its prior decision in *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. Sept. 13, 2012) (Bates, J.) and claiming that the Court "dismissed the complaint where plaintiffs had failed . . . to put forth specific evidence of actual malice." Mtn. at 27 (emphasis omitted). That is simply not accurate. As is apparent from the quoted language, the order in question was entered **on summary judgment,** not on a motion to dismiss. 890 F. Supp. 2d at 80. And contrary to Defendants' suggestion, earlier in the same case, the Court **denied** the defendants' motion to dismiss (or, in the alternative, motion for summary judgment), finding that the plaintiff had sufficiently alleged actual malice and that "[d]iscovery is needed, then, to determine what defendant knew at the time he made the contested statements." *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 103, 106-08, n.2 (D.D.C. Feb. 4, 2009) (Bates, J.). Defendants also attempt to cite matters well outside the four corners of the Complaint (*e.g.*, their supposed efforts to "correct and withdraw the error") in an improper effort to influence the Court, notwithstanding that these matters cannot properly have any bearing on the outcome of this Motion.[6] The Court must reject Defendants' patently inappropriate arguments.

---

[6] Defendants actually make at least two wholly inappropriate references to inadmissible matters in their Motion. To the extent that they claim to have sought to correct their defamatory statements in the August 21, 2017 e-mail after the filing of the Complaint in this matter (Mtn. at 27), there is no evidence of the same before the Court on this Motion, and it is irrelevant to the issue of malice since Defendants exhibited malice in connection with their September 7, 2017 publication. Moreover, the correction of a defamatory statement **after** litigation is filed is hardly evidence of good faith. Defendants' claim that they do not trade in the stocks they cover (Mtn. at 1, n.5) is also not supported by evidence properly before the Court, and in any event, Defendants are alleged to have acted as a "shill" for the short sellers in this case, so their financial motivation may not be strictly linked to Defendants' own investments.

Accordingly, MiMedx has sufficiently alleged that Defendants published their defamatory statements to third parties without privilege and with "actual malice."

        3.      *Defendants acted with the requisite scienter.*

The third element of the defamation claim is whether the defendant's actions "constitute[ed] fault as judged by, at minimum, a negligence standard." As explained above, Defendants both acted maliciously and with intentional—or, at best, reckless—disregard for the falsity of their statements toward MiMedx. *See supra* Part IV.A.2.

        4.      *MiMedx has alleged both defamation* per se *and special damages.*

The fourth and final element of a defamation claim requires the plaintiff to allege either defamation *per se* or special damages caused by the defamatory statement(s). MiMedx has independently satisfied this element in both ways.

Defamation *per se* "generally consists of false statements that impute to the subject a crime, a repugnant disease, a matter adversely affecting the person's ability to work in a profession, or gross sexual misconduct. *Franklin v. Pepco Holdings, Inc. (PHI)*, 875 F. Supp. 2d 66, 75 (D.D.C. 2012); *see also Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 113 (D.D.C. 2011) (defamation per se is that which "imputes the commission of a crime to another" or is "calculated to injure a person in his trade, office, or profession") (applying Georgia law). Therefore, accusations of "stealing and fraud . . . are *per se* defamatory." *Dean v. Am. Fed'n of Gov't Employees, Local 476*, 509 F. Supp. 2d 39, 58 (D.D.C. 2007) (emphasis omitted); *see also* 50 Am. Jur. 2d Libel and Slander § 212 ("Where a statement impugns the basic integrity of a business, an action for defamation lies, and injury is conclusively presumed; no proof of special damages is required. . . . A corporation may be defamed *per se* by statements which cast aspersions on its honesty.").

In their Motion, Defendants concede that the "main thrust" of their publications concerning MiMedx was that the company had been accused of channel stuffing, a fraudulent revenue recognition practice. Mtn. at 11; *see also* Compl., ¶ 19 (explaining channel stuffing concept), Exs. A, C (describing channel stuffing allegations). This brings the publications in question squarely within the doctrine of defamation *per se*, as demonstrated by cases such as *Zimmerman.* In that case, the plaintiff professional baseball players properly alleged a claim for defamation *per se* when they accused the defendant of retransmitting a third party's false allegations that they were taking or had taken illegal performance-enhancing substances. 246 F. Supp. 3d 270-71, 275-76 n.12. Notably, Defendants make no attempt to argue otherwise, despite acknowledging that a plaintiff need not allege special damages when a statement constitutes defamation *per se*. *See* Mtn. at 6 (acknowledging element of "special harm or the actionability of the statement irrespective of special harm); *Lindsey*, 879 F. Supp. 2d at 95 (arguments not made in party's opening memorandum are waived).

Even though it was not required to do so given the operation of the defamation *per se* doctrine, MiMedx also alleged in the Complaint that following Defendants' publication of false and misleading statements about the company, its stock price dropped over 20%, representing a loss in total corporate value exceeding $300 million. Compl., ¶ 32. Additionally, Defendants' false and misleading statements were picked up and retransmitted by more legitimate media outlets, including Bloomberg News, increasing the scope of the harm inflicted. *Id.*, ¶ 31. Defendants argue in response that MiMedx nevertheless fails to allege special damages because a company's right to recover under a defamation claim is limited to "lost profits." Mtn. at 27-28. However, this argument takes the cases cited for such a proposition far out of context.

Indeed, the cases cited by Defendants hold only that a corporation has no right to "the essential dignity and worth" of an individual and can therefore only recover actual monetary damages sustained; thus, the statements in these cases about "lost profits" are nothing more than dicta describing an example of actual damages. *E.g.*, *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947, 955 (D.D.C. 1976). In none of the cases cited by Defendants were the courts presented with the question of whether a corporation's right to actual damages in a defamation case can take the form of a diminution in corporate value, only to hold that it cannot.[7] And a host of other courts and commentators have specifically advanced a contrary approach. *See*, *e.g., Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 114 (Del. Ch. 2017) (decline in stock price resulting from defamatory statements compensable by money damages); *Ampex Corp. v. Bettini*, No. A097630, 2003 WL 1558183, at *10 (Cal. App. Mar. 26, 2003) (same); Meiring De Villiers, *Quantitative Proof of Reputational Harm*, 15 Fordham J. Corp. & Fin. L. 567, 614 (2010) (observing that "a decline in the value of the securities of a defamed corporation, adjusted for factors unrelated to the defamation, constitutes legally valid evidence of special damages for reputational harm").

Finally, to the extent that Defendants appear to contend that MiMedx cannot sufficiently allege that Defendants' publications directly caused the decline in MiMedx's stock price (Mtn. at 28), it is well-established that complicated issues of causation are inappropriate for resolution at the pleading stage, where the parties have had no opportunity for discovery or expert analysis. *See Appalachian Voices v. Chu*, 262 F.R.D. 24, 29 (D.D.C. 2009) ("To satisfy the standing

---

[7] This is particularly true because, contrary to Defendants' assertion (Mtn. at 28), a corporate stockholder has no individual right to sue a third party for damages to the company. *Cowin v. Bresler*, 741 F.2d 410, 414 (D.C. Cir. 1984). That right belongs to the corporation, and can only be exercised by the shareholder in a derivative suit, if at all. *Id.* Therefore, a rule that the corporation likewise has no right to recover for a diminution in its value would be nonsensical, as there would be no redress at all in cases like these.

analysis at this stage, the plaintiffs need only offer general factual allegations of injury resulting from the defendant's conduct, and the court must presume that those allegations embrace the specific facts necessary to support the claim."); *Cmty. Nutrition Inst. v. Block,* 698 F.2d 1239, 1247–48 (D.C. Cir. 1983) (at the motion to dismiss stage, plaintiffs were not required to prove causation, but were "only required to assert a fairly traceable causal connection between the challenged action and the alleged injury"), *rev'd on other grounds,* 467 U.S. 340 (1984). Here, MiMedx has alleged a precipitous and abnormal stock price decline that followed so closely from Defendants' conduct that a jury could easily infer causation. Compl., ¶ 32; *see also Singletary v. D.C.*, 351 F.3d 519, 525 (D.C. Cir. 2003) (holding, in different context, that "a close temporal relationship" was in and of itself alone to establish causation).

Accordingly, MiMedx has sufficiently alleged both defamation *per se* and special damages, and along with the previously-discussed elements, has sufficiently alleged its claims for defamation, libel, and slander.

### B. MiMedx Has Sufficiently Pleaded its False Light Claim

As Defendants concede, "[t]o establish a claim for false light under Georgia law, 'a plaintiff must show the existence of false publicity that depicts [her] as something or someone which she is not [and] must demonstrate that the false light in which she was placed would be highly offensive to a reasonable person.'" Mtn. at 29 (citing *Torrance v. Morris Publ'g Grp. LLC*, 636 S.E.2d 740, 747 (Ga. App. 2006)). It is generally accepted that false light claims—like defamation claims—need not be predicated on literally false speech, but may include "speech that is technically true but [nevertheless] places someone in a highly offensive and misleading light." *SIRQ, Inc. v. The Layton Companies, Inc.*, 379 P.3d 1237, 1246 (Utah 2016); *see also Int'l Union v. Garner*, 601 F. Supp. 187, 189–90 (M.D. Tenn. 1985) (under false light theory, "a cause of action is made out when the plaintiff or aspects of his life have been presented in a

misleading manner that would be highly offensive to a reasonable and prudent person"). For the reasons described above, MiMedx has sufficiently pleaded that Defendants publicized false or misleading depictions of MiMedx. *See supra* Part IV.A. Therefore, the only additional requirement is that the publicity be "highly offensive to a reasonable person."

In this respect, it is well-established among jurisdictions recognizing the false light tort that suggestions of fraudulent or illegal conduct are considered "highly offensive" to a reasonable person as a matter of law. *See, e.g., Dubinsky v. United Airlines Master Exec. Council*, 303 Ill. App. 3d 317, 331 (1999) (false accusations of criminal activity deemed "highly offensive"); *Fanelle v. LoJack Corp.*, 79 F. Supp. 2d 558, 563 (E.D. Pa. 2000) ("Being falsely labeled a criminal could be highly offensive to a reasonable person."); *White v. Manchester Enter., Inc.*, 871 F. Supp. 934, 938 (E.D. Ky. 1994) (article falsely accusing plaintiff of fraud deemed "highly offensive"). Here, MiMedx has alleged that Defendants' August 21, 2017 e-mail falsely stated that they had published an article detailing allegations of channel stuffing by customers. Compl., ¶¶ 23-26, Exs. A-B. Further, MiMedx has alleged that Defendants' September 7, 2017 article and e-mail contained misleading omissions of fact concerning the channel stuffing allegations, and misleadingly implied that MiMedx was under active investigation by the OIG when it was not. *Id.*, ¶¶ 27-30, Exs. C-D. Therefore, there can be little question that Defendants' statements were of the type that are considered "highly offensive."

In response, Defendants make three arguments: (i) that a false light claim can only be stated by a natural person; (ii) that a false light claim cannot be premised upon statements concerning one's business; and (iii) the Complaint fails to allege either "substantial falsity or actual malice." Mtn. at 29. The first two of these arguments, however, are essentially the same argument styled in two different ways. Indeed, the theory that a false light claim can only be

stated by a natural person has never been adopted by a Georgia court, nor have Defendants cited any Georgia authority for the proposition that a corporation has no intrinsic right to be free of false or misleading statements that would be highly offensive to a reasonable person.

Rather, all of the Georgia authority cited by Defendants seems to stem from a 1905 decision of the Georgia Supreme Court holding simply that "[o]ne who seeks public office, or any person who claims from the public approval or patronage," waives his right to seek redress for being placed in a false light. *Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 72 (Ga. 1905); *see also Jaillett*, 520 S.E.2d at 727 (citing *S & W Seafoods Co. v. Jacor Broad. of Atlanta*, 390 S.E.2d 228, 232 (Ga. App. 1989), which cited in turn to *Pavesich* for the proposition that "plaintiffs waived their right to be let alone in regard to the operation of their restaurant by inviting and advertising for public patronage.").  Mtn. at 31-32.  Here, it is far from clear that that MiMedx has placed its accounting practices in the public eye, such that it has waived any right to be free from statements that place it in a false light with respect to its accounting practices.  Certainly, the Complaint does not contain any such allegations.

Finally, Defendants' third argument that the Complaint fails to allege either "substantial falsity or actual malice" fails for reasons previously discussed herein.  *See supra* Part IV.A.1 (discussing "substantial falsity" of Defendants' statements); Part IV.A.2 (discussing "actual malice" standard as applied to Defendants' conduct).

Accordingly, MiMedx has sufficiently alleged its claim for false light.

## C.     MiMedx Has Sufficiently Pleaded its Tortious Interference Claim

The elements for a claim of tortious interference under Georgia law are: "(1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of a contractual obligation or caused a party or third party to discontinue or fail to enter into an anticipated

business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." *Rowell v. Phoebe Putney Mem'l Hosp., Inc.*, 791 S.E.2d 183, 185 (Ga. App. 2016). The elements are similar under District of Columbia law, with the exception that it is not the plaintiff's burden to show that the defendant's conduct was "wrongful;" it is the defendant's burden to show that his conduct was not "wrongful." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008).

In either case, the first element of "wrongfulness" under Georgia law is easily satisfied because, as described above, Defendants published materially false and misleading statements about MiMedx. Defendants' argument in the Motion does not actually concern "wrongfulness" so much as it concerns the question of whether a plaintiff may "circumvent the rules for pleading defamation simply by characterizing the claim as one for . . . interference with business relations." Mtn. at 34 (citing *Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013) ("Because [plaintiffs'] defamation claim fails, so do their other tort claims based upon the same allegedly defamatory speech.")). But MiMedx is not attempting to circumvent the requirements of a defamation claim. MiMedx has pleaded concurrent claims for defamation and for tortious interference with business relations based on the same indisputably wrongful conduct. Thus, to the extent Defendants attempt to argue that their conduct was not independently wrongful or improper, those arguments fail for the same reasons described above. *See supra* Part IV.A.

The second element of malice with the intent to injure is also easily satisfied for the reasons described above. MiMedx has alleged that Defendants' primary goal in publishing false and misleading statements about the company was to manipulate its stock price downward and benefit the company's short sellers, and that Defendants did so with intentional or reckless

disregard for the truth of their claims.  *See supra* Part IV.A.2.  Notably, Defendants make no particular argument that the tortious interference claim fails for lack of malice.

Instead, it is the third element of the tortious interference claim—*i.e.*, the existence of and interference with a third-party business relationship—where Defendants focus their argument. According to Defendants, MiMedx "does not allege interference with a business relationship with a third party; it alleges interference with its own shareholders."  Mtn. at 35.  Defendants then purport that "there is no case of which we are aware" that suggests a corporation's relationship with its investors can be the subject of tortious interference.  While the authority on this issue within Georgia is admittedly scant, at least one court has implicitly accepted the idea that such a claim has a valid legal basis.  *See Robins Fed. Credit Union v. Brand*, 507 S.E.2d 185, 186 (Ga. App. 1998) (recognizing that plaintiffs had sued for "tortious interference with shareholder rights," but reversing denial of summary judgment on other grounds).  Conversely, Defendants cite no Georgia case in which a court has rejected a claim for tortious interference with the relationship between investor and company.

Courts in other jurisdictions, however, have held that a relationship with an investor is one that may be tortiously interfered with.  *See Lasker v. UBS Sec. LLC*, 614 F. Supp. 2d 345, 360 (E.D.N.Y. 2008) (plaintiff shareholder stated claim for tortious interference after alleging that he had a reasonable expectation to sell his shares at a certain price, which he was unable to do following defendant's interference); *Weil v. Express Container Corp.*, 824 A.2d 174, 183 (N.J. App. 2003) (implicitly recognizing that one investor could be held liable under tortious interference theory for attempting to cause another investor to sell shares at an artificially low price, but disposing of claim for other reasons); *Rebecca Broadway Ltd. P'ship v. Hotton*, 143 A.D.3d 71, 77 (N.Y. App. 2016) (affirming denial of summary judgement on tortious

interference claim, following defendant's e-mails to a potential investor that caused him to withdraw investment in plaintiff's theater production); *Advanced Marine Techs., Inc. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 385 (S.D.N.Y. 1998) (recognizing claim for tortious interference with investor relationship, but dismissing for other reasons); *Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 352 (S.D.N.Y. 2013) (same). The Court should follow suit here.

Defendants also argue that MiMedx has failed to identify any specific investor relationships with which Defendants' conduct has interfered. Mtn. at 36. However, courts have found it "grossly unfair" to impose such a burden at the pleading stage when there is no reasonable way for a large company to drill down to that level of specificity absent the benefit of discovery. *Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150, 156 (S.D.N.Y. 1983). Here, it would be exceedingly difficult for MiMedx to identify the shareholders that have sold their stock in the company because those transactions are conducted through brokerages.

The fourth element of damages is satisfied for the reasons previously discussed as to the defamation claim, and Defendants make no damages argument particular to the tortious interference claim in their Motion. *See supra* Part IV.A.4.

Accordingly, MiMedx has sufficiently alleged its claim for tortious interference.

### D.     MiMedx Has Sufficiently Pleaded its Claim for Violation of the Lanham Act

Finally, in order to state a claim under Section 43(a) of the Lanham Act, a plaintiff is required to allege a "false or misleading description of fact, or [a] false or misleading representation of fact" used "in commercial advertising or promotion" which "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). MiMedx has satisfied these simple statutory requirements. The Complaint alleges that Defendants published multiple false

or misleading statements about MiMedx in commercial solicitations aimed toward potential customers (*i.e.*, e-mails which propose a commercial transaction in which the recipient purchases a subscription to Defendants' website), and that the statements misrepresented the "nature, characteristics, [and/or] qualities" of MiMedx's commercial activities by accusing the company of fraudulent accounting practices. Compl., ¶¶ 23-30.[8]

Defendants' first argument in opposition to this claim is that a company simply may not assert a claim under the Lanham Act against a person that is not a direct competitor—contending that MiMedx is not within the "zone of interests" protected by the statute. Mtn. at 37-39. But in the very case that Defendants cite for this proposition, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014), the Supreme Court specifically rejected the same argument. *See id.* at 1392 ("It is thus a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect **only** the false-advertiser's direct competitors.") (emphasis in original). To the contrary, the test adopted by the *Lexmark* Court was simple: "[T]o come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales" that is "proximately caused" by the defendant's conduct. *Id.* at 1390-91.

There can be little question in this case that MiMedx has alleged a concrete injury to its "commercial interest in reputation." *Id.* The Complaint describes a scheme by Defendants that was specifically intended to harm MiMedx's reputation so that its stock price would fall and the short-sellers would be able to reap a profit. This brings MiMedx squarely within the "zone of

---

[8]    To the extent that Defendants argue that their representations did not concern the "nature, characteristics, qualities, or geographic origin" of MiMedx's products, Defendants apparently read the statute to concern only "goods" or "services," notably ignoring the statute's inclusion of "commercial activities" as another potential subject of actionable misrepresentation. *See* Mtn. at 39 ("[Defendants] did not, report, for example, that MiMedx's products did not work, or that other products were superior").

interests" protected by the statute. Indeed, Defendants admit that one of the purposes of the Lanham Act is to "regulate commerce within the control of Congress" (*i.e.*, interstate commerce) and "to protect persons engaged in such commerce against unfair competition." Mtn. at 38 (citing 15 U.S.C. § 1127). This is exactly such a case. Put another way, if MiMedx were to come under an identical smear campaign by a directly competing medical products company, there would be no question that the Lanham Act would apply to bar such conduct—particularly since Defendants' claims about MiMedx concerned "customers," which were likely to persuade other customers that MiMedx was not a company to be trusted. And because the *Lexmark* Court put to rest any notion that the statute can only be invoked against a "direct competitor[]," 134 S. Ct. at 1392, there is no reason that MiMedx's claim should be subject to dismissal.

Further refuting Defendants' argument is the fact that this case is remarkably analogous on its facts to *First Mariner Bank v. Resolution Law Grp., P.C.*, No. CIV. MJG-12-1133, 2014 WL 1652550 (D. Md. Apr. 22, 2014). In *First Mariner*, the plaintiff First Mariner Bank alleged claims for defamation and violation of the Lanham Act against a law firm that had sent mass mailing advertisements "stat[ing] that [it] was investigating First Mariner," suggesting that "First Mariner was engaging in illegal and improper banking practices," and "indicat[ing] that some banks were in settlement negotiations with government agencies." *Id.* at *1. Based on those allegations—which are remarkably similar to MiMedx's allegations here—the court refused to dismiss First Mariner's Lanham Act claim under *Lexmark*. *See id.* at *21 ("When a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements.").

Defendants also argue that MiMedx cannot sustain a Lanham Act claim because their publications should not be deemed "commercial speech." Mtn. at 23-26, 38-39. Defendants are

incorrect, as their e-mails of August 21, 2017 and September 7, 2017 did in fact constitute commercial speech. In *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60 (1983), the Supreme Court set out a three-factor test which assesses whether: (i) the publications were "conceded to be advertisements;" (ii) the publications contained a "reference to a specific product;" or (iii) the speaker "has an economic motivation" for publication. *Id.* at 66-67. No single factor is dispositive, and any single factor standing alone may be insufficient to demonstrate commercial speech. *Id.* "The combination of all these characteristics, however, provides strong support" for a conclusion that the challenged publication constituted commercial speech. *Id.*

Here, Defendants' e-mails satisfied all three of the foregoing criteria. First, there is no dispute that the e-mails were advertisements that proposed a commercial transaction; namely, the purchase of a subscription to Defendants' website. Compl., ¶¶ 7, 64; *see also* Mtn. at 2 (conceding that e-mails were sent to "potential subscribers"). Second, for much the same reason, the e-mails impliedly suggested that Defendants had a specific product for sale—the website subscription itself—if the recipient called the sales representative to discuss further. *Id.* Third, it is clear that Defendants had an economic motivation for sending the e-mails in question, whether that motive is construed as their express motive to sell website subscriptions, or their hidden motive to negatively impact MiMedx's stock price and benefit the company's short-sellers. Compl., ¶¶ 33-34. This case is therefore much like *Bolger* itself. There, the defendant initiated "a campaign of unsolicited mass mailings to members of the public" concerning contraceptive products and "discussing the desirability and availability of prophylactics in general or [the defendant's] products in particular." 463 U.S. at 62. The Supreme Court had no problem classifying this speech as commercial in nature, and specifically rejected the defendant's argument that it was not commercial because the mailings concerned "important public issues."

*Id.* at 68 ("Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.").[9]

Finally, Defendants argue that "a Lanham Act plaintiff must show that 'deception of consumers causes them to withhold trade from the plaintiff" and that MiMedx "has not plausibly alleged that [Defendants'] publications caused anyone to 'withhold trade' from the company." Mtn. at 39-40. This language is drawn from *Lexmark*, which held that in addition to satisfying the "zone of interests" inquiry for standing to assert a claim under the Lanham Act, a plaintiff must also demonstrate that the defendant's actions "proximately caused" its injuries. 134 S. Ct. at 1391. However, proximate causation can be shown in different ways; the *Lexmark* Court appears to have merely stated that it is "ordinarily" demonstrated when a consumer withholds trade from the company (likely because the "ordinary" Lanham Act case involves misleading representations made by a direct competitor to common customers). *Id.* In a more recent case, the Supreme Court wrote that the proximate cause inquiry "requires some direct relation between the injury asserted and the injurious conduct alleged." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1306 (2017) (internal quotation marks omitted).

Here, MiMedx adequately alleged the requisite "direct relation" between its injuries and Defendants' conduct. Not only did its injuries occur immediately after Defendants published their false and defamatory statements, but Defendants' statements were in fact specifically intended to cause the resulting injuries to MiMedx's reputation and corresponding drop in the stock price. MiMedx is not required to prove its allegations of Defendants' intent at this early stage of the litigation. *See supra* Part IV.A.4.

---

[9]     Defendants, like the defendant in *Bolger*, mistakenly argue that their speech was not commercial merely because it concerned "allegations of misconduct by a publicly traded corporation and government contractor." Mtn. at 25.

Accordingly, MiMedx has sufficiently alleged its claim for violation of the Lanham Act.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, MiMedx respectfully requests that the Court deny Defendants' Motion in its entirety.  Alternately, if the Court determines that any of MiMedx's claims are insufficiently pled, MiMedx respectfully requests leave to file an amended Complaint.

Dated:  December 6, 2017                    Respectfully submitted,

*/s Marlon Q. Paz*
Marlon Quintanilla Paz (Bar No. 1001174)
paz@sewkis.com
SEWARD & KISSEL, LLP
901 K Street, NW, Suite 800
Washington, DC 20001
Tel: 202-661-7178

Joseph D. Wargo (GA No. 738764)
*(admitted pro hac vice)*
jwargo@wargofrench.com
WARGO & FRENCH LLP
999 Peachtree St. NE, Floor 26
Atlanta, GA 30309
Tel: 404-853-1500
Fax: 404-853-1501

*/s Jeff Williams*
Jeffrey N. Williams (CA No. 274008)
*(admitted pro hac vice)*
jwilliams@wargofrench.com
WARGO & FRENCH LLP
601 S Figueroa Street, Suite 4625
Los Angeles, CA 90017
Tel: 310-853-6300
Fax: 310-853-6333