# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MIMEDX GROUP, INC., | |
| Plaintiff, | |
| v. | Case No. 1:17-cv-01925-JDB |
| DBW PARTNERS LLC,<br>     D/B/A THE CAPITOL FORUM,<br>TREVOR BAINE,<br>TEDDY DOWNEY,<br>JAKE WILLIAMS,<br>MILES PULSFORD,<br>MATT TREACY, and<br>DOES 1-100, inclusive, | |
| Defendants. | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

Kevin T. Baine
Stephen J. Fuzesi
Connor S. Sullivan

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel:  (202) 434-5000
Fax: (202) 434-5029
kbaine@wc.com

December 20, 2017

## <u>TABLE OF CONTENTS</u>

I.  THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION ......................2

    A.  The August 21 Report and Email.............................................................................2

        1.  Substantial Truth ...........................................................................2

        2.  Actual Malice.................................................................................8

    B.  The September 7 Report and Email ......................................................................11

        1.  The Complaint Did Not Include A Claim for Defamation Based on the September 7 Publications....................................................11

        2.  Plaintiff Could Not State a Claim for Defamation Based on the September 7 Publications....................................................12

    C.  MiMedx Has Not Alleged Compensable Damages. ............................................16

II.  THE COMPLAINT FAILS TO STATE A CLAIM FOR FALSE LIGHT INVASION OF PRIVACY....................................................................................19

III.  THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE ...................................................................................20

IV.  THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF THE LANHAM ACT ......................................................................................22

    A.  Defendants' Publications Are Not Commercial Speech. .....................................22

    B.  Plaintiff's Claim Does Not Fall In the Lanham Act's Zone of Interests. ..............24

CONCLUSION............................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015)..........................................15

*Advanced Marine Techs., Inc. v. Burnham Sec., Inc.*,
 16 F. Supp. 2d 375 (S.D.N.Y. 1998).......................................................................................21

*Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852 (2014) ............................................................3

*Am. Petrol. Inst. v. Technomedia Int'l Inc.*, 699 F. Supp. 2d 258 (D.D.C. 2010) ..................16, 17

*Art-Metal-USA, Inc. v. United States*, 753 F.2d 1151 (D.C. Cir. 1985) ...................................16, 18

*Balance Point Divorce Funding, LLC v. Scrantom*,
 978 F. Supp. 2d 341 (S.D.N.Y. 2013).......................................................................................21

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ......................................................23, 24

*Brand v. Robins Fed. Credit Union*, 969 F. Supp. 778 (M.D. Ga. 1997) .....................................21

*Carpenter v. King*, 792 F. Supp. 2d 29 (D.D.C. 2011),
 *aff'd*, 473 Fed. App'x. 4 (D.C. Cir. 2012) ...............................................................................3

*\*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993)...................................................14

*Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150 (S.D.N.Y. 1983) ........................22

*Charles v. City of Los Angeles*, 697 F.3d 1146 (9th Cir. 2012)....................................................23

*CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068 (W.D. Ky. 1995)...........................................17

*Coates v. Law Sch. Admission Council*, No. Civ.A. 105CV0641JDB,
 2005 WL 3213960 (D.D.C. Oct. 25, 2005) ...........................................................................11

*Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526 (E.D. Pa. 1999).......................17

*Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, No. 00-CV-98-K,
 2001 WL 670927 (D. Utah Mar. 26, 2001),
 *aff'd*, 312 F.3d 1292 (10th Cir. 2002)...................................................................................17

*Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213 (D.D.C. 2008)...................................................3

*Dodds v. Am. Broad. Co.*, 145 F.3d 1053 (9th Cir. 1998) ...........................................................15

*Econ. Res. Servs., Inc. v. Res. Econ., LLC*, 208 F. Supp. 3d 219 (D.D.C. 2016) .........................22

*Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir. 1977) ............................13, 16

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ..................................................19, 20, 22

*First Mariner Bank v. Resolution Law Grp., P.C.*, No. CIV. MJG-12-1133,
    2014 WL 1652550 (D. Md. Apr. 22, 2014) ........................................................................25

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ............................................................................1, 8

*Groden v. Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995) .....................................................23

*Harte-Hanks Commc'ns Inc. v. Connaughton*, 491 U.S. 657 (1989) ................................ passim

*Hayes v. Irwin*, 541 F. Supp. 397 (N.D. Ga. 1982)....................................................................22

*Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir. 1986) ................................................12, 13

*Jankovic v. Int'l Crisis Corp.*, 822 F.3d 576 (D.C. Cir. 2016),
    *cert. denied,* 137 S. Ct. 1434 (2017) ..........................................................................1, 8, 10

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017) ..........................................10

*Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142 (D.D.C. 2014) ......................................11

*Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995)............................................23, 24

*Lasker v. UBS Sec. LLC*, 614 F. Supp. 2d 345 (E.D.N.Y. 2008).................................................21

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014).................24, 25

*Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563 (D.C. Cir. 1984) ................................................6

*Martin Marietta Corp. v. Evening Star Newspaper Co.*,
    417 F. Supp. 947 (D.D.C. 1976) ....................................................................................17

*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) ..............................................................6

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996) ..................................9

*Nat'l Life Ins. Co. v. Phillips Pub., Inc.*, 793 F. Supp. 627 (D. Md. 1992) ...............................23

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ......................................................1, 10, 23

*Ning Ye v. Holder*, 644 F. Supp. 2d 112 (D.D.C. 2009) ..............................................................3

*Prins v. Int'l Tel. & Tel. Corp.*, 757 F. Supp. 87 (D.D.C. 1991) .................................................6, 7

*Robertson v. Cartinhour*, 867 F. Supp. 2d 37 (D.D.C. 2012),
    *aff'd per curiam*, 553 Fed. App'x. 1 (D.C. Cir. 2014)..............................................................3

*Robinson v. U.S News & World Report, Inc.*, No. 88 C 7260, 1989 WL 55021
(N.D. Ill. May 11, 1989) ..................................................................................14

*\*St. Amant v. Thompson*, 390 U.S. 727 (1968)...............................................2, 9, 16

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110 (9th Cir.
2003) ...............................................................................................................11

*\*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) ................................................10

*United States v. Tavares*, 100 F.3d 995 (D.C. Cir. 1996)...............................................1

*\*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) .....................14, 15

### STATE CASES

*Ampex Corp. v. Bettini*, No. A097630,
2003 WL 1558183 (Cal. Ct. App. Mar. 26, 2003)............................................17, 18

*Bd. of Regents of Univ. Sys. of Ga. v. Atlanta J.*, 378 S.E.2d 305 (Ga. 1989)...............19

*\*Brewer v. Rogers*, 439 S.E.2d 77 (Ga. Ct. App. 1993) ..............................................3

*Bryant v. Cox Enters., Inc.*, 715 S.E.2d 458 (Ga. Ct. App. 2011) ..................................6

*\*Jaillet v. Georgia T.V. Co.*, 520 S.E.2d 721 (Ga. Ct. App. 1999) ................2, 7, 12, 19

*Jenkins v. Gen. Hosps. of Humana, Inc.*, 395 S.E.2d 396 (Ga. Ct. App. 1990) .....................20, 22

*Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102 (Del. Ch. 2017) ..........................18

*Pavesich v. New Eng. Life Ins.*, 50 S.E. 68 (Ga. 1905)...............................................19

*Rebecca Broadway Ltd. P'ship v. Hotton*,
37 N.Y.S.3d 72 (App. Div. 1st Dep't 2016) ........................................................21

*Renden, Inc. v. Liberty Real Estate L.P. III*, 444 S.E.2d 814 (Ga. Ct. App. 1994) ......................20

*Robins Fed. Credit Union v. Brand*, 507 S.E.2d 185 (Ga. Ct. App. 1998)....................21

*Savannah News-Press v. Hartridge*, 120 S.E.2d 918 (Ga. Ct. App. 1961) ....................11

*\*Stange v. Cox Enterprises, Inc.*, 440 S.E.2d 503 (Ga. Ct. App. 1994) ..........................7

*Weil v. Express Container Corp.*, 824 A.2d 174 (N.J. App. Div. 2003) ........................21

*Yandle v. Mitchell Motors, Inc.*, 404 S.E.2d 313 (Ga. Ct. App. 1991) ........................12

iv

## CONSTITUTION AND STATUTE

U.S. Const. amend. I ................................................................................................ passim

15 U.S.C. § 1125(a)(1)(B) ........................................................................................24

## OTHER AUTHORITIES

134 Cong. Rec. H10,419-21 (daily ed. Oct. 19, 1988)
  (statement of Rep. Kastenmeier)................................................................................25

Restatement (Second) of Torts (1977)................................................................8, 14, 19

Restatement (Third) of Unfair Competition (1995)......................................................23

Plaintiff's opposition rests to a significant degree upon the contention that Defendants were motivated by a desire to profit from short selling MiMedx stock, and that as a result "this case has nothing to do with the First Amendment."  Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("Opp.") 11, 8.  As we noted in our initial Memorandum, however, Plaintiff's counsel was assured well before this lawsuit was filed that Defendants did not trade in the stock of companies they write about, and there is no good-faith basis upon which to believe that they (or any of their unidentified "friends, family" or "cohorts") did.  Defendants' Memorandum in Support of Motion to Dismiss ("Mem.") 5 n.1.  But ultimately this baseless charge is beside the point, as is the rhetorical statement that the case "has nothing to do with the First Amendment."  Opp. 8. For Plaintiff does not question the legal standards that the First Amendment and common law impose in this case, and its groundless attack upon the Defendants' motives does not come close to meeting those standards.

*First*, Plaintiff does not question that it bears the burden of pleading and proving a substantial falsity.  Defendants' alleged financial motive has nothing to do with this issue.

*Second*, Plaintiff does not contest (and thereby concedes[1]) that it is a public figure and must plead "actual malice" as defined in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and its progeny—that is, knowledge of falsity or "a high degree of awareness of . . . probable falsity." *Harte-Hanks Commc'ns. Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)); *Jankovic v. Int'l Crisis Corp.*, 822 F.3d 576, 586 (D.C. Cir. 2016) (internal quotation omitted), *cert. denied*, 137 S. Ct. 1434 (2017).  The Complaint does not even attempt to allege "actual malice" in that sense, and the arguments in Plaintiff's opposition do

---

[1] *See, e.g.*, *United States v. Tavares*, 100 F.3d 995, 997 (D.C. Cir. 1996) (finding an argument implicitly conceded, even though "not expressly concede[d]," where one party failed to contest the opposing party's "arguments on [that] point").

not come close to offering any alleged facts that could establish that state of mind.  Contrary to Plaintiff's opposition, evidence of "anger and hostility," "financial motive," and "failure to investigate" are not "sufficient to prove" the conscious awareness of probable falsity that the actual malice standard requires.  Opp. 21.  "'Actual malice' . . . has nothing to do with bad motive or ill will," *Harte-Hanks*, 491 U.S. at 666 n.7, and "is not measured by whether a reasonably prudent man . . . would have investigated before publishing."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

*Third,* Plaintiff offers no rebuttal to the case law establishing that a corporation cannot recover for defamation without proof of economic loss, regardless of whether the challenged statements would be regarded as actionable *per se* by a natural person.  Plaintiff alleges no lost profits, the only form of economic loss that can be sustained by a corporation.  Instead, Plaintiff bases its defamation claim solely upon an alleged, unrealized decline in stock value allegedly suffered *by its shareholders*, which, if due to any falsity at all, can be reversed through the means contemplated by the First Amendment—speech pointing out the truth.

For these and other reasons, the Complaint should be dismissed.

## I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION

### A.  The August 21 Report and Email

#### 1.    Substantial Truth

Plaintiff's opposition confirms that its sole allegation of falsity with respect to the August 21 report and email is the single word "customers," which appeared in the email alone.  Nothing else in the August 21 report or email is alleged to be false.  The passing reference to "customers" cannot give rise to a defamation claim, however, because it did not alter the "substance, the gist, the sting" of the underlying allegation, *Jaillet v. Georgia T.V. Co.*, 520 S.E.2d 721, 724 (Ga. Ct. App. 1999) (internal quotation omitted), such that the email as a whole had a significantly different

"effect on the mind of the [reader] from that which the pleaded truth would have produced." *Brewer v. Rogers*, 439 S.E.2d 77, 81 (Ga. Ct. App. 1993) (internal quotation omitted).

When a minor factual error like this does not alter the central meaning of the article, the complaint must be dismissed.  *See Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 59 (D.D.C. 2012) (dismissing defamation claims because statements were substantially true), *aff'd per curiam*, 553 Fed. App'x. 1 (D.C. Cir. 2014); *Ning Ye v. Holder*, 644 F. Supp. 2d 112, 118 (D.D.C. 2009) (dismissing libel complaint because statement was substantially true).[2]

Plaintiff agrees that the "'main thrust' of [the Capitol Forum's] publications concerning MiMedx was that the company had been accused of channel stuffing, a fraudulent revenue recognition practice."  Opp. 26.  The addition of the single word "customers" in the August 21 email did not alter the gist or sting of that report.  Whether the accusation had been made by former employees and customers, or by former employees alone, does not alter the thrust of the accusation. The accusation remains that MiMedx engaged in channel stuffing.

Plaintiff argues that the reference to "customers" makes a difference because customers can "affect a company's revenues by ceasing to do business with the company"; "if a company is alleged to deal unfairly with one customer," that could cause "other customers . . . to also withdraw their business"; and "a company's relationship with its customers is often its most important

---

[2] Plaintiff argues that a substantial truth argument is "inappropriate for purposes of a motion to dismiss," Opp. 13, but ignores the many cases in which motions to dismiss have been granted on that basis.  *See also Carpenter v. King*, 792 F. Supp. 2d 29, 38 (D.D.C. 2011), *aff'd*, 473 Fed. App'x. 4 (D.C. Cir. 2012); *Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213, 217 & n.5 (D.D.C. 2008).  Moreover, Plaintiff's sole citation is to a portion of an opinion *dissenting* from the Court's holding.  Not only does Plaintiff fail to acknowledge that fact; it also fails to acknowledge the sentence immediately preceding the one it quotes—"that under the First Amendment, a court's role is to determine whether a reasonable jury could find a material difference between the defendant's statement and the truth."  *Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 867-68 (2014) (Scalia, J., concurring in part and dissenting in part).

business relationship."  Opp. 14.  But those observations have nothing to do with whether the addition of the word "customers" to the August 21 email altered the gist or sting of what was published.  The gist of the report was that MiMedx had been accused of a practice of "distributing to retailers more products than a company is able to sell to the public."  Compl. ¶ 19.  As the August 21 email explained: "In the article, we detail channel stuffing allegations and recent counterclaims which may pose [] a regulatory risk for the company."  Compl. Ex. B.  The defamatory nature—the gist or sting—of those allegations was the same regardless of whether they were made by a customer or an employee.

The fact that customers might stop doing business with a company engaged in channel stuffing is a reason why such an accusation could be considered defamatory in the first place— though the August 21 email was circulated to "MiMedx's shareholders," not to any customers, and the only defamatory effect alleged was on "those shareholders."  Compl. ¶ 38.  But even assuming that the August 21 email could have had an effect on customers, that is true regardless of where the accusation originated.

Plaintiff also argues that a customer, unlike a former employee, would not have an "ulterior motive" to level such an allegation.  Opp. 14.  One can easily imagine circumstances, however, in which a customer had a dispute with its supplier that would provide such a motive.  But such speculation is beside the point:  at most, this amounts to an argument that a reader might give more weight to the allegation if made by a customer—not that the substance or gist of the charge is any different.   In other words, Plaintiff cannot argue that the mistake is what made the email defamatory.  What made it defamatory was the underlying accusation of channel stuffing.

Even assuming that the attribution of a charge might alter the gist or sting of the charge itself in some circumstances, the passing reference to "customers" in the August 21 email cannot

4

have had that effect.  The August 21 email did not stand alone.  On its face, the email referred to and quoted from the lengthier report that appeared that day in *The Capitol Forum* newsletter. Indeed, the obvious purpose of the email was to draw attention to that lengthier report and invite the recipient to learn more about the allegations.  The excerpt from the newsletter that appeared in bold in the email attributed the channel stuffing allegations to two named "former MiMedx employee[s]."  Compl. Ex. B.  It noted that the allegations "were first made public" in a lawsuit filed by those two former employees in December 2016 and had "recently resurfaced" in a counterclaim asserted by one of those former employees.  *Id*.  The quoted excerpt mentioned the former employees by name *seven times*.  There was no mention in that excerpt of any "customers." And if any recipient of the email thought it important to know what any customer had alleged, he could have responded to the email's invitation to schedule a call and learned that the reference to customers was a mistake.

In short, the August 21 email made only a passing, one-word reference to "customers," and the underlying report to which it invited attention made no reference at all to "customers."  To the extent that one focuses on the source of the allegation, rather than the allegation itself, the main thrust of both the email and the underlying report was that two former employees had accused MiMedx of channel stuffing.  The unexplained reference to "customers" did not materially alter the reader's understanding of where these allegations had come from, much less alter the gist or sting of the allegations themselves.  Under these circumstances, the single word "customers" did not render the email or the underlying report false.

For the same reason, the single reference to unnamed "customers" in the August 21 email could not have caused any incremental harm beyond the harm Plaintiff suffered from the detailed

discussion of the allegations that had been made by two named former employees.[3]

Plaintiff cites only one case in support of its position—*Prins v. Int'l Tel. & Tel. Corp.*, 757 F. Supp. 87 (D.D.C. 1991)). In that case the Government had indicted the corporate defendant and some of its employees, and claimed that the plaintiff had supervised and conspired with the wrongdoers. *Id.* at 89. The plaintiff alleged that during an interview, the corporate defendant's spokesperson told a reporter (1) that employees involved in illegal conduct no longer worked for the company, and (2) that the plaintiff had recently been "fired." *Id.* at 90. In fact, the plaintiff's position had been eliminated in a restructuring, and he had "continued to receive his salary for some time" and "received generous separation benefits." *Id.* at 89. Under these circumstances, the court held that a jury could find that the false charge that plaintiff had been "fired" was defamatory. *Id.* at 91-92. *Prins* has little in common with this case, other than the fact that it turned on a single word. The single word in that case—"fired"—carried an entirely different meaning than the alleged fact—a corporate restructuring with continued salary and benefits. In addition, as the court noted, in the context of the company's statement that those involved in the

---

[3] The applicability of the incremental harm rule is a question of state substantive tort law. *See Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 523 (1991). Plaintiff does not disagree that the doctrine is recognized in Georgia law, which it contends applies here. *See Bryant v. Cox Enters., Inc.*, 715 S.E.2d 458, 463 (Ga. Ct. App. 2011) (affirming on other grounds the trial court's conclusion that a claim was barred by the incremental-harm doctrine). It cites a D.C. Circuit opinion applying District of Columbia law. Opp. 18 (citing *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568 (D.C. Cir. 1984)). But that case involved a different issue—whether truthful statements on one subject could so devastate a person's reputation that no other statement on any other subject, regardless of how false or damaging, could harm the individual's reputation. *Liberty Lobby*, 746 F.2d at 1568 ("It is shameful that Benedict Arnold was a traitor; but he was not a shoplifter to boot, and one should not have been able to make that charge while knowing its falsity with impunity."). Here the Plaintiff is complaining of a minor inaccuracy that adds nothing to the defamatory impact of truthful statements on the same subject. The court in *Liberty Lobby* did not question this version of the incremental harm doctrine. *Liberty Lobby*, 746 F.2d at 1568 n.6 ("[S]ince the essentially derogatory implication of the statement . . . is correct, he has not been libeled").

wrongdoing had departed, its statement that plaintiff had been fired implied that the company had made a determination—as opposed to the government's unproven allegation—that the plaintiff was involved in the wrongdoing.  *Id.* at 92.  In this case, there was no suggestion that anyone had made anything other than an unproven allegation, and there is no falsity alleged that is remotely comparable to the falsity of mischaracterizing a restructuring as a termination for cause.

This case is much closer to the Georgia cases, applying Georgia law, cited in our initial memorandum.  In *Stange v. Cox Enterprises, Inc.*, 440 S.E.2d 503 (Ga. Ct. App. 1994), the court held as a matter of law that a news report about a real estate purchaser was substantially true even though it had (a) overstated the number of people who had alleged they were deceived in connection with the sale of their homes and (b) falsely implied that the plaintiff had been sued when in fact his sister and brother-in-law were the only named defendants.  Plaintiff here notes that the plaintiff in *Stange* had conceded that the published statements "were in large part accurate."  Opp. 15.  But the Plaintiff here has also conceded that the report of the substance of the allegations was in large part accurate.

In *Jaillet v. Georgia Television Co.*, 520 S.E.2d 721 (Ga. Ct. App. 1999), the defendant reported that an air conditioning repair business had told a homeowner that she had to replace her entire unit, when in fact she only had to replace the fan motor.  The defendant had failed to report that the business had also provided a quote to replace the fan motor alone, which obviously meant that the unit would function at least for a time without being replaced.  Still, the court held that the report was substantially true.  *See also* cases cited at Mem. 10-11.

Defendants contend that this case presents an even stronger case of substantial truth and incremental harm than any of these cases.  But ultimately other cases can only provide a sense of how other courts have assessed the particular facts of those cases.  It goes without saying that the

assessment of substantial truth and incremental harm is entirely dependent upon the wording and context of the particular publications at issue.  And in this case, for all of the reasons stated, the passing reference to "customers" in an email that itself explained the precise origin of the channel stuffing allegations did not alter the gist or sting of those allegations.

**2.      Actual Malice.**

Plaintiff concedes that the actual malice standard applies.  *See supra* 1-2.  Yet its Complaint fails to allege actual malice, and its opposition cites no facts that could support a finding that the sole mistake in the August 21 email was the product of actual malice.  Plaintiff's brief offers three arguments, none of which is sufficient to support a finding of actual malice.

*First*, Plaintiff argues that the former employees who made allegations of channel stuffing were "potentially biased," and that some of them later dropped their claims.  Opp. 21-22.  But any questions Plaintiff might raise about the credibility of its former *employees* has nothing to do with whether any Defendant knew that the reference to *customers* in the August 21 email was false or "probably false."  That is the only alleged falsity in the August 21 publications.  The question in this case is *not* whether the Defendants had doubts about the former employees' allegations: those allegations were made in litigation, and the Complaint does not question the privilege of the Defendants to report those allegations.  *See* Restatement (Second) of Torts § 611 (1977).  The only question is whether any Defendant had "a high degree of awareness of [the] probable falsity" of the one word that is the basis for Plaintiff's claim.  *Harte-Hanks*, 491 U.S. at 667; *Garrison v. Louisiana*, 379 U.S. at 74 (1964); *Jankovic,* 822 F.3d at 586.  Plaintiff's factual contentions about the former employees are simply irrelevant to that issue.

Moreover, even if the former employees' credibility were somehow relevant, the undeniable fact is that the Capitol Forum addressed that issue in an evenhanded way.  It not only reported the basis for Plaintiff's claim of bias—that the former employees' allegations were made

8

in response to claims against them in litigation; it also quoted MiMedx's chief executive saying that the company's accusers were "trying to intimidate the company with—frankly—lies." Compl. Ex. A. at 5.  In short, Defendants' accurately and fairly presented the Plaintiff's position that the former employees were not credible.  That only underscores the Defendants' "good faith," which is the antithesis of actual malice.  *See, e.g.*, *St. Amant*, 390 U.S. at 732.[4]

*Second*, Plaintiff argues that "prior to publishing *their September 7, 2017 article*," Defendants conducted interviews in which its employees denied the channel stuffing allegations. Opp. 22 (emphasis added).  But that argument, addressed below, has nothing to do with whether the Defendants published *the August 21 email* with actual malice.  *See McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996) (actual malice must "necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant prior to publication").

*Third*, and finally, Plaintiff argues that actual malice is shown by the Defendant's alleged "financial motivation" to "devalue the company's stock price, . . . so that they and their cohorts could profit."  Opp. 23.  Quite apart from the fact that there is no good-faith basis for any such allegation, *see* Mem. 5 n.1, the allegation is neither factually plausible nor legally sufficient to establish that any Defendant acted with knowledge of falsity or a "high degree of awareness or probable falsity."  As an initial matter, it is simply implausible that a prospective short seller would think that the way to drive the stock price down would be to add a passing reference to "customers" to an email that referred to its lengthier report that not only laid out the precise source of the allegations, but also reported at length on the company's response, including the outcome of an

---

[4]  It is also noteworthy that Defendants secured corroboration from former employees who were not involved in litigation against the company and who were not vulnerable to any claim of bias.

investigation by "Audit Committee members . . . , an outside law firm, [the company's] Auditors and a nationally recognized expert on revenue recognition."   Compl. Ex. A at 4.   But the implausibility of the allegation aside, it is simply insufficient as a matter of law to establish actual malice.   "'Actual malice' . . . has nothing to do with bad motive or ill will."   *Harte-Hanks*, 491 U.S. at 666 n.7.   Financial motivation is no different in kind from any other "bad motive" that might be alleged, and "the mere presence of some ulterior motive—whether a profit motive, a motive to produce the most interesting stories, or a personal desire to harm the subject of a story— is not enough to support a finding of actual malice.   This is so even though such motives may naturally provide publishers with an incentive to achieve an end without regard to the truth of what they publish."   *Jankovic*, 822 F.3d at 596 (internal citations omitted).   Journalists and other commentators of every stripe, *see Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017), can have a broad range of motivations for their work, some of which may seem dubious or even deplorable to some observers.   But "[a]bsent evidence that the publisher's alleged motive shows an 'intent to inflict harm through falsehood,' a 'willingness to publish *unsupported allegations*,' or a desire to publish '*with little or no regard for [the report's] accuracy*,' the plaintiff has not produced motive-based evidence probative of actual malice."   *Jankovic*, 822 F.3d at 596 (emphasis in original) (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 795-97 (D.C. Cir. 1987)).

Almost all commentary on public issues is somehow linked to a desire to profit.   "If a profit motive could somehow strip communications of the otherwise available constitutional protection, [the Supreme Court's] cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."   *Harte-Hanks*, 491 U.S. at 667; *N.Y. Times v. Sullivan*, 376 U.S. at 266 ("That the Times was paid for publishing the advertisement [at issue] is as immaterial in this connection as is the fact that newspapers and books are sold").   In fact, the sole case Plaintiff cites on this issue

itself confirms the point: "financial motive cannot, by itself, prove actual malice . . . ." *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1136 (9th Cir. 2003).  Ultimately, Plaintiff has alleged nothing else, and even that allegation is without a good-faith factual basis. Plaintiff has failed altogether, therefore, to plead a case of actual malice.

### B.  The September 7 Report and Email

#### 1.  The Complaint Did Not Include A Claim for Defamation Based on the September 7 Publications.

In its opposition, Plaintiff attempts to add a brand-new defamation claim based on the Capitol Forum's September 7 report and email.  That claim is not pleaded in the Complaint, and Plaintiff cannot create it now by argument.  "It is well settled law that a plaintiff cannot amend his or her complaint by the briefs in opposition to a motion to dismiss." *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014) (collecting cases).

The duplicative libel, slander and defamation claims in the Complaint nowhere refer to any statement in the September 7 publications.  The only specific statement the Complaint ever identifies as a basis for liability is the word "customers" in the August 21 email. *See* Compl. ¶¶ 37, 43, 48.  For that matter, that single word is the only statement alleged to be "false" anywhere in the Complaint. *Id.* ¶ 26.  "Defamation claims must be pleaded with particularity and specify the time, place, content, speaker and listener of the alleged defamatory material," *Coates v. Law Sch. Admission Council*, No. Civ.A. 105CV0641JDB, 2005 WL 3213960, at *2 (D.D.C. Oct. 25, 2005) (internal quotation marks and citation omitted), and a defamation complaint must be dismissed unless it contains "an affirmative statement that . . . *particular portions* of the article are false." *Savannah News-Press v. Hartridge*, 120 S.E.2d 918, 922 (Ga. Ct. App. 1961) (emphasis added). Plaintiff chose what to plead in its Complaint and cannot now assert a new claim in its brief.

### 2. Plaintiff Could Not State a Claim for Defamation Based on the September 7 Publications.

As Defendants argued in their opening brief (in response to the false light claim), Mem. 32-33, Plaintiff has not alleged that anything in the September 7 report or email was false. [5]  Nor has Plaintiff offered any factual or legal basis for a finding of actual malice with respect to the September 7 items.  The September 7 article was a straightforward, accurate report of the content of the documents to which it referred: it identified all the items it sought in its FOIA request, quoted the response to that FOIA request, and even provided a hyperlink to the complete response. Compl. Ex. C.  Beyond that, it made brief reference to the prior report and to the company's denial of the allegations.

Plaintiff argues that the September 7 report omitted information that was favorable to it. But the mere omission of favorable information is insufficient to establish a claim for defamation unless, by virtue of the omission, what was published was false.  *See, e.g.*, *Jaillett*, 520 S.E.2d at 725; *Yandle v. Mitchell Motors, Inc.*, 404 S.E.2d 313, 314 (Ga. Ct. App. 1991). As the Eighth Circuit put it, "Every news story . . . reflects choices of what to leave out, as well as what to include." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1306 (8th Cir. 1986).  But even when some omitted detail would, if included, have made the story "fairer to [the plaintiff] and more informative to the reader," the mere fact of its omission cannot make the report as a whole false – "particularly when the 'sting' of the implication . . . [would remain] present" even with that fact included.  *Id.*  "Accounts of past events are always selective, and under the First Amendment the

---

[5] Plaintiff claims that Defendants did not argue that the September 7 publications were true and therefore implicitly conceded they are false.  Opp. 18.  Plaintiff overlooks the pages of Defendants' brief where they made precisely that argument.  *See* Mem. 32-33.  The discussion appeared under the false light claim because Plaintiff had not asserted a defamation claim based on the September 7 report and email.

decision of what to select must almost always be left to writers and editors." *Id.* In this case, what was published was true, and the alleged omissions did not render anything false.

Capitol Forum accurately stated that the Department of Veterans Affairs Office of the Inspector General was conducting an "investigation involving MiMedx documents." Plaintiff argues that the Capitol Forum failed to report (1) denials of the channel stuffing allegations from MiMedx employees; and (2) MiMedx's off-the-record denial that it was the target of the OIG investigation. Opp. 19. But the alleged failure to report a mere denial does not render the report of an allegation false, much less indicate that the reporter was aware of any probable falsity. "[T]he press need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" *Harte-Hanks*, 491 U.S. at 691 n. 37 (*quoting Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977)). Regardless, the charge of falsity by omission of denials is particularly unavailing here, because the September 7 article *did* report that MiMedx "denies the allegations." Compl. Ex. C. at 1. And, as MiMedx concedes, it prevented the Capitol Forum from publishing its denial that it was the "target" of the OIG investigation. Compl. ¶ 30 ("Defendants could not have included MiMedx's off-the-record statements in their article or e-mail . . ."). Nonetheless, the Capitol Forum alerted its readers that MiMedx would provide its "official comments . . . through other means." Compl. Ex. C. at 1.

Plaintiff argues that the September 7 report "implied" that it was the "target" of the OIG investigation. Opp. 19. But what the September 7 report actually said was simply that "the VA Office of Inspector General (OIG) is conducting an investigation that involves documents related to MiMedx, according to an OIG response to a Capitol Forum FOIA request." Compl. Ex. C. That statement was carefully worded and concededly true. It would be unreasonable to interpret that

statement to mean that MiMedx was a "target."  *See* Restatement (Second) of Torts § 563 ("The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express.").  The Department of Justice defines a "target" as "a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." U.S. Dep't of Justice, United States Attorneys' Manual, 9-11.151.  Nothing in the September 7 report implied that anyone had reached such a judgment about MiMedx.  And if what Plaintiff alleges is simply that the Defendants implied it was a "subject" of an investigation, in the sense that the government was investigating allegations against it, that is concededly true[6]—though even that goes farther than what Defendants reported.

But even if a reader might conclude from the limited, truthful information provided that MiMedx was a "target," Defendants are not legally responsible for that conclusion.  "[B]ecause the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true."  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092–93 (4th Cir. 1993) (footnote omitted).  Thus, "if a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established."  *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990).  In such circumstances, a plaintiff can only state a

---

[6]  Plaintiff has acknowledged that the Securities and Exchange Commission issued a subpoena to the company as part of "its investigation of these [channel-stuffing] allegations."  News Release, *MiMedx Provides Information on Its Interaction With The SEC*, (Sept. 21, 2017) http://phx.corporate-ir.net/phoenix.zhtml?c=213465&p=irol-newsArticle&ID=2302107.     *See Robinson v. U.S News & World Report, Inc.*, No. 88 C 7260, 1989 WL 55021, at *2 (N.D. Ill. May 11, 1989) (substantially true to report that plaintiff was arrested by the FBI instead of local police, as the "'gist' or 'sting' of the publication is not the name of the arresting agency but the fact that plaintiff was arrested").

claim for defamation by implication if the face of the communication "supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference." *Id.* (emphasis in original).[7]  Here, there is nothing on the face of the September 7 report that *affirmatively* suggests that the Defendants *intended* or *endorsed* the inference that MiMedx was a *target*.

At most, it might be argued that the Capitol Forum report raised a *question* about whether MiMedx was a "target."  But here too, the Court of Appeals has emphasized the difference between raising a *question* and providing an *answer*:  "questions are not factual representations" and therefore cannot ordinarily give rise to a defamation claim.  *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015).  "Questions indicate a defendant's 'lack of definitive knowledge about the issue,'" *id.*, and that is precisely what the Defendants' report indicated—a lack of definitive knowledge about whether MiMedx was a target.  As in *Abbas,* such a report cannot constitute a false statement of fact sufficient to support a defamation claim.

It is equally clear, if not more so, that Plaintiff's arguments do not support a claim of actual malice—knowledge of the falsity or probable falsity of the alleged implication that MiMedx was the target of an investigation.  *First,* the argument that some former employees who accused MiMedx of misconduct were arguably biased has nothing to do with whether the Defendants knowingly and falsely implied that MiMedx was the target of an investigation.  Nor does the argument that Defendants did not conduct "[a]reasonable investigation into the former employees' claims."  Opp. 22.  There is no claim that further investigation would have revealed that MiMedx

---

[7] *See also Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1064 (9th Cir. 1998) (holding that because "there is no actual malice where journalists unknowingly mislead the public," a plaintiff alleging defamation by implication must therefore plead and prove the defendant's "subjective or actual intent" to communicate the defamatory implication).

was *not* the target.  And in any case, actual malice "is not measured by whether a reasonably prudent man . . . would have investigated before publishing."  *St. Amant*, 390 U.S. at 731.

*Second*, the fact that MiMedx denied the channel stuffing allegations and told Defendants *off the record that* it was not the target of the investigation does not create a genuine issue of actual malice.  As already noted, mere denials are "so commonplace" that they cannot create a triable issue of actual malice.  *Harte-Hanks*, 491 U.S. 657, 691 n.37 (1989) (quoting *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 (2d Cir. 1977)).  That is particular true of a denial that the company is not willing to put on the record.  And insofar as the underlying allegations are concerned, the September 7 article explicitly acknowledged, as did the August 21 article, that Plaintiff "denies the allegations" against it.  Compl. Ex. C.

*Third*, as discussed above, there is nothing about any alleged financial motive on Defendants' part that could establish that Defendants knowingly falsified their straightforward report on September 7 about the VA investigation.

## C.  MiMedx Has Not Alleged Compensable Damages.

Plaintiff argues that because accusations of wrongful accounting practices are defamatory *per se,* it need not prove special damages.  That argument misses the point.  The point here is not that accusations of wrongful accounting practices would not generally fall under the category of defamation *per se.*  It is that, regardless of whether an *individual* can recover without proof of economic loss for certain kinds of false statements, a *corporation* can never recover for anything other than economic losses.  Because corporations are not natural persons with "essential dignity and worth," but legal entities created to make a profit, they may not recover damages for general loss of reputations or hurt feelings, but only for "lost profits."  *Art-Metal-USA, Inc. v. United States*, 753 F.2d 1151, 1156 (D.C. Cir. 1985); *Am. Petrol. Inst. v. Technomedia Int'l Inc.*, 699 F.

Supp. 2d 258, 267 n.7 (D.D.C. 2010) (same); *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947, 955 (D.D.C. 1976) (same); *see also CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995) ("[H]istorically, damages to corporate reputation may be proven only by loss of profits caused by the defamation.").

Plaintiff offers no rebuttal to the case law establishing that a corporation may only recover for economic loss.  Instead, it argues that a corporation may recover not only for lost profits (not alleged here), but also for any alleged decline in its stock price.  That argument makes no sense, however, because it is the shareholders, not the corporation, who suffer from a decline in stock price.  And unlike lost profits, a dip in stock price is reversible: if the price of a stock drops because of an unproven allegation, it can equally recover based on an effective response.  And that, of course, is how the free market of ideas and stock trading is supposed to work.  As a result, the sound principle—consistent with the numerous statements that a corporation is limited in its recovery to lost profits—is that a decline in stock price is not recoverable as damages to the corporation in a defamation case.  *See Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, No. 00-CV-98-K, 2001 WL 670927, at *3-4 (D. Utah Mar. 26, 2001), *aff'd*, 312 F.3d 1292 (10th Cir. 2002) (dismissing libel complaint because the plaintiff's allegation that a publication had caused "lost market capitalization of more than $100 million" did not constitute "special damages . . . [of] the type recoverable" in defamation); *see also Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 540 (E.D. Pa. 1999) (holding that evidence of stock price changes did "not provide the kind of direct evidence required on summary judgment to raise an issue of material fact on the issue of special damage[s]").

In *Ampex Corp. v. Bettini*, No. A097630, 2003 WL 1558183, at *10 (Cal. Ct. App. Mar. 26, 2003), upon which Plaintiff relies, the court concluded on a special motion to strike under

California's Anti-SLAPP Statute that a decline in stock price was sufficient to establish "actual damages."  But the court did not address the point that it would be the shareholders, rather than the corporation itself, that would suffer from a decline in stock price.  The other case cited by the Plaintiff, *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102 (Del. Ch. 2017), does not support its position.  The only request for relief in that case was for an injunction against future defamatory publications.  The Chancery Court held that such a request did not support the exercise of equitable jurisdiction, relying largely on the rule that "equity has no jurisdiction to enjoin a libel."  *Id.* at 115.  The Chancery Court did *not* hold that the plaintiff could recover for "the decline in its market capitalization," but instead "set[ ] aside whether that was an appropriate quantum of relief" in any claim for damages the plaintiff might choose to bring.  *Id.* at 114.

In sum, the sound rule in a case such as this is the one articulated repeatedly by this Court and the D.C. Circuit—that a corporation "may only recover damages in the form of lost profits." *Art-Metal-USA, Inc. v. United States*, 753 F.2d at 1156; *see also* cases cited *supra* 16-17.  The way to remedy any decline in stock price that Plaintiff believes is attributable to allegations of channel stuffing is for Plaintiff to rebut those charges in the investment community.  The marketplace is better equipped to sort out the effect of charges and countercharges on stock price than a court of law.  And even if one doubts these propositions, the fact remains that the corporation's treasury is not depleted—even on a temporary basis—when its stock price declines.  And it would be a windfall to the corporation to allow it to recover any temporary decline in value that its shareholders might be thought to have suffered as a result of disputes that the company is publicly contesting and on which the company might ultimately prevail.

## II.  THE COMPLAINT FAILS TO STATE A CLAIM FOR FALSE LIGHT INVASION OF PRIVACY

Plaintiff's false light claim fails for at least three reasons:

1.      Plaintiff has not plausibly alleged either falsity or actual malice.[8]  Mem. 32-33. Without both it cannot recover for false light any more than it can for defamation.  *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013).

2.      The Restatement (Second) of Torts and the overwhelming weight of authority from other states agree that a corporation has no cause of action for false light invasion of privacy. Mem. 29-31.  Although Georgia courts have not addressed this specific question, they follow the Restatement, and the Supreme Court of Georgia has noted that a corporation has no "personal right to privacy."  *Bd. of Regents of Univ. Sys. of Ga. v. Atlanta J.*, 378 S.E.2d 305, 308 (Ga. 1989).

3.      As the Georgia courts have held, no plaintiff, natural or corporate, can state a false light claim arising from statements about its business or public life, because "engag[ing] in any pursuit or occupation or calling which calls for the approval or patronage of the public" is not a private matter.  *Jaillett*, 520 S.E.2d at 727 (internal quotation marks and citation omitted).  Plaintiff notes that this principle originated in a case involving a person who sought public office.  Opp. 30 (citing *Pavesich v. New Eng. Life Ins.*, 50 S.E. 68, 72 (Ga. 1905)).  But in 1999 a Georgia appellate court applied the principle in a case like this one pertaining to a plaintiff's business conduct. *Jaillett*, 520 S.E.2d at 727.  That principle applies here too, and Plaintiff's false light claim cannot survive it.  Plaintiff says half-heartedly that "it is far from clear" that it has placed its business practices "in the public eye."  Opp. 30.  But as a publicly traded corporation, it clearly has.

---

[8] The Complaint, fairly read, only pleads a claim for false light invasion of privacy based on the September 7 report's "misleading" characterization of the VA OIG's FOIA response.  *See* Compl. ¶¶ 29-30, 53-54.  But even if the Complaint also pleaded a claim for false light arising from the August 21 publications, it would fail for all of the same reasons.

19

### III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE

Plaintiff's tortious interference claim fails for the same reasons as its defamation claims, and for other reasons as well.

1.      As Defendants argued in their opening brief, Plaintiff cannot maintain a claim for tortious interference based on the August 21 and September 7 publications, because there is no proper allegation of substantial falsity or actual malice.  Mem. 34.  *See also Farah*, 736 F.3d at 540 ("Because [the plaintiff's] defamation claim fails, so do their other tort claims based upon the same allegedly defamatory speech.").

2.      Plaintiff's opposition does not argue that the Capitol Forum disrupted any relationship other than its relationship with its stockholders.  Opp. 32-33.  As Defendants have argued, however, a relationship between a corporation and its shareholders is not one that is embraced by the tort of tortious interference with business relations.  A corporation does not do business with its shareholders; the corporation does business with others on the shareholders' behalf.  Nor are a corporation's owners "third part[ies]," as Georgia law requires.  *Renden, Inc. v. Liberty Real Estate L.P. III*, 444 S.E.2d 814, 817 (Ga. Ct. App. 1994).  MiMedx has not "lost" any shareholders as a result of Defendants' action; any sales of its shares were matched by corresponding purchases.  And in the same vein, MiMedx did not incur "financial loss" from those sales, because it does not profit or lose from trades among its shareholders.  *Jenkins v. Gen. Hosps. of Humana, Inc.*, 395 S.E.2d 396, 398 (Ga. Ct. App. 1990).

Instead of responding on the merits to these arguments, Plaintiff simply lists a series of cases recognizing a claim for tortious interference in totally different circumstances.  If anything, the cases Plaintiff cites illustrate the deficiencies in its own allegations by showing the kind of situations in which tortious interference claims *can* arise from interference with shareholders.  For

20

example, in two cases that Plaintiff cites, a shareholder sued, claiming that a third party had interfered with his rights as a shareholder or his ability to sell shares free from interference. *See Robins Fed. Credit Union v. Brand*, 507 S.E.2d 185, 186 (Ga. Ct. App. 1998) (shareholders alleged that the defendants had interfered with their rights as shareholders in the entity); *Lasker v. UBS Sec. LLC*, 614 F. Supp. 2d 345, 360 (E.D.N.Y. 2008) (shareholder alleged that an underwriter's failure to finance a merger deprived him of the premium he would have earned for his shares had the merger closed).[9]  In others, the plaintiff argued that the defendant had prevented it from seeking or closing business relationships with sources of financing. *See Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 352 (S.D.N.Y. 2013); *Advanced Marine Techs., Inc. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 385 (S.D.N.Y. 1998); *Rebecca Broadway Ltd. P'ship v. Hotton*, 37 N.Y.S.3d 72, 77 (App. Div. 1st Dep't 2016).  And in *Weil v. Express Container Corp.*, 824 A.2d 174, 183 (N.J. App. Div. 2003), the court did not "implicitly recognize[e]" that one investor could be liable to another, Opp. 32; to the contrary, it dismissed the tortious interference claim brought by one shareholder against another because both were "part[ies] to the corporate relationship" and so neither was a third party.  In none of these cases did a corporation claim that a defamatory statement interfered with its relationship with its shareholders.

       3.     Even assuming that a shareholder relationship could be the basis for a tortious interference claim, Plaintiff has not identified any specific relationship with which the Defendants have allegedly interfered.  Plaintiff argues that it would be unfair to require it to identify any specific shareholders, but that is simply not the law.  Defendants do not argue that Plaintiff should have to identify *every* relationship at issue.  But the law does require tortious interference plaintiffs

---

[9] *See also Brand v. Robins Fed. Credit Union*, 969 F. Supp. 778, 779 (M.D. Ga. 1997) ("illegally interfered with *their* rights as shareholders" (emphasis added)).

to identify *some* disrupted relationships.  *Jenkins v. Gen. Hosps. of Humana, Inc.*, 395 S.E.2d 396, 398 (Ga. Ct. App. 1990); *Econ. Res. Servs., Inc. v. Res. Econ., LLC*, 208 F. Supp. 3d 219, 229 (D.D.C. 2016).  Otherwise, angry plaintiffs could gin up a tortious interference claim whenever someone said or did something they disliked, whether or not it actually hurt their business.

The single case Plaintiff cites to support its position did not involve a claim for tortious interference with business relations at all.  Opp. 33 (citing *Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150 (S.D.N.Y. 1983)).  In *Charles Atlas*, the court identified an alternative way for the plaintiff *in a product disparagement case* to prove *lost profits* when it was "virtually impossible" to identify any potential customers who never placed orders.  *Id.* at 156.  But this is neither a product disparagement case nor a case of lost profits.  The thrust of a claim of tortious interference is not simply that business suffered, but that the Defendants intentionally interfered with known business relationships.  That requires that some such relationships be identified.  *See Hayes v. Irwin*, 541 F. Supp. 397, 429 (N.D. Ga. 1982) ("Interference with business relations, like interference with contractual relations, is an intentional tort.  Since intentional interference is a prerequisite, it presupposes knowledge of the plaintiff's interest . . .").

IV.   **THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF THE LANHAM ACT**

Plaintiff has made clear it seeks to use the Lanham Act exactly as it cannot be used—as a federal commercial defamation statute.  The Lanham Act does not create a duplicative cause of action for defamation, nor does it circumvent the constitutional limitations on defamation claims.

A.  **Defendants' Publications Are Not Commercial Speech.**

The Lanham Act applies only to commercial speech.  *See Farah*, 736 F.3d at 541.  Plaintiff does not argue otherwise.  Opp. 35-37.  And where, as here, a defamation plaintiff seeks to hold a publisher liable in tort for advertising its own otherwise protected speech, the advertisement is no

more commercial speech for these purposes than the underlying speech it promotes.[10]  *Lane v. Random House, Inc.*, 985 F. Supp. 141, 152 (D.D.C. 1995); *Nat'l Life Ins. Co. v. Phillips Pub., Inc.*, 793 F. Supp. 627, 644-48 (D. Md. 1992).  MiMedx's complaint "is over the fact that the statements were made," not that "they happen[ed] to appear" in an email seeking to promote the Capitol Forum as a publication.  *Nat'l Life Ins.*, 793 F. Supp. at 644.  To find otherwise "would yield a result that commentators on national issues could enjoy the uninhibited, robust debate guaranteed by *New York Times* and *Gertz* only so long as their statements did not happen to be reprinted in advertisements for their books, articles and television programs."  *Id.* at 644-45.

Plaintiff never even acknowledges the foregoing principles.  Instead, it simply recites the elements of the test the Supreme Court outlined in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983).  But while the Court in *Bolger* found that the advertisements at issue qualified as commercial speech, the Court recognized at the same time that a different result would follow "in a case where the [publication] advertise[d] an activity itself protected by the First Amendment." *Id.* at 67 n.14.  Nor does Plaintiff ever acknowledge that almost all the cases holding that communications qualified as commercial speech—including *Bolger* itself—dealt with the scope of governmental regulation of commercial activity, not the standard of liability in a private defamation suit.  *See Charles v. City of Los Angeles*, 697 F.3d 1146, 1155-56 (9th Cir. 2012) (commercial motive may be relevant for government regulation but not for imposing tort liability).

Plaintiff's only attempt to engage with Defendants' argument comes in a footnote, where it notes that Defendants, like the defendant in *Bolger,* argued that the publications at issue

---

[10] Similar reasoning guides courts to deny commercial appropriation liability when plaintiffs seek to sue based on a promotional sample of a publication on a matter of public interest, when the underlying publication would be protected against such liability.  *See, e.g.*, *Groden v. Random House, Inc.*, 61 F.3d 1045, 1049 (2d Cir. 1995) (listing cases); *see also* Restatement (Third) of Unfair Competition § 47 cmt. a (1995)

"concerned 'allegations of misconduct by a publicly traded corporation and government contractor.'" Opp. 37 n.9. But Plaintiff misses the point. That point was made to underscore that the Capitol Forum's newsletter reports themselves were fully protected by *New York Times.* The emails promoting the newsletter are not commercial speech and are not subject to the Lanham Act, because those emails "relate[] to a speech product that is itself protected." *Lane*, 985 F. Supp. at 152; Def. Mem. 22-26; *Bolger,* 463 U.S. at 67 n.14 (recognizing that *Bolger*'s holding would not apply to speech "advertis[ing] an activity itself protected by the First Amendment").

### B.  Plaintiff's Claim Does Not Fall In the Lanham Act's Zone of Interests.

As the Supreme Court made clear in *Lexmark*, there are boundaries to the zone of interests Congress intended the Lanham Act to protect. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1389 (2014). The interest Plaintiff seeks to defend here does not fall within those boundaries, because it is "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." *Id. First*, the Capitol Forum published reports about a non-competitor on a matter of public interest that were not even allegedly circulated to MiMedx's customers. *Second*, MiMedx has never alleged that the Capitol Forum made false statements about "the nature, characteristics, qualities, or geographic origin of [its] goods, services, or commercial activities," as the text of the Act requires. 15 U.S.C. § 1125(a)(1)(B). The reports were not about "the nature, characteristics [or] qualities" of any of those things.

Contrary to Plaintiff's characterization, Defendants have not argued that the Lanham Act only protects the interests of "direct competitor[s]." Opp. 34; *see* Def. Mem. 37-39. Instead, Defendants pointed out that if the zone of interests the Lanham Act protects extended so far as to cover Plaintiff's claim here, then there would be no distinction whatsoever between a Lanham Act

claim and a garden-variety defamation suit.  And the legislative history makes unambiguously clear that the Lanham Act does "not provide a kind of commercial defamation action."  *See* 134 Cong. Rec. H10,419-21 (daily ed. Oct. 19, 1988) (statement of Rep. Kastenmeier).

Plaintiff ignores the legislative history entirely and attempts to evade the clear limits on the Lanham Act's scope by relying on a case from the District of Maryland—*First Mariner Bank v. Resolution Law Grp., P.C.*, No. CIV. MJG-12-1133, 2014 WL 1652550 (D. Md. Apr. 22, 2014)). But *First Mariner* is different in at least two important ways.  *First*, the defendant in *First Mariner* apparently did not even contest that its mailers constituted commercial speech.  And *second*, the plaintiff in *First Mariner* alleged that the mailers deceived the plaintiff's *customers* into believing that the services plaintiff sold were fraudulent.  *Id.* at *21.  Here, Plaintiff does not allege that the Defendants contacted its customers at all, let alone deceived or confused them; nor has Plaintiff argued that the Defendants actually disrupted its customer relationships.  *See supra* 20-22.

For essentially the same reasons, MiMedx has not alleged that its "position in the marketplace has been damaged" by the publications for which it seeks to recover.  *Lexmark*, 134 S.Ct. at 1393.  It has not alleged that the Capitol Forum's publications were distributed to its customers, that its sales have declined, or that its relationships with customers have been disrupted in any way.  Instead, MiMedx alleges only an injury to the price of its stock.  But, just as MiMedx's relationship with its stockholders is not one recognized under a tortious interference claim, damage to its stock price is not an injury to its "*commercial interest* in reputation or sales" and is not the kind of injury against which the Lanham Act was intended to protect.  *Id.* at 1390.

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' initial Memorandum, the Complaint should be dismissed.

Respectfully submitted,

By: /s/ Kevin T. Baine

WILLIAMS & CONNOLLY LLP
Kevin T. Baine
Stephen J. Fuzesi
Connor S. Sullivan

725 Twelfth Street NW
Washington, DC 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
kbaine@wc.com

December 20, 2017

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, I caused Defendants' Reply in Support of their Motion to Dismiss to be filed and served electronically via the Court's ECF System upon counsel of record. I further certify that all parties required to be served have been served.


Dated:  December 20, 2017                    By: _/s/ Kevin T. Baine
                                             Kevin T. Baine